**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**JOHN DOE,**

**Plaintiff,** **Civil Action No.: 8:18-cv-2941**

**v.**

**UNITED THERAPEUTICS., et al.**

**Defendants.**

---

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

---

Plaintiff John Doe., by and through his counsel Emejuru Law LLC, KNA Pearl, LLC, and the Chinwah Firm LLC, and responds to Defendants, United Therapeutics Inc., (hereinafter "UT"), Martine Rothblatt, Jenesis Rothblatt, Shola Oyewole and Robert Day (hereinafter "Individual Defendants") Motion to Dismiss and respectfully avers as follows:

## INTRODUCTION

This is not your typical sexual harassment case. Plaintiff is a young male tech professional who was fired from United Therapeutics (UT) simply because he rejected the sexual advances of Jenesis Rothblatt—his supervisor and the daughter of Martine Rothblatt, UT's Chief Executive Officer. Jenesis pressured Plaintiff for sex repeatedly. Plaintiff refused each time. This made Jenesis angry—so much so that she engineered the termination of his employment. UT then coerced Plaintiff sign a separation agreement—which contains a waiver of claims—by threatening his physical safety and promising to drown him in legal fees.

In moving for dismissal under Rule 12(b)(1) and 12(b)(6), Defendants have avoided challenging Plaintiff's claims on the merits. That's because Defendants cannot deny the legitimacy of his claims or the gravity of the harm they have caused him. Still, their Motion to Dismiss fails and

should be denied for three main reasons.[1]

First, Defendants cannot carry their burden of showing that the Release in the Separation Agreement is valid. Plaintiff has established that he signed the Separation Agreement under duress in the form of an improper threat. All told, the record is too sparse for the totality-of-the-circumstances analysis required to determine whether the Release is valid, because discovery has not occurred. Plaintiff's lawsuit is not barred under the Separation Agreement.

Second, Plaintiff's negligent supervision claims (Counts 4 and 12) are legally sufficient because they arise from facts other than those that support Plaintiff's Title VII and FEPA claims.

Finally, Defendant cannot carry its burden of showing that the FEPA claims against Jenesis Rothblatt, Shola Oyewole, Robert Daye, and Martine Rothblatt (Counts 8 through 11) were not administratively exhausted. By raising allegations—without providing any evidentiary support—that contradict Plaintiff's allegations about administrative exhaustion, Defendants invite this Court to take their factual allegations as true and draw all reasonable inferences from the allegations their favor. Under Rule 12(b)(6), however, that is impermissible.

For all these reasons, this Court should deny Defendants' Motion and allow the parties to proceed to discovery on all of Plaintiff's remaining claims.

## FACTUAL BACKGROUND

*UT Officials, including CEO Martine Rothblatt, Recognize Plaintiff's Excellent Job Performance*

Plaintiff was hired by UT on May 6, 2013 and worked in the Information Technology Department. Compl. ¶ 11-14. After working as a Lead Senior Systems Administrator, Plaintiff was

[1] Plaintiff withdraws Count 5 (Hostile Work Environment Based on Sex in violation of Title VII and FEPA, against Jenesis Rothblatt individually); Count 6 (Quid Pro Quo Sexual Harassment in violation of Title VII and FEPA, against Jenesis Rothblatt individually); and Count 7 (Sex Discrimination in violation of Title VII and FEPA, against Jenesis Rothblatt individually). Although Plaintiff does not concede Defendants' arguments to dismiss these Counts, Plaintiff has decided not pursue them further.

promoted to Systems Engineer II in March 2015 and continued in the same role until January 2017. Compl. *Id.*. Plaintiff also worked as a Digital Archivist/Wikipedia Editor from August 2016 until his termination in January 2017. *Id.* At UT Plaintiff was well recognized for his excellent performance and accomplishments. *Id.* In 2014, Plaintiff became the first person in the Information Technology Department to receive the "UT Key Contributor Award." CEO Martine Rothblatt held Plaintiff in high regard. *Id.* She called Plaintiff one of her top employees at UT. *Id.*

*Jenesis Rothblatt Pressures Plaintiff to Have Sex With Her But Plaintiff Refuses*

The sexual harassment that Plaintiff experienced at UT started and ended with Jenesis Rothblatt. In February 2015, during a company trip to Las Vegas, Nevada, Jenesis followed Plaintiff into his hotel room and made sexual advances towards him. Compl. ¶¶15-19. She went as far as climbing into Plaintiff's bed—without his consent—and lying beside him. *Id.*

Jenesis also showed up unannounced at Plaintiff's home. At the time Plaintiff lived directly across the street from UT's building. Compl. ¶ 20. Soon after entering Plaintiff's apartment that day, Jenesis removed her clothes. Compl. ¶¶ 21-22. After once more refusing her sexual advances, Plaintiff urged Jenesis to put her clothes back on and explained that he did not want to be sexually involved with her. Compl. ¶¶ 23-29. The next morning Plaintiff woke up to a series of angry text messages from Jenesis. *Id.*

Eventually, several members of UT management forced Plaintiff to work closely with Jenesis. Jenesis, Robert Daye, Martine Rothblatt, and Human Resources Head Director Alyssa Friedrich forced Plaintiff into a newly created "Digital Archivist" position. Compl ¶¶ 30-54. Plaintiff did not want to take the position because it was unrelated to his formal training and skill set; however, he was pressured by UT management to take it. *Id.* As a result of this change, Jenesis became Plaintiff's direct supervisor—Plaintiff had to report directly to her. *Id.* Jenesis continued to

make unwelcome sexual advances towards Plaintiff. *Id.* Even worse, she controlled Plaintiff's position to the point where he was required to do personal tasks for her. *Id.*

Jenesis insisted on preying upon Plaintiff even on company trips. Compl. ¶¶ 55-66. During a company trip to New York in November 2016, Daye and Jenesis forced Plaintiff to attend a conference with Jenesis and book a room in the same hotel where she was staying. *Id.* Plaintiff refused a one on one meeting with Jenesis in her hotel room during the trip, where she made more sexual advances towards him. *Id.*

After the trip, Jenesis requested to go to Plaintiff's home to have sex with him. *Id.* He again refused to have sex with Jenesis, and in January 2017, Plaintiff was terminated. *Id.* The individual defendants played a substantial role in aiding and abetting the unlawful sexual harassment of Plaintiff as well as the unlawful termination of his employment. *Id.*

*Plaintiff Signs Separation Agreement Under Duress*

On the same of Plaintiff's termination, UT management asked Plaintiff to sign a separation agreement containing a waiver of legal claims against UT. After receiving the separation agreement, Plaintiff was threatened repeatedly by UT Senior officials to sign the separation agreement. Plaintiff alleges that Defendants subjected him to the following intimidation and threats:

1. UT terminated Plaintiff's employment on January 4, 2017. Compl. ¶ 66.
2. On that same day, UT's Human Resources Alyssa provided him with a separation agreement. Compl. ¶ 67.[2]
3. Oyewole paid Plaintiff a home visit in January 2017 and pressured him to sign the separation agreement. Oyewole said, "You don't know how dangerous these people can be. By the time they are done with you, you won't be able to find work in Maryland

[2] Plaintiff did not attach the separation agreement referenced in the complaint.

again." Oyewole also warned Plaintiff to "leave his apartment" if he didn't sign the agreement[3] because "[t]he Rothblatts are very dangerous." Compl. ¶ 69.

4. Around the same time Timothy Atolagbe, another UT employee, warned Plaintiff to "[l]eave his apartment" and move away from Silver Spring, Maryland in order to avoid physical harm. Compl. ¶ 70.

5. On January 21, 2017, Oyewole again urged Plaintiff to sign the separation agreement. Oyewole insisted that Plaintiff and Plaintiff's brother join him for dinner. At dinner, Oyewole repeated the warning: "By the time they are done with you, you won't even be able to find another job in Maryland. You will drown in legal fees. These people are very powerful and dangerous." Compl. ¶ 71.

6. The multiple warnings about the Rothblatts being powerful and dangerous made Plaintiff fear for his safety. Plaintiff became was so overwhelmed with fear for his life that he executed the separation agreement on January. Compl. ¶ 72.

7. At least two other male UT employees have been fired for rejecting Jenesis's sexual advances. Compl. ¶ 64.

8. According to the separation agreement attached by Defendant, Plaintiff signed the agreement on January 25, 2017.[4] (Defs' Mot., Ex. A, Separation Agreement).

## LEGAL STANDARD

Plaintiff does not need to scale a high hurdle to avoid dismissal. Rule 8(a)(2) requires only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds

[3] Plaintiff's Complaint also spells out the proximity of Plaintiff's apartment to UT. Compl. ¶ 20. He also alleged that Jenesis stopped by his apartment "unannounced" and the other UT officials also knew his whereabouts *Id. See also* Compl. ¶¶ 69-70.

[4] Plaintiff does not waive any objections made below.

upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). Although Defendants seek dismissal under Rules 12(b)(1) and 12(b)(6), their Motion must be analyzed under the legal sufficiency standard of Rule 12(b)(6) alone, because Defendants base its request for dismissal solely on the allegations in Plaintiff's Complaint. *See Allen v. Discovery Commc'ns, LLC*, No. 15-1817, slip op. at 3 (D. Md. Sep. 28, 2016) (noting that when a party moves for 12(b)(1) dismissal based solely on a complaint's allegations, the court treats the motion as one filed under Rule 12(b)(6)). As a result, Plaintiff is entitled to "the same procedural protection as he would receive under a 12(b)(6) consideration": all of his allegations must be taken as true and he must be given every favorable inference that can be drawn from his allegations. *See id.* (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)).

So long as a complaint contains "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of a defendant's misconduct," a court should not dismiss it under Rule 12(b)(6). *Twombly*, 550 U.S. at 556. Rule 12(b)(6) does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). Thus, if Plaintiff's factual allegations raise the reasonable expectation that discovery will reveal evidence of Defendants' misconduct, this Court should deny Defendants' Motion even if the Court decides "that actual proof of those facts is improbable and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.

Similarly, so long as the Complaint "alleges sufficient facts to invoke subject matter jurisdiction," the Court should not dismiss it under Rule 12(b)(1). *Kerns v. United States,* 585 F.3d 187, 192 (4th Cir. 2009).

Defendants, on the other hand, have a heavy burden. Because they have raised affirmative defenses, they are not entitled to dismissal unless they carry the burden of persuasion on each defense. *See Alexander v. UIP Prop. Mgmt.*, No. 14-2469-DKC, slip op. at 5 (D. Md. Mar. 30, 2015).

"While affirmative defenses may be reached by a motion to dismiss filed under Rule 12(b)(6), such a motion should be granted only in the rare circumstances where facts sufficient to rule on an affirmative defense clearly appear on the face of the complaint." *Id.* (citing *Goodman v. PraxAir, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc)). In addition, the "movant must show that the plaintiff's potential rejoinder to the affirmative defense was foreclosed by the allegations in the complaint." *Id.* (quoting *Goodman v. PraxAir, Inc.*, 494 F.3d 458, 466 (4th Cir. 2007) (en banc)). Defendants cannot carry their burden.

## ARGUMENT

### I. The Court should not consider Defendants' Exhibit A, the Separation Agreement, because Defendants have failed to authenticate it.

Plaintiff objects to authenticity of Defendants' Exhibit A, which purports to be a Separation Agreement. Defendants have not authenticated the document in accordance with the Federal Rules of Evidence 901. While the separation agreement was referenced in the Plaintiff's complaint, Defendants cannot rely upon a document that has not been authenticated; as a result, the document is inadmissible or cannot be used for the purpose of its motion. Therefore, all statements made concerning Defendants Exhibit A are hearsay. Notwithstanding the objection, the following discussion makes clear why this Court should deny Defendants' Motion and allow Plaintiff a fair opportunity to conduct discovery on his well-pleaded claims.

### II. The Court should deny Defendants' Motion because Plaintiff has alleged and shown that he signed the Agreement under duress.

Because the Complaint establishes that Plaintiff did not knowingly and voluntarily waive his claims against UT, this Court should conclude that the Separation Agreement does not bar Plaintiff's lawsuit. An employee can waive his employment discrimination claims against his employer only if the waiver is knowing and voluntary. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 n.15; *Cook v. Sci. Md. Funeral Servs., Inc.*, No. 14-3770-WDQ, slip op. at 9 (D. Md. Jul. 28, 2015).

To determine whether a release of claims is valid, a court reviews the totality of the circumstances surrounding its execution. *Id.* at 9. The factors to be considered are (1) Plaintiff's education and business experience; (2) the respective roles of Defendant and Plaintiff in determining the terms and conditions of the Release; (3) the clarity of the Release; (4) the time Plaintiff had to study the Release; (5) whether Plaintiff had the advice of counsel; (6) whether the employer encouraged the employee to seek the advice of counsel and whether the employee had sufficient time to do so; and (7) the waiver's consideration. *Id.* at 9-10. The list of factors is non-exhaustive, and no single factor is determinative. *Id.* Thus, if an employee signs a separation agreement including a release of claims while under duress, the release is invalid and the employee can pursue those claims in court. *Id.* at 9.

i. Defendants coerced Plaintiff to sign the Separation Agreement by repeatedly subjecting him to improper threats.

Duress is "a wrongful act which deprives an individual of the exercise of his free will." *Randolph v. Caruso Homes Inc.*, 2014 U.S. Dist. LEXIS 12981 (D. Md. 2014) (citing *Eckstein v. Eckstein*, 379 A.2d 757, 761 (Md. Ct. Spec. App. 1978)). Any wrongful acts that compel a person to manifest apparent assent to a transaction without his volition, or cause such fear as to preclude him from exercising free will and judgment in entering into a transaction, constitute duress. *Id.* As a result, any agreement, contract, or deed obtained by oppressing a person by threats regarding the safety or liberty of himself, or his property, or a member of his family so as to deprive him of the free exercise of his will and prevent the mutuality of assent required for a valid contract may be avoided on the ground of duress. *Id.* The acts or threats which constitute duress do not have to be unlawful in order to affect the validity of the agreement. Acts that are wrongful in a moral sense, though not criminal or tortious or in violation of contractual duty, may also constitute duress. *Id.*

The wrongful act may take the form of an "improper threat which leaves the victim with no reasonable alternative other than to execute the agreement." *Employers Ins. Of Wausau v. Bond*, 1991

U.S. Dist. LEXIS 951, *2 (D. Md. 1991). Contracts formed in this manner are voidable when the opposing party to the transaction caused, or was privy to, the victim's duress. *Id.* at (citing Restatement (Second) of Contracts § 175). This form of duress often arises in employment contracts. *See Cook*, 14-3770-WDQ, slip op. at 11-12 (denying defendant's motion to dismiss on the ground that plaintiff's release was invalid because plaintiff alleged that defendant rushed him to sign the contract, told him that he did not need a lawyer, and threatened to take the deal off the table if plaintiff did not execute the sign the agreement the same day); s*ee also Gottex Indus. v. Menczel*, 1995 U.S. Dist. LEXIS 9642, at * 7-8 (S.D.N.Y. Jul. 12, 1995) (concluding that plaintiff subjected defendant to duress, thereby invalidating defendant's promissory note for $100,000, because plaintiff threatened defendant with criminal prosecution if defendant did not sign the note).

Here, contrary to Defendants' assertion, the Complaint's allegations make clear that Defendants subjected Plaintiff to duress by threatening his safety and promising to drown him in legal fees. The following allegations plausibly show the coercion and the improper threat of physical harm that deprived Plaintiff of his exercise of free will:

1. After receiving the separation agreement, Chief Information Officer ("CIO") Oyewole called Plaintiff number times and eventually paid him a home visit in January 2017. Oyewole told Plaintiff to sign the separation agreement saying, "you don't know how dangerous these people can be. By the time they are done with you, you won't be able to find work in Maryland again. The Rothblatts are very dangerous." Oyewole also advised Plaintiff to "leave his apartment" if he didn't sign the agreement. UT employee, Timothy Atolagbe, once again advised Plaintiff to Plaintiff to "leave his apartment." On January 21, 2017, Oyewole once again urged Plaintiff to sign the separation agreement. During a dinner conversation, Oyewole stated: "By the time they are done with you, won't even be able to find another job in Maryland. You will drown in legal fees. These people are very powerful and dangerous." Doe was overwhelmed with fear and felt threatened for his life. He had no choice but to sign the agreement. Compl. ¶68-72.

Plaintiff has sufficiently shown that UT, through its CIO Oyewole and employee Atolagbe, coerced him into signing the separation agreement by threatening his physical safety. To begin with, Oyewole and Atolagbe warned Plaintiff to leave his apartment, located directly across the street from UT, if he didn't sign the agreement. These statements made directly to Plaintiff constituted as

an immediate threat to his safety or liberty of himself, or his property. *See Eckstein*, 38 Md. App. 506, 379 A.2d 757, 761 (Md. Ct. Spec. App. 1978). Under *Eckstein*, although the statement that the "Rothblatts are very dangerous" may not be unlawful, that statement qualifies as a threat or act to induce Plaintiff into believing that his safety or liberty and property are at risk. *See id.*

Also, contrary to Defendants' assertion, Oyewole's threat that Plaintiff will "drown in legal fees" is also an improper threat that constitutes duress. Maryland courts have long held that the threat to institute legal proceedings, criminal or civil, which might be justifiable, per se, becomes wrongful, within the meaning of this rule, if made with the corrupt intent to coerce a transaction grossly unfair to the victim and not related to the subject of such proceedings. *Eckstein*, 379 A.2d at 761 (citing *Bell v. Bell*, 38 Md. App. 10 (Md. Ct. Sp. Ap. 1977)). Thus, Oyewole's statement about "drowning in legal fees" was an obvious attempt to tell Plaintiff that Defendants would deliberately seek to cause him severe financial hardship or loss of property if he brought meritorious legal claims against Defendants. *See Eckstein*, 379 A.2d at 76.

Finally, the court should note that the Plaintiff executed the agreement at the last minute. If Plaintiff were to take the attached release agreement as an accurate copy as the one he executed, Def's. Separation Agreement gave Plaintiff only [14 days] from the date of his termination to sign it. Compl. ¶72 Thus, the original deadline was January 18, 2017. However, there was no signed agreement within that time frame. ¶72.

Assuming *arguendo* that the separation date was changed to January 12, 2017, Plaintiff would have had up until January 26, 2017 to sign the agreement. But he still did not sign the agreement until January 25, 2017. (See Def. Ex, A. pg. 7). This last-minute execution was due to mounting pressure from UT and its senior officials. Once again, in between this time frame Oyewole "called Plaintiff numerous times to find out if he planned to seek legal representation." Oyewole and Atolagbe warned Plaintiff that he has to "leave his apartment" if he didn't sign. During the dinner on January

21, 2017, Oyewole warned Plaintiff: "By the time they are done with you, [Plaintiff] won't even be able to find another job in Maryland," and that Plaintiff will "drown in legal fees" because "these people are very powerful and dangerous." Compl. ¶ 68-72.

ii. The Supreme Court has long Rejected an Argument that Employee is Barred from Bringing a Discrimination Lawsuit simply because he was Paid a Severance and did not Return the Tender

Defendants do not specifically raise an argument that the monetary payment to Plaintiff, as a part of the separation agreement, summarily precludes Plaintiff from initiating a lawsuit, despite the execution made under duress. But Defendants, at various times, sound an alarm about the sum of money paid to Plaintiff as a part of a separation agreement. (See Def. Mot. pg. 1, 10, 13). Nevertheless, the fact that Plaintiff did not return or still has the payment does not prevent him from bringing federal discrimination claims.

Assuming *arguendo* that the court considers these circumstances, the issue of whether a discrimination claim is barred by the payment of monies pursuant to an executed release agreement, but not returned back by Plaintiff (e.g. tender back doctrine"), was summarily decided in *Oubre v. Entery Operations,* 522 U.S. 422, 118 S.Ct. 838 (1998). *In Oubre*, the Court considered whether the retention of monies by a Plaintiff amounted to a ratification equivalent to a valid release of her discrimination claim claims. *Id.* The Court rejected the idea. The Supreme Court ruled that an employer could not argue that an employee's failure to tender back money already paid precludes the filing of a subsequent discrimination suit. *Id.*

Recently, the Sixth Circuit applied *Oubre* to claims brought under Title VII and the Equal Pay Act (EPA) in *McClellan v. Midwest Machining, Inc.,* 900 F.3d 297 (6th Cir. 2018). It concluded that the "tender back doctrine" is inapplicable not only to an ADEA claim but also to Title VII and EPA claims. The Sixth Circuit noted that *Oubre* offers guidance for other cases involving federal remedial statutes other than the ADEA and the Older Workers Benefit Protection Act:

> "In many instances a discharged employee likely will have spent the moneys received and will lack the means to tender their return. These realities might tempt employers to risk noncompliance with the OWBPA's waiver provisions, knowing it will be difficult to repay the moneys and relying on ratification. We ought not to open the door to an evasion of the statute by this device."

*Id.* at 305 (citing *Oubre*, 522 U.S. at 427).

The Sixth Circuit found that the Supreme Court was "motivated in part by the remedial goals of an antidiscrimination statute." *Id.* at 305. The Sixth Circuit further pointed out that the statute in *Oubre* (ADEA) and the statute in McClellan (Title VII) have similar substantive features and share one remedial purpose: "the elimination of discrimination in the workplace." *Id.* at 306.

Since *Oubre*, several other circuit and district courts have refused to apply the tender-back doctrine used to claims brought under various federal employment statutes. *See Richardson v. Sugg*, 448 F.3d 1046, 1057 (8th Cir. 2006) (applying *post-Oubre*'s policy considerations to a prospective Title VII waiver and finding "that the doctrines of tender-back and ratification do not bar [Plaintiff's] suit."); *Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770 (3d Cir. 2007)( explained that "ERISA, like the ADEA and the FELA, is a 'federal remedial statute.' It was 'designed to promote the interests of employees. *Rangel v. El Paso Nat. Gas. Co.*, 996 F. Supp. 1093, 1097 (D.N.M. 1998)(rejecting tender back doctrine as argument against filing suit under Title VII)(collecting cases). [5]

### III. Counts IV and XII, Alleging Negligent Supervision and Retention are not based on Harassment, and Cannot be Dismissed

"To establish a cause of action in negligence, a plaintiff must prove [**84] the existence of a duty owed by a defendant to him (or to a class of which he is a part), a breach of that duty, a legally cognizable causal relationship between the breach of duty and the harm suffered, and damages." *Bryant v. Better Business Bureau,* 923 F. Supp. 720 (Md. Dist. 1996) (citing *Cramer v. Housing Opp. Comm'n of Montg. County,* 501 A.2d 35, 39 (1985)). At common law, an employer owed its

[5] Since *Oubre*, the Fourth Circuit has not addressed the question whether the tender back doctrine applies to Title VII claims.

employees, *inter alia,* the following duties: "to provide a safe workplace; . . . to provide a sufficient number of competent fellow employees; and . . . to promulgate and enforce rules governing employee conduct for the purpose of enhancing safety." *Id, citing* Prosser & Keeton on Torts § 80 at 569 (W. Keeton ed. 1984), quoted in *Hastings v. Mechalske,* 336 Md. 663, 677 n.8, 650 A.2d 274, 281 n.8 (1994). *See also Athas v. Hill,* 300 Md. 133, 139, 148, 476 A.2d 710, 713, 718 (1984) (employer owes its employees "duties to provide a safe place to work and to retain competent, nonviolent employees"); *accord Merchants' & Miners' Transp. Co. v. Maryland,* 108 Md. 564, 569, 70 A. 413, 415 (1908) (same); *Wonder v. B & O R.R. Co.,* 32 Md. 411, 417-18 (1870). In part, these duties translated into an employer's duty to its employees [**85] to exercise due care in the hiring, supervision and retention of its employees and agents. *Henley v. Prince George's County,*305 Md. 320, 330-38, 503 A.2d 1333, 1338-43 (1986); *Cramer,* 304 Md. 705, 501 A.2d 35; *Evans v. Morsell,* 284 Md. 160, 395 A.2d 480 (1978); *Norfolk and Western R.R. Co. v. Hoover,* 79 Md. 253, 29 A. 994 (1894);

In order to prove a cause of action for either negligent hiring, supervision or retention, the Plaintiff must establish that her injury was caused by the tortious conduct of a coworker, that the employer knew or should have known by the exercise of diligence and reasonable care that the coworker was capable of inflicting harm of some type, that the employer failed to use proper care in selecting, supervising or retaining that employee, and that the employer's breach of its duty was the proximate cause of the Plaintiff's injuries. *See Evans v. Morsell*, 284 Md. 160, 165, 395 A.2d 480 (1978)] (quoting [*Norfolk and Western R.R. Co. v. Hoover*, 79 Md. 253, 262, 29 A. 994 (1894)]; *see also McCall's Ferry Power Co. v. Price*, 108 Md. 96, 69 A. 832, 834 (1908).

Plaintiff's allegations imply that Defendants failed to use reasonable care in executing its responsibilities with respect to the supervision and retention of Jenesis Rothblatt. Compl. ¶ 86. The allegations show that Martine Rothblatt, Robert Daye, and Alyssa Friedrich knew or should have known about Jenesis's long-standing pattern of sexually harassing male employees. Plaintiff alleges

that Martine Rothblatt, UT's Chief Executive Officer, supervises her daughter Jenesis Rothblatt. Compl. ¶7-9. Plaintiff alleges that Martine knew that her daughter desired Plaintiff. Compl. ¶48. Specifically, Jenesis was asked by Martine, "Jenesis, you're still single. Why don't you date [Plaintiff]." Such a statement suggests that Martine knew or should have known that a supervisor vigorously pursuing a subordinate employee would be a questionable practice in the workplace. *See Bastian v. Laffin,* 54 Md. App. 703, 710, 460 A.2d 623, 627 (1983) (holding that a principal "must use reasonable diligence in selecting . . . and supervising [*751] [its] agent's conduct"); Restatement (Second) of Torts § 317 (1965); Restatement (Second) of Agency § 213 (1958). "If [am employer] Plaintiffs not perform these duties, and injury is occasioned by the negligence of an incompetent or careless servant, the master is responsible to the injured employee . . . for his own negligence in not discharging his own duty towards the injured servant." *Hoover,* 79 Md. at 262, 29 A. at 995.

Plaintiff alleges that he faced pressure to work under Jenesis' supervision and was also required to perform to personal tasks for her outside of his job role and responsibilities. Compl. ¶30-54. Plaintiff further alleged that there are at least "two other male employees that were abruptly terminated because they rejected Jenesis' relentless sexual advances." Drawing all reasonable inferences in Plaintiff's favor under Fed. R. Civ. Pro. 12(b)(6), Defendants' failed to use reasonable diligence in supervising Jenesis, when they knew or should have known that Jenesis created an unsafe working environment and had a pattern of previous harassment against former employees.

Finally, Discovery should be permitted for this claim. Discovery will permit Plaintiff to discover the truth and subpoena the alleged male victims and find out what they may have told UT officials about Jenesis before and/or at the time of termination. The male witnesses may have also reported the conduct to UT prior to termination and such information may be discoverable to prove that Defendants should have terminated Jenesis.

### IV. <u>Defendant has failed to show that Plaintiff did not administratively exhaust his claims against the individually named defendants.</u>

Defendants argue that "Plaintiff's Complaint fails to provide any details regarding his alleged exhaustion efforts. Defendants' argument is without merit. On a Rule 12(b)(1) motion, the plaintiff bears the burden of proving that subject matter jurisdiction exists. *See Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). In considering a motion to dismiss for lack of subject matter jurisdiction, the court "is to regard the pleadings' allegations as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac Ry. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). The Fourth Circuit has held "that receipt of, or at least entitlement to, a right-to-sue letter is a jurisdictional prerequisite that must be alleged in a plaintiff's complaint." *E.g.*, *Davis v. N.C. Dep't of Corr.*, 48 F.3d 134, 140 (4th Cir. 1995).("We have long held that receipt of, or at least entitlement to, a right to-sue letter is a jurisdictional prerequisite that must be alleged in a plaintiff's complaint." See *United Black Firefighters of Norfolk* v. *Hirst*, 604 F.2d 844, 847 (4th Cir. 1979) ("[A] plaintiff in a civil action under Title VII must allege and prove filing of a timely charge of discrimination with the Equal Opportunity Commission together with receipt of, and action on, a statutory notice of his right to sue."); *Perdue* v. *Roy Stone Transfer Corp.*, 690 F.2d 1091, 1093 (4th Cir. 1982) ("It is entitlement to a 'right to sue' notice, rather than its actual issuance or receipt, which is a prerequisite to the jurisdiction of the federal courts under § 2000e-5(f)(1).")

Defendants, without any supporting evidence, state that Plaintiff failed to exhaust his administrative remedies or did not file a charge of discrimination. *See Alexander v. UIP Prop. Mgmt.*, No. 14-2469-DKC, slip op. at 5 (D. Md. Mar. 30, 2015) (citing *Goodman v. PraxAir, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc) ("While affirmative defenses may be reached by a motion to dismiss filed under Rule 12(b)(6), such a motion should be granted only in the rare circumstances where facts sufficient to rule on an affirmative defense clearly appear on the face of the complaint.")). But Plaintiff's allegations are clear in that he "has exhausted his administrative

remedies with the Equal Employment Opportunity Commission and Montgomery County Human Rights Commission." Compl. ¶ 3. Thus, these allegations in his complaint alone establish that Plaintiff has exhausted his administrative remedies. Further, the court may look outside of Plaintiff's pleadings and to the actual Notice of Right to Sue attached and provided to Defendants. (See Def. Mot., Ex. B. pg. 2). *Id at Richmond, Fredericksburg & Potomac Ry.,* 945 F.2d 765, 768 (4th Cir. 1991). The attached Notice of Right to Sue indicates that Plaintiff has met the jurisdictional prerequisite. However, should the court require that Plaintiff state or allege within his complaint that he is in "possession of his right to sue" before he gratuitously provided it Defendants, then Plaintiff reserves the right to amend his complaint to meet the formality of this requirement.

Lastly, as a last resort, Defendants argues that the individual defendants were not put on notice about Plaintiff's discrimination complaint. First, it would be premature to dismiss all individual defendants just because Defendants state that none of them were given ample notice or named in the charge. Notably, Defendants have once again failed to attach a charge of discrimination or evidentiary support to sustain their argument that none. Their lone exhibit, the Notice of Right to Sue, is not a charge of discrimination.

To the contrary, Plaintiff's Notice of Right to Sue specifically names or identifies Defendant Alyssa Friedrich. (*See* Def. Mot., Ex. B. pg. 2). As the "Human Resources" official, Freidrich is presumed to have been given fair notice of the charge and allegations in the complaint. She would be responsible for investigating claims on behalf of the organization. *Davis v. BBR Mgmt.,* LLC, 2011 U.S. Dist. LEXIS 8716 (D. Md. 2011), *citing, Vanguard Justice Soc. Inc. v. Hughes*, 471 F. Supp. 670, 687 (D. Md. 1979) (internal citations omitted). A plaintiff's failure to name a defendant in an EEOC charge Plaintiffs does not bar a subsequent suit if "the purposes of the naming requirement were substantially met," i.e. if (1) all defendants received fair notice, and (2) the EEOC was able to attempt conciliation with the responsible parties. *Id at Vanguard.* Finally, as to Defendant's argument

that Plaintiff took "two years" to initiate suit, Plaintiff is not responsible for handling or processing of the EEOC charge. Therefore, it is not appropriate to dismiss Plaintiff's complaint at this stage.

## CONCLUSION

**For all the reasons, the court should deny the motion to dismiss in its entirety.**

Dated: December 13, 2018 Respectfully Submitted,

By: *<u>/s/Ikechukwu Emejuru</u>*
Ikechukwu "Ike" Emejuru
**Emejuru Law L.L.C.**
8403 Colesville Road
Suite 1100
Silver Spring, MD 20910
Telephone: (240) 638-2786
Facsimile: 1-800-250-7923
iemejuru@emejurulaw.com

*<u>/s/Onyebuchim Chinwah</u>*
Onyebuchim "Onye" Chinwah
**The Chinwah Firm LLC**
8403 Colesville Road
Suite 1100
Silver Spring, MD 20910
Telephone: 240.638.2738
oc@chinwahfirm.com

<u>/s/*Andrew Nyombi*</u>
Andrew Nyombi
**KNA Pearl L.L.C**.
8701 Georgia Avenue
Suite 606
Silver Spring, MD 20910
Telephone: (301) 585-1568
Facsimile: 1-800-250-7923
anyombi@knapearl.com

*ATTORNEYS FOR PLAINTIFF JOHN DOE*