# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

_____

MARK EKE,                                              )
                                                       )
                            Plaintiff,                 )
                                                       )
            v.                                         )
                                                       )
UNITED THERAPEUTICS, *et al.*,                         )          Civil Action No. 8:18-cv-2941
                                                       )
                                                       )
                            Defendants.                )
_____)

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................. 1

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE ............................................ 2

LEGAL STANDARD ........................................................................................... 16

ARGUMENT ...................................................................................................... 17

A.      PLAINTIFF'S CLAIM IS BARRED BY A VALID, UNAMBIGUOUS RELEASE. ....... 17

       1.    Plaintiff's Execution of the Release Was Not Made Under Duress. ...................... 18

           Oyewole Encourages Plaintiff to Negotiate More Favorable Terms During Two Personal Conversations....................................................................... 19

           Oyewole's Alleged Statements Do Not Convey Any Threat To Plaintiff in The Event He Did Not Sign the Agreement ............................................ 21

           Plaintiff's Conduct Confirms That He Had Reasonable Alternatives to Execution ......................................................................................... 24

           Plaintiff's Personal Economic Hardships Do Not Form The Basis for Duress ....... 25

           The Undisputed Evidence Confirms the Absence of Duress ................................. 26

       2.    Plaintiff's Release of His Claims Was Knowing and Voluntary. ........................... 27

CONCLUSION .................................................................................................... 32

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AEL Asia Express (H.K.) Ltd. v. Am. Bankers Ins. Co. of Fla.*,
    5 F. App'x 106 (4th Cir. 2001) ..................................................................19

*Alexander v. UIP Prop. Mgmt., Inc.*,
    No. CV DKC 14-2469, 2016 WL 125605 (D. Md. Jan. 12, 2016)..........................16, 17, 20, 32

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).....................................................................16, 17

*In re Blackstone*,
    557 B.R. 858 (Bankr. D. Md. 2016) ..........................................................18

*Brown v. Estate of McLain*,
    No. 1802 SEPT.TERM 2014, 2016 WL 1385622 (Md. Ct. Spec. App. Apr. 7,
    2016) .........................................................................................21

*Cassiday v. Greenhorne & O'Mara, Inc.*,
    220 F. Supp. 2d 488 (D. Md. 2002), *aff'd*, 63 F. App'x 169 (4th Cir. 2003) ..........19, 20, 27, 30

*Cassiday v. Greenhorne & O'Mara, Inc.*,
    63 F. App'x 169 (4th Cir. 2003) ..............................................................27

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)...........................................................................16

*Cobb v. Potter*,
    No. 1:04-cv-128, 2006 WL 2457812 (W.D.N.C. Aug. 22, 2006) *aff'd*, 233 F.
    App'x 331 (4th Cir. 2007) ...................................................................27, 31

*Eckstein v. Eckstein*,
    38 Md. App. 506, 379 A.2d 757 (Md. Ct. Spec. App. 1978).....................................18

*Employers Ins. of Wasau v. Bond*,
    No. HAR–90–1139, 1991 WL 8431 (D. Md. 1991) ...........................................18, 26

*Haulbrook v. Michelin N. Am., Inc.*,
    252 F.3d 696 (4th Cir. 2001) .................................................................16

*Jarallah v. Thompson*,
    123 F. Supp. 3d 719 (D. Md. 2015), *aff'd*, 627 F. App'x 185 (4th Cir. 2015) ..................32

ii

*Jesus v. Sanofi Aventis Puerto Rico, Inc.*,
   No. CV 15-1803 (BJM), 2017 WL 972100 (D.P.R. Mar. 13, 2017) .........................................19

*Juneau v. Motiva Enterprises LLC*,
   No. CIV.A. 1:06-CV-252, 2007 WL 1577647 (E.D. Tex. May 31, 2007) .................................26

*Krupczak v. DLA Piper LLP*
   (US), No. CV WMN-16-23, 2016 WL 4013640 (D. Md. July 27, 2016), *aff'd*,
   No. 16-1980, 2016 WL 7338497 (4th Cir. Dec. 19, 2016)....................................................17, 30

*Lutz-Heiman v. Sharp*,
   No. 2496 SEPT.TERM 2013, 2015 WL 5824345 (Md. Ct. Spec. App. Aug. 3,
   2015) ..........................................................................................................................................18

*Meredith v. Talbot Cty.*,
   80 Md. App. 174, 560 A.2d 599 (1989).....................................................................................21

*Pallonetti v. Liberty Mut.*,
   10 Civ. 4487, 2011 WL 519407 (S.D.N.Y Feb. 11, 2011) ........................................................26

*Randolph v. Caruso Homes, Inc.*,
   No. RWT–13–2069, 2014 WL 4661985 (D. Md. Sept. 16, 2014) ...................................... *passim*

*Recchia v. Kellogg Co.*,
   No. CIV. 10-4899-JEI-KMW, 2012 WL 762445 (D.N.J. Mar. 6, 2012) ...................................25

*Smelkinson Sysco v. Harrell*,
   162 Md. App. 437, 875 A.2d 188 (2005).............................................................................17, 27

*Tarantino v. Exxon Mobil Corp.*,
   No. 1052 MDA 2012, 2013 WL 11256843 (Pa. Super. Ct. July 10, 2013)................................19

*Taylor v. Northrop Grumman Sys. Corp.*,
   No. CIV. JKB-13-1832, 2013 WL 4781094 (D. Md. Sept. 5, 2013).........................................26

*U.S. for Use of Trane Co. v. Bond*,
   322 Md. 170, 586 A.2d 734 (1991) ...........................................................................................18

*Washington v. Chicago Bd. of Educ.*,
   786 F. App'x 602 (7th Cir. 2019) ..............................................................................................25

*Williams v. Prof. Transp. Inc.*,
   294 F.3d 607 (4th Cir. 2002) .....................................................................................................27

## Other Authorities

Fed. R. Civ. P. 56(c) ......................................................................................................................16

Fed. R. Civ. Proc. 56.........................................................................................................................1

Restatement of Contracts § 492, Comment g ...................................................................................22

64586809v.1

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, United Therapeutics Inc. ("UT") and Martine Rothblatt, Jenesis Rothblatt, Shola Oyewole and Robert Daye (collectively, "Individual Defendants"), move for summary judgment pursuant to Fed. R. Civ. Proc. 56.

## INTRODUCTION

Plaintiff is a former UT employee who was terminated from his employment on January 4, 2017. Thereafter, Plaintiff negotiated and signed a separation agreement ("Agreement") which provided him with a considerable monetary payment in exchange for a full release and waiver of any and all claims he may have had against UT, as well as all officers and employees of the company. Plaintiff was given 22 days to consider the Agreement and made multiple efforts to secure the counsel of a lawyer and his family before ultimately deciding to execute the Agreement.

Now, after having received the full benefit of this Agreement, Plaintiff asserts claims against UT and four of its employees and officers – belatedly seeking to escape the consequences of his knowing and voluntary release of claims based on an unsupported claim of "duress" centered on the alleged conduct of Defendant Shola Oyewole. However, stripped of the conclusory labels, it is clear that the alleged actions and statements of Oyewole, a personal friend of Plaintiff and his immediate family, are insufficient as a matter of law to support Plaintiff's claim of duress. Indeed, now with the benefit of full discovery, Plaintiff's vague allegations of duress in his Complaint have been laid bare and amount to nothing more than two conversations where Oyewole encouraged Plaintiff to seek more money from UT before signing the Agreement and, at most, cautioned Plaintiff against the potential economic pitfalls of ultimately pursuing lengthy litigation against UT. Oyewole did not physically threaten Plaintiff in any way and purportedly made only vague statements that, years from now, Plaintiff would be a "dead man walking" if he pursued a claim against UT. These non-

specific statements do not convey any wrongful threat as required by Maryland law and certainly cannot be said to have denied Plaintiff of his free will to execute the Agreement – particularly where the two alleged conversations at issue occurred fifteen days and four days before Plaintiff's ultimate execution of the Agreement.  There is simply no evidence that Plaintiff executed the Agreement under legal "duress" as required to invalidate the Agreement and Plaintiff's waiver of potential claims.  Instead, this is little more than Plaintiff's *post hac* attempt to renegotiate the terms of his Agreement having failed to do so on multiple occasions after his termination of employment.

In short, the undisputed facts confirm that Plaintiff released any purported claims over three years ago and enjoyed the benefit of his bargain, almost $32,000, to which he was not otherwise entitled and which he never returned.  Plaintiff's knowing and voluntary execution of the Agreement and acceptance of the separation payment is dispositive and summary judgment should be granted in favor of Defendants in its entirety.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### Plaintiff is Terminated and Is Offered a Separation Agreement. [1]

1.       On January 4, 2017, Alyssa Friedrich, SVP, HR & Corporate Development, informed Plaintiff that his employment with UT was being terminated and that she would be sending him a separation agreement ("Agreement").[2]  Pl. Dep. 68:1-5, 76:18-77:8, 79:18-80:3.  That same day, on

---

[1] Defendants will not address the circumstances of Plaintiff's performance or termination to the extent they are not material to the limited issue before the Court of whether Plaintiff knowingly and voluntarily executed a waiver of the claims asserted in this lawsuit.

[2] Plaintiff's request for paid time off on January 4, 2017 was denied. Pl. Dep. 119:2-8. Nonetheless, Plaintiff missed a mandatory town hall meeting with Martine Rothblatt on January 4, 2017, indicating that he "had to be in New York to get my facts and documents in order with my big brother."  Pl. Dep. 98:12-99:2, 101:19-21.  In his email communications to Friedrich, Plaintiff suggested that his absence was related to his immigration status interview on January 22, 2017.  Pl. Dep. Exh. 6.  Plaintiff's "big brother" Ike Eke (who is the only brother who resides in New York) denied ever meeting or having plans to meet with Plaintiff on or about January 4, 2017, suggesting Plaintiff was being untruthful regarding the nature of his absence on January 4, 2017.  Ike Dep.

January 4, 2017, Friedrich, presented Plaintiff with the Agreement via email.  Pl. Dep. 82:14-83:1; Pl. Dep. Exh. 1.

2.      Just days before his termination, on January 1, 2017, Plaintiff applied for a $50,000 SoFi personal loan to "offset [his] debt."  Pl. Dep. 84:1-13; Pl. Dep. Exh. 2.  Plaintiff cannot recall how much debt he was in at that time, but "needed the $50,000 to consolidate [his] debt" for "personal stuff."[3]  Pl. Dep. 89:12-21.

3.      As a result, Plaintiff was "pleading and crying" during his conversation with Friedrich to either move to another position within UT or to have his grant under UT's Share Tracking Awards Program ("STAP") - scheduled to vest in May 2017 - vest early.  Pl. Dep. 85:8-14, 87:4-88:4.

4.      Plaintiff was "banking on getting the [STAPS] payments" to pay off his debt.  Pl. Dep. 85:15-86:12, 89:3-11.

5.      In addition to his pleas to Friedrich, Plaintiff reached out to his supervisor Robert Daye, Senior Manager of the Office of the Chairman, and Executive Assistant to the Board of Directors & Scientific Advisory Board, as well as UT's Chief Information Officer, Shola Oyewole, Chief Executive Officer, Martine Rothblatt, Project Leader, Jenesis Rothblatt, and General Counsel, Paul Mahon, on January 4 and 5, 2017, similarly imploring each for another position within the IT department or an accelerated vesting of his STAP grant.  *See* SOMF¶¶6-19, *infra.*

---

26:6-27:8, 31:11-13.  Indeed, when pressed during his deposition Plaintiff refused to answer Defendants' questions about his whereabouts contending it was a "personal matter."  Pl. Dep. 71:14-76:14.  Although Plaintiff refused to testify on this issue, it is further evidence of the extensive external issues *unrelated to Defendants* that caused any alleged duress at the time of signing the Agreement.

[3] At the time of the deposition, Plaintiff could not recall how he accumulated the debt. Pl. Dep. 90:19-91:14. UT reimbursed Plaintiff for his prior educational expenses.  Pl. Dep. 92:5-8.

<u>January 4, 2017 Communications with Robert Daye</u>

6.      One minute after receiving the Agreement, Plaintiff reached out to Daye via email, forwarding him the SoFi confirmation of Plaintiff's recent $50,000 loan application and, again, "pleading" for the value of his STAPs.  Pl. Dep. 84:14-85:15; Pl. Dep. Exh. 2.  Daye responded, referring Plaintiff to Friedrich to discuss his STAPs once Plaintiff was "in a better place emotionally."  Pl. Dep. Exh. 2.

7.      Plaintiff did not speak to Daye again before he signed the Agreement.  Pl. Dep. 93:2-8.  Plaintiff agreed that his communications with Daye did not make Plaintiff feel threatened or coerced to sign the Agreement in January 2017.  Pl. Dep. 70:20-71:4.

<u>January 4-5, 2017 Communications with Martine Rothblatt</u>

8.      Less than 90 minutes after contacting Daye, Plaintiff also reached out to the CEO, Martine Rothblatt ("Martine"), in a lengthy email.  Pl. Dep. 93:14-95:16; Pl. Dep. Exh. 3.

9.      Plaintiff described his working relationship with Martine by acknowledging that she had never been unreasonable with him and stated that he enjoyed working for the company.  Pl. Dep. 96:16-97:2.

10.     In his first January 4th email, Plaintiff wrote to Martine that "the reason [he was] sending this email is to humbly plead and explain that [he has to] live *and waited four years to cash some stock and pay off my debt.*"  Pl. Dep. 95:2-8, Pl. Dep. Exh. 3 (emphasis added).  Plaintiff reiterated that his "life wholly depends on [his] STAPS that [he] had hoped to sell off and pay [his] debt."  Pl. Dep. 108:19-109:9, Pl. Dep. Exh. 3.  Additionally, Plaintiff disclosed that "[he couldn't]

afford [his] rent so [he'll] probably move back to Nigeria for a while."[4]  Pl. Dep. 112:21-113:4, Pl. Dep. Exh. 3.

11.     After this plea for the value of his unvested STAP grant, Plaintiff emailed Martine again just twenty minutes later asking if he could return to UT in a different position.  Pl. Dep. 119:17-120:8.

12.     Having received no response, Plaintiff persisted and emailed Martine yet again less than 24 hours later.  Pl. Dep. Exh. 4.  Plaintiff attributed his incessant entreaties to Martine to being "depressed" and "unable to eat [and] unable to even leave [his] apartment" since his termination the day before.  Pl. Dep. 120:4-121:3.

13.     In his January 5th email, Plaintiff "begg[ed Martine] for any funds that may be able to offset some debt and relocate to Nigeria…"  Pl. Dep. 121:4-16; Pl. Dep. Exh. 4.

14.     Martine did not respond to Plaintiff's email communications and Plaintiff never actually spoke to Martine in January 2017.  Pl. Dep. 97:7-14.

January 4-5, 2017 Communications with Jenesis Rothblatt

15.     Plaintiff also reached out to Jenesis Rothblatt via text message on the evening of January 4, 2017.  Pl. Dep. 127:3-129:1.; Pl. Dep. Exh. 5.  Plaintiff then sent repeated text messages to Jenesis on January 5th, imploring her to intervene with Martine and convince Martine to consider his email proposals, saying he would "DO ANYTHING to keep [his] job at UT."  *See id.* (emphases in original).  Plaintiff ended the exchange, "please Jenesis, my only hope is you now."  *Id.*

---

[4] During his deposition, Plaintiff implied that this was a false statement he made to Martine, as he "wasn't going to move anywhere."  Pl. Dep. 113:5-13.

16.     Plaintiff's Agreement was not mentioned anywhere in this text exchange.  *See* Pl. Dep. Exh. 5, *passim*.  Plaintiff did not communicate with Jenesis again after this series of text messages.  Pl. Dep. 128:8-129:1.

January 4-6, 2017 Communications with Paul Mahon

17.     Plaintiff similarly reached out to UT's General Counsel, Paul Mahon, with multiple emails after being advised of his termination.  Plaintiff "thank[ed Paul] very much for just being a kind person."  DEF 00319; *see also* Pl. Dep. 239:1-10, 241:13-18. Mahon told Plaintiff that "if [he] ever needed a reference that…[Mahon] could be a good reference for [Plaintiff]."  Pl. Dep. 239:1-10; *See also* DEF 00319.

18.     Plaintiff immediately responded to Mahon's email, reiterating Plaintiff's financial troubles, saying his "whole life depends on cashing out [his] SARS to offset [his] debt."  DEF 00321. Plaintiff went on to explain that he could not afford his rent and did not even have a car to do Uber or search for a new position.  *Id.*  Plaintiff stated he could not live if he did not pay off the loan, and that he could not pay his loan and his rent even if he did get a new job.  *Id.*  Plaintiff pleaded he had "nowhere else to go for funds."  *Id.*

January 4, 2017 Communications with Shola Oyewole

19.     Plaintiff also contacted Shola Oyewole by telephone on January 4, 2017 to inform Oyewole of the termination.  Pl. Dep. 55:19-56:4.  Oyewole was not aware that Plaintiff had been terminated prior to the telephone call.  Pl. Dep. 58:2-5.  Oyewole told Plaintiff that he was in Jamaica and would call Plaintiff when he returned.  Pl. Dep. 58:19-59:1.  They did not discuss Plaintiff's STAPs or Agreement at that time.  *See id.*

**Plaintiff Continues Communications with Friedrich and Successfully Negotiates Modifications of the Agreement.**

20.     The Agreement expressly provides that "Employee and the Company acknowledge that each party had an equal opportunity to review and/or modify the provisions set forth in this Agreement."  Pl. Dep. Exh. 1, ¶ 15.

21.     Consistent with that term, in the early morning of January 5, 2017, Plaintiff emailed Freidrich and requested that his January 4, 2017 termination date be moved to January 12, 2017 to accommodate his citizenship interview on January 11th.  Pl. Dep. Exh. 6.[5]  UT agreed to this change, which Friedrich communicated to Plaintiff.  Pl. Dep. 130:5-131:4, Pl. Dep. Exh. 6.  Friedrich revised the Agreement with the termination date requested by Plaintiff and sent the updated version to Plaintiff.  Pl. Dep. 131:5-11.

22.     Later that day, Plaintiff contacted Friedrich again with further questions and proposed revisions to the Agreement regarding his STAP grant, refunds of his contributions to the Employee Stock Purchase Program ("ESPP"), tuition reimbursement and unused Paid Time Off ("PTO").  Pl. Dep. Exh. 6.  Although Plaintiff's STAP vesting could not be accelerated, Friedrich confirmed that UT would be refunding Plaintiff's contributions to the ESPP, paying out his remaining PTO, and reimbursing his education expenses.  Pl. Dep. 132:19-134:3; Pl. Dep. Exh. 6.

23.     After these initial communications with Friedrich, Plaintiff had telephone communications with Friedrich regarding the return of his UT equipment, his desire to return to the IT Department and his severance.  Pl. Dep. 68:15-69:3; 70:1-19.

---

[5] This citizenship interview weighed heavy on Plaintiff in January 2017 as his "big brother…has been in detention for over a month and I have lost sleep and lost weight thinking about the issue cos (sic) he made some comments that put my family under surveillance."  Pl. Dep. Exh 3 at DEF 00212.]

24.     However, Friedrich did not make any statements to Plaintiff that made him fearful if he did not sign the Agreement.  Pl. Dep. 70:19-10.

**The Separation Agreement**

25.     The Agreement is less than five pages long and, on its face, provided Plaintiff <u>two weeks</u> from the date of this termination to consider the offer and determine whether to accept it.  Pl. Dep. Exh. 1, ¶1.  However, because UT granted Plaintiff's request to move his termination date to January 12, 2017 (and paid him his regular salary during that time), Plaintiff ultimately had 22 days to consider the Agreement.  *See* Pl. Dep. Exh. 7, 9.

26.     The Agreement offered Plaintiff a total of $31,949.76, less applicable taxes and withholdings, which was equivalent to eight weeks of his prior salary plus a payment in lieu of Plaintiff's 2016 target bonus payment to which he would not otherwise be entitled due to his termination date as consideration.  This total was separate and apart from the ESSP refund, PTO payout and tuition reimbursement.  Pl. Dep. Exh. 1, ¶2.

27.     Among other things, Plaintiff acknowledged in the Agreement that "he has been given a reasonable period of time in which to consider, sign and return the Agreement to the Company," and that "he is entering into this Agreement knowingly, voluntarily, and with knowledge of its significance and the rights he is waiving, that no promises or representations whatsoever have been made to induce him to sign this Agreement, and that he has not been coerced, threatened or intimidated into signing the Agreement."  *Id*. at ¶¶5(e) and 18.

28.     Additionally, it contains the following language, in bold font, and all capital letters, making clear to Plaintiff that the Agreement contains a waiver of potential claims.

**EMPLOYEE UNDERSTANDS AND AGREES THAT, OTHER THAN THE EXEMPTED CLAIMS AND CLAIMS THAT CANNOT BE WAIVED BY LAW, HE IS WAIVING AND RELEASING ANY AND ALL CLAIMS AGAINST THE RELEASED PARTIES TO THE DATE OF THIS**

8

**AGREEMENT IN EXCHANGE FOR CONSIDERATION TO WHICH HE IS
NOT OTHERWISE ENTITLED.**

Pl. Dep. Exh. 1, at ¶ 5(b) (emphasis in original)

**Plaintiff Searches for an Attorney After Receiving the Agreement**

29.    The Agreement explicitly states that Plaintiff is "being advised in writing to consult

with an attorney concerning this Agreement."  *See* Pl. Dep. Exh. 1 as ¶5(e).

30.    Plaintiff made "multiple" efforts to retain an attorney after receiving the Agreement.

Pl. Dep. 121:17-123:12.  Plaintiff had not decided whether he would sign the Agreement at the time

he was looking for an attorney.  Pl. Dep. 124:8-125:5.  He was still "weighing his options." 134:18-

135:1.

**Oyewole and Plaintiff Continue Their Personal Relationship After Plaintiff's Termination.**

31.    Oyewole and Plaintiff had a personal relationship outside of UT.  *See* Pl. Dep.

147:17-20; Ife Dep. 18:7-9; *see also* Pl. Dep. 177:7-13.  Oyewole's mother-in-law, Mrs. Echebiri,

was Plaintiff's high school biology teacher in Nigeria, and Plaintiff had been to Oyewole's home in

Maryland to visit her.  Pl. Dep. 147:14-20.  In addition, Mrs. Echebiri and Plaintiff's aunt had been

school friends.  Pl. Dep. 267:12-17.

32.    Plaintiff conveyed to his brother, Ife, that Plaintiff and Oyewole were friends.  Ife

Dep. 27:2-4.  According to Ife, "[Plaintiff and Oyewole] were friends.  They hung out all the time.

[Plaintiff] was always at [Oyewole's] place.  [Oyewole's] daughter was a big fan of [Plaintiff].

[Plaintiff] did stuff for [Oyewole].  [Plaintiff] helped [Oyewole] sell his vehicle…yeah, just -- they

had a relationship." Ife. Dep. 27:8-17.

33.    Oyewole and Plaintiff's brother, Ife, had also become personal friends.  Ife Dep.

21:17-19.  They went to dinner together with their wives and Oyewole had also bought Plaintiff's

brother a gift when he had a baby in 2016.  Pl. Dep. 146:16-21.

34.     The first time Plaintiff spoke to Oyewole after the January 4, 2017 telephone call was on January 10, 2017.  Pl. Dep. 59:2-5.

35.     On January 10th, Oyewole went to Plaintiff's apartment to pick up a birthday present - a bike - that Plaintiff had purchased for Oyewole's daughter.  Pl. Dep 146:2-12.  Oyewole did not show up unannounced, rather he and Plaintiff communicated in advance about when and where to meet.  Pl. Dep. 63:17-64:18.  They agreed to meet in Plaintiff's driveway which was next to the UT offices.  Pl. Dep. 148:19-150:13, 158:3-9.

36.     During their meeting on January 10th, Plaintiff informed Oyewole about his severance package and that he was searching for an attorney.  Pl. Dep. 66: 2-8; 151:152:2.  Oyewole encouraged Plaintiff to try to negotiate for additional severance money.  Pl. Dep. 159:18-20.

37.     During this conversation, Plaintiff also told Oyewole that he was moving as, at the time, Plaintiff "had on [his] mind…possibly moving back to Nigeria."  Pl. Dep. 157:16-158:2.

38.     After Plaintiff indicated he may file a lawsuit against UT and release text messages between himself and Jenesis, Plaintiff claims that Oyewole replied that "these guys are dangerous" and that Oyewole said he would "sign the severance, move away…and just be done with this."[6]  Pl. Dep. 154:1-8.

---

[6] Plaintiff testified without explanation that he was physically scared of Martine and Jenesis <u>while he was still employed at UT</u> and consequently, there can be no argument that these post-termination conversations created that fear, to the extent it existed.  Pl. Dep.  171:2-172:10 ("Q: Do you hang out with people that you're physically scared of?  A.  If I was scared of United Therapeutics and Martine Rothblatt, *do you advise I should have quit my job, my source of livelihood*?  Q.  Were you in fact scared of Martine or Jenesis?  A.  Yes, I was." (emphasis added)).

39.     Plaintiff also testified that Oyewole said that "the Rothblatts are really powerful" and asked Plaintiff if he thought the Rothblatts "just got rich without putting their hands in something dirty -- without getting their hands dirty?"  Pl. Dep. 154:17-155:12; *see also* Pl. Dep. 230:17-231:13.

40.     In response, Plaintiff reaffirmed that he was going to find an attorney to which Oyewole responded, "it's [Plaintiff's] choice."  Pl. Dep. 155:21-156:3.  According to Plaintiff, Oyewole explained "these guys have all the resources, you probably wouldn't be able to afford the attorney.  You know this could go on *for years*.  And *after you take them to court and you lose*, Martine is going to deal with you."  Pl. Dep. 156:3-8 (emphasis added).  Finally, Plaintiff claims, Oyewole then stated Plaintiff "would be a dead man walking."  Pl. Dep. 156:8-9.

41.     Plaintiff acknowledged that Oyewole did not explain what he meant by the Rothblatts getting their "hands dirty" or the phrase "dead man walking" and that Plaintiff did not ask for more information or clarification.  *See* Pl. Dep. 160:8-16; 172:18-173:4.

42.     Plaintiff confirmed that he was not aware of the Rothblatts ever physically hurting anyone, and that they had never physically threatened Plaintiff.  Pl. Dep. 161:3-8, 174:2-7; *see also* Pl. Dep 278:11-14 (Q:. "And you haven't been subject to any physical threats or harm from the Rothblatts, right?"; A: "Not that I know of.")

43.     Rather, Plaintiff felt threatened by his assessment of the Rothblatts as "rich and powerful," noting that he has "been to Martine's house. [he has] see[n] pictures of Martine and the President…[he has] been to events with Martine [and] seen the crowd...they're rich and powerful. *[He] watch[es] TV*."  Pl. Dep. 173:5-15 (emphasis added).

44.     Yet as Plaintiff admits, after the conversation with Oyewole on January 10th, Plaintiff still had not decided whether he would sign the Agreement and continued his search for counsel.  Pl.

11

Dep. 180:14-20.  Oyewole's comments did not affect Plaintiff's resolve to seek legal counsel.  Pl. Dep. 182:20-183:8.

45.     Plaintiff testified that he and Oyewole spoke on the phone "multiple times" following January 10th.  Plaintiff indicated that Oyewole was "asking about [his] attorney search" and "how [his] legal search was going" but cannot recall the substance of these conversations or anything in particular Oyewole asked or said.  Pl. Dep. 65:5-66:1.

46.     At the time, Plaintiff considered Oyewole's inquiries about legal counsel to simply "be a question about legal counsel."  Pl. Dep. 142:5-11.  Only "in hindsight" did Plaintiff consider these statements "part of [Oyewole's] threats."  Pl. Dep. 141:16-142:4.

47.     Plaintiff does not recall anything else Oyewole said during these telephone conversations.  Pl. Dep. 67:4-12.

48.     Plaintiff also testified that he encountered another UT employee Timothy Atolagbe at the gym around this time.  Pl. Dep. 190:17-191:21.  Plaintiff claims that they did not discuss the Agreement but that Atolagbe said that Plaintiff "should move from his apartment" next to the UT offices, so Plaintiff "is not around these guys."  Pl. Dep. 193:19-194:10.  Plaintiff could not remember anything else about the conversation.  *Id.*  And he continued his search for an attorney.  Pl. Dep. 200:7-201:3.

**Plaintiff is Running Out of Time and Money.**

49.     Despite being approved for the So Fi loan, Plaintiff had less than $500 in his bank account as of January 17, 2017.  Pl. Dep. 244:4-8.

50.     And although Plaintiff testified that he made multiple attempts to find an attorney, he had been turned down by at least one firm and had no success in locating another. Pl. Dep. 121:17-123:21; 255:4-11.

51.     Plaintiff also spoke to his brother, Ife Eke, about the Agreement and his January 10, 2017 conversation with Oyewole during this time.  Ife. Dep. 61:8-62:19.  Ife advised Plaintiff to continue searching for a lawyer.  Ife Dep. 83:6-13.

52.     On January 20, 2017, Friedrich emailed Plaintiff to remind him that "if [he] wish[es] to sign the release agreement [he] ha[d] 14 days from the 12th to return it."  Pl. Dep. Exh. 7 at DEF 110.

**Plaintiff, His Brother Ife and Oyewole Meet on January 21, 2017.**

53.     On January 21, 2017, Oyewole invited Plaintiff and Plaintiff's brother, Ife, to meet him at Urban Butcher, a restaurant and bar in Silver Spring.  Pl. Dep. 202:17-203:20.  Despite being only eleven days after Oyewole's alleged initial threats, Plaintiff "didn't think anything of" the fact that Oyewole asked him to get together.  Pl. Dep. 205:4-8.  And Ife did not recall Plaintiff expressing any reservation about meeting up with Oyewole.  Ife Dep. 93:6-94:1.

54.     At Urban Butcher, Plaintiff, Ife and Oyewole sat at the bar and ordered drinks.  Pl. Dep. 204:11-16; Oyewole Dep. 105:3-15.  Oyewole updated Plaintiff and Ife about a new Harvard program and his kids.  Ife Dep. 95:2-96:7.  Oyewole then asked Plaintiff how his legal search was going and Plaintiff advised that he had been turned down by at least one attorney, but that he was continuing his search.  Pl. Dep. 207:2-13.

55.     During that conversation, Plaintiff claims that Oyewole told him and his brother that "Martine owns Silver Spring and [he] wouldn't be able to find work again in Maryland."  Pl. Dep. 208:14-20.

56.     Plaintiff testified that they also "rehashed" what was said during the January 10th meeting - that "they're dangerous and you don't have the finances to afford any attorney, do you know how long these things take? And you're definitely going to regret going against them, and

*when you lose*, you'll be a dead man walking.  And you wouldn't [sic] be able to find a job in Maryland again."  Pl. Dep. 209:5-13.

57.    However, despite Oyewole's alleged statement, Plaintiff was already "doing job interviews in January 2017, to which [he] got a job offer."  Pl. Dep. 114:8-9.

58.    According to Plaintiff, Oyewole again mentioned the "finances" and "legal fees" Plaintiff would incur if he ultimately filed a lawsuit against the Rothblatts.  Pl. Dep. 225:7-9. Oyewole made it clear to Plaintiff that "if this date passes [to sign the Agreement], you not only will lose out on those [stock] options but you also will not get any of it at all.  Not even the regular package that people normally get."  Ife Dep. 69:3-8.

59.    The conversation at Urban Butcher focused on Plaintiff's legal search, and the only reference to the Agreement was Oyewole's questioning if Plaintiff had a deadline by which he had to sign it.  Pl. Dep. 217:8-13.  Specifically, Oyewole inquired about what Plaintiff was "going to do about the [Agreement] if he doesn't find a lawyer in time."  Ife Dep. 97:2-8.

60.    Additionally, Oyewole again encouraged Plaintiff to speak with someone at UT and request more money for his separation payment.  Oyewole conveyed his belief that UT would give him more money if he simply asked.  Ife Dep.  123:15-124:5.  Plaintiff responded to Oyewole that Plaintiff still had to get a lawyer.  Ife Dep. 124:6-8.

61.    After about an hour, Plaintiff, Ife and Oyewole paid their checks and said their goodbyes. Ife Dep. 114:16-115:4  Plaintiff never spoke to Oyewole about his termination, potential lawsuit against UT or the Agreement again. Ife Dep. 109:7-21.

62.    Plaintiff describes certain comments made by Oyewole as "threats" but acknowledges that he has no evidence that anyone at UT ever directed Oyewole to contact Plaintiff. Pl. Dep. 140:5-14.

14

63.     Plaintiff also never told anyone at UT (or the police) about these alleged comments or "threats" by Oyewole (or Atolagbe), notwithstanding the fact that Plaintiff was in communication with not only Friederich but also UT's General Counsel, Paul Mahon, following his termination.  Pl. Dep. 237:9-241:21; DEF 00319-321.

**After Further Advice and Discussion with His Brothers, Plaintiff Signs The Agreement And Receives the Separation Payment.**

64.     After the Urban Butcher outing, Ife told Plaintiff "that he should keep trying to find a lawyer but that he should also just -- if he doesn't find a lawyer, just go ahead, just go ahead and sign it because we don't know exactly what is going on with all these threats."  Ife Dep. 120:6-15.

65.     Plaintiff understood Oyewole's statements to mean that if Plaintiff asked for a larger severance payment, that UT would agree to pay him a larger sum.   Pl. Dep. 228:3-11 (A. "Well, by the 23rd, I sent Alyssa an e-mail, a final e-mail.  And I was just stating the things that Shola had told me on the 10th:  Tell Alyssa how much you want and they will pay you.  He kept making it clear that they will pay me.")

66.     Plaintiff made an additional attempt on January 23, 2017 to renegotiate a higher severance payment (including a STAP payment or accelerated vesting) before signing the Agreement.  Pl. Dep. 228:2-11, Pl. Dep. Exh. 7.  UT declined to further modify the Agreement.  *Id.*

67.     Plaintiff ultimately discussed the Agreement with his brothers and they collectively made the decision that he would sign it.  Pl. Dep. 226:3-228:11.

68.     On January 24, 2017, Plaintiff encountered Oyewole and Daye on the plaza area outside of his apartment and the UT offices.  Pl. Dep. 143:15-17.  Oyewole asked Plaintiff "how's everything going" to which Plaintiff responded that he was "good" and walked into his apartment.  Pl. Dep. 143:18-144:13.  There was no mention of the prior conversations or the Agreement.  *See id.*

69.     Plaintiff signed the Agreement on January 25, 2017, the day before his deadline to sign, and 21 days after first receiving the Agreement.  Pl. Dep. Exh. 9; *see also* Pl. Dep. Exh. 7. At DEF 110.

70.     Plaintiff never returned the separation payment to UT or raised any alleged duress with the EEOC in filing his charge. Pl. Dep. 242:1-18

71.     Plaintiff was hired soon after his termination for a position with the National Gallery of Art and still lives in the apartment building "next door" to the UT offices.  Pl. Dep. 278:11-279:11.

72.     Notwithstanding the purported threats from Oyewole, Plaintiff has never experienced retaliation of any kind since signing the Agreement, taking the severance payment, filing his EEOC Charge and suing UT and the Rothblatts.  Pl. Dep. 278:5-10 (Q: Since you signed the agreement, took the money, filed the charge, filed the lawsuit, you haven't been retaliated against by the Rothblatts, right? A.  Not that I know of.")

## LEGAL STANDARD

"Summary judgment is not a 'disfavored procedural shortcut,' but is an important mechanism for weeding out claims and defenses [that] have no factual basis." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  A movant is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 700 (4th Cir. 2001).   "Summary judgment is particularly appropriate where, as here, the record evidence would not support a verdict by a reasonable jury in favor of the plaintiff."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A mere scintilla of proof...will not suffice to prevent summary judgment."  *Alexander v. UIP Prop. Mgmt., Inc.*, No. CV DKC 14-2469, 2016 WL 125605, at *3 (D. Md. Jan. 12, 2016)

16

(*citing Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted).

## ARGUMENT

**A.    PLAINTIFF'S CLAIM IS BARRED BY A VALID, UNAMBIGUOUS RELEASE.**

"Courts have, in the employment law context, commonly upheld releases given in exchange for additional benefits." *Krupczak v. DLA Piper LLP* (US), No. CV WMN-16-23, 2016 WL 4013640, at *5 (D. Md. July 27, 2016), *aff'd*, No. 16-1980, 2016 WL 7338497 (4th Cir. Dec. 19, 2016).[7]   Where an agreement contains a release provision that, if valid, would bar the claims Plaintiff now asserts against Defendants, "the Court must examine whether she signed the Agreement under duress and executed it knowingly and voluntarily" to determine whether the release provision forecloses Plaintiff's claims. *Alexander*, No. CV DKC 14-2469, 2016 WL 125605, at *3 (*citing Randolph v. Caruso Homes, Inc.*, No. RWT–13–2069, 2014 WL 4661985, at *4–5 (D. Md. Sept. 16, 2014)). The "party attacking the validity of other terms in an arm's-length settlement agreement or other contract bears the burden of proving fraud, *duress*, coercion, mistake, undue influence, or incompetence." *Smelkinson Sysco v. Harrell*, 162 Md. App. 437, 451, 875 A.2d 188, 196 (2005) (citing *Cannon v. Cannon*, 384 Md. 537, 555, 865A.2d 563, 573 (2005)) (emphasis added).

---

[7] "In the Fourth Circuit, courts apply ordinary contract principles to determine the validity of a release, and therefore, 'turn to the appropriate state's law for guidance.'" *Id.* (citing *O'Shea v. Commercial Credit Corp.*, 930 F.2d 358, 362 (4th Cir. 1991)). Here, the Agreement expressly states that it will governed by Maryland law." Pl. Dep. Exh. 1, ¶17.

17

As set forth below, the undisputed record evidence in this case confirms that Plaintiff cannot meet his burden. The execution of the waiver of claims was knowing and voluntary, and not executed under duress, compelling the entry of summary judgment in Defendants' favor.

### 1. Plaintiff's Execution of the Release Was Not Made Under Duress.

Under Maryland law, the "test for duress is essentially composed of two elements: '(1) a wrongful act or threat by the opposite party to the transaction ..., and (2) a state of mind in which the complaining party was overwhelmed by fear and precluded from using free will or judgment.'" *Lutz-Heiman v. Sharp*, No. 2496 SEPT.TERM 2013, 2015 WL 5824345, at *3 (Md. Ct. Spec. App. Aug. 3, 2015); *Eckstein v. Eckstein*, 38 Md. App. 506, 379 A.2d 757, 761 (Md. Ct. Spec. App. 1978) (Under Maryland law, duress is "a wrongful act which deprives an individual of the exercise of his free will.") (finding duress where a husband and his lawyer prepared an agreement including a transfer of the wife's interest in the marital home, would not respond to her questions regarding the agreement, and when she refused to sign the agreement on the spot, threatened that the wife would get nothing including her van, her clothes and the right to communicate with her children, and when the wife signed the agreement on the spot, she received $1100 and her van and clothes that the husband was withholding from her).

Duress in the context of signing a release of employment-related claims may take the form of an "improper threat which leaves the victim with no reasonable alternative other than to execute the agreement."[8] *Employers Ins. of Wasau v. Bond*, No. HAR–90–1139, 1991 WL 8431, *2 (D. Md.

---

[8] There are generally two type of cases in which Maryland courts have found an agreement was made under duress, physical inducement and improper threat. *In re Blackstone*, 557 B.R. 858, 871 (Bankr. D. Md. 2016) (citing *Emp'rs Ins. of Wausau*, No. HAR–90–1139, 1991 WL 8431, at *2). Claims of duress under physical inducement require a "actual physical compulsion [or] a threat of *imminent physical violence* is exerted upon the victim of such magnitude as to cause a reasonable person, in the circumstances, to fear loss of life, or serious physical injury, or actual imprisonment for refusal to sign the document." *U.S. for Use of Trane Co. v. Bond*, 322 Md. 170, 182–83, 586

18

1991).  Plaintiff cannot survive summary judgment by merely labelling the conduct at issue a "threat" as such legal conclusions must be disregarded and *only the actual conduct* must be evaluated.  *See, e.g., AEL Asia Express (H.K.) Ltd. v. Am. Bankers Ins. Co. of Fla*., 5 F. App'x 106, 111 (4th Cir. 2001) (disregarding conclusory affidavit on summary judgment (citing *Evans v. Technologies Applications & Serv. Co*., 80 F.3d 954, 962 (4th Cir. 1996) (same)) ("an intermediary's conduct, and not what it labels itself, will be determinative of its status."). The absence of an actual threat of physical harm weighs heavily against a finding of duress.  *See Cassiday v. Greenhorne & O'Mara, Inc.*, 220 F. Supp. 2d 488, 492 (D. Md. 2002), *aff'd*, 63 F. App'x 169 (4th Cir. 2003) ("She does not allege that Greenhorne physically threatened her or otherwise misled or duped her into signing. At all times she remained free to reject the offer and pursue her legal remedies.")(emphasis added).[9]

Here, the undisputed material facts confirm that Plaintiff was not subject to a "wrongful act" or "improper threat" that left him with "no reasonable alternative" other than to sign the agreement.

**Oyewole Encourages Plaintiff to Negotiate More Favorable Terms During Two Personal Conversations.**   Plaintiff and Oyewole, through their families, had multiple personal connections unrelated to UT and a relationship that Plaintiff's brother (also a friend of Oyewole)

---

A.2d 734, 740 (1991)(emphasis added).  Because there can be no argument that there was a physical inducement to execute based on the undisputed facts, Defendants analyze Plaintiff's claim of duress under the improper threat theory, which, even if found, merely renders a contract voidable, not void.  *See id.* at 738.

[9] *See also, e.g., Jesus v. Sanofi Aventis Puerto Rico, Inc*., No. CV 15-1803 (BJM), 2017 WL 972100, at *7 (D.P.R. Mar. 13, 2017) (duress "exists when one of the contracting parties is inspired with a reasonable and well-grounded fear of suffering an *imminent and serious injury* to his person or property...")(emphasis added); *Tarantino v. Exxon Mobil Corp*., No. 1052 MDA 2012, 2013 WL 11256843, at *3 (Pa. Super. Ct. July 10, 2013) ("In the present case, no actual, threatened, or impending restraint or danger was employed to obtain Appellants' assent to the settlement. Furthermore, since Appellants admittedly were free to consult with another lawyer and since no threats of actual harm were employed, they did not execute the settlement agreement under duress.").

19

described as "friends."   SOMF ¶¶31-33.   Nonetheless, Plaintiff's claims of duress hinge on two conversations with Oyewole.   Reflecting the nature of their relationship, these conversations - one while exchanging a birthday present for Oyewole's daughter and the other while sitting at a bar with Plaintiff's brother - were personal, not professional, in nature.   SOMF ¶¶35, 53-54.   Additionally, both conversations occurred in public, and Plaintiff's brother was present for the conversation over drinks at Urban Butcher <u>at Oyewole's request</u>.   *Id*.

Oyewole did not bring a copy of the Agreement with him (and indeed there is no evidence that Oyewole ever even saw the Agreement to know its terms), and there is no evidence that Oyewole sought to have Plaintiff execute the Agreement on the spot during either of these conversations.   *See* SOMF ¶¶36, 60.   Plaintiff was not required to have either of these meetings with Oyewole (to be sure, it was Plaintiff who invited Shola to his apartment to receive a gift), and there is no evidence that Plaintiff could not end these communications or leave at any time.   *See* SOMF ¶61.   This evidence undermines any argument that UT threatened Plaintiff through these conversations, and this Court has found an absence of duress and granted summary judgment based on similar key facts. *See Alexander*, No. CV DKC 14-2469, 2016 WL 125605, at *4 (finding no duress and granting summary judgment where, *inter alia*, supervisor locked door during meeting regarding separation agreement, placed a pen on the agreement and told plaintiff she had to sign, *but plaintiff did not try to leave the room, there was no evidence that Plaintiff could not leave, supervisor did not appear to have any weapons, there was no evidence of physical contact by supervisor, the conversation proceeded in a normal tone and the supervisor answered questions).*

Moreover, although Oyewole was the CIO at UT, during these conversations, his comments confirmed that he had no involvement or role with respect to the Agreement (as he had no knowledge of the payment terms), and that he encouraged Plaintiff to engage in further negotiations with UT on

both occasions in an effort to get Plaintiff more money from the company.  SOMF ¶¶36, 60, 65. This simple fact - that Oyewole at least twice encouraged Plaintiff to request additional money from UT before signing the Agreement - demonstrates the inadequacy of Plaintiff's duress claim as a matter of law.  Rather, it is undisputed that Oyewole encouraged Plaintiff <u>not</u> to simply sign the Agreement at that time, but rather to seek more favorable terms.  These statements, notably contrary to the interest of UT, negate any argument that Oyewole's statements were intended to threaten Plaintiff and force Plaintiff to accept the Agreement.[10]

**Oyewole's Alleged Statements Do Not Convey Any Threat To Plaintiff in The Event He Did Not Sign the Agreement.**  Notwithstanding the clear contradiction between the record evidence and Plaintiff's characterizations, even accepting solely for the purposes of summary judgment that Oyewole made the statements that Plaintiff would be a "dead man walking" and that the Rothblatts were "dangerous", Plaintiff cannot survive summary judgment because:

(1)     they do not constitute "wrongful conduct" (e.g, a physical threat),

(2)     Plaintiff's own conduct confirms that he was neither threatened nor believed that he had no reasonable alternative based on these statements, and

(3)     these statements were not made in reference to the Agreement, precluding any finding

---

[10] Defendants note that Oyewole was not personally a party to the Agreement, nor was there any indication at that time that Plaintiff intended to seek legal action against Oyewole. Consequently, Oyewole's conduct may be evaluated as a third party, rather than a party to the contract.  "A contract wrongly coerced by a third party may be voidable if a party to the contract, aware of a third party's coercive wrong doing, takes advantage of it. But, where a party 'in good faith and without reason to know of the duress either gives value or relies materially on the transaction,' the contract should not be invalidated."  *Brown v. Estate of McLain*, No. 1802 SEPT.TERM 2014, 2016 WL 1385622, at *5 (Md. Ct. Spec. App. Apr. 7, 2016).  As there is no evidence that UT (or the Rothblatts or Daye) had any knowledge or awareness of these alleged conversation, the contract should not be invalidated by Oyewole's statements made in his personal capacity. *See* SOMF ¶¶ 62-63.

that they were a threat of things to come if Plaintiff declined to sign the Agreement.

<u>Oyewole's statements are not "wrongful" and do not convey a physical threat.</u>  With respect to the first element of duress, it is clear "the acts or threats must be wrongful."  *Meredith v. Talbot Cty.*, 80 Md. App. 174, 183, 560 A.2d 599, 603 (1989) (*quoting Food Fair Stores, Inc. v. Joy*, 283 Md. 205, 217, 389 A.2d 874 (1978) (citing Restatement of Contracts § 492, Comment g)).  Thus, Plaintiff cannot establish duress with just any statement or action that he contends personally compelled him to execute the Agreement.

Here, Plaintiff's Amended Complaint and testimony convey that he perceived Oyewole's statements as a threat to his safety.  However, on their face, these statements do not convey any actual physical threat.  And the record evidence renders Plaintiff's efforts to characterize them as such incredible.  *See, e.g.,* SOMF ¶¶9, 14, 41-42, 46, 62-63, 72.

As set forth above, there is nothing "wrongful" about Plaintiff and Oyewole engaging in discussions regarding Plaintiff's termination, separation agreement, attorney search or potential lawsuit against UT.  *See* SOMF ¶46.  Plaintiff acknowledged that he had no facts to support any argument that UT was aware of or directed Oyewole to engage in these conversations, which happened during friendly, personal encounters.  SOMF ¶62; *see also* SOMF ¶63.  Nor does the content of the communications render them wrongful.  The undisputed context of these conversations makes clear that Oyewole was speaking about the Rothblatts being "powerful" in an economic sense (i.e., having more resources than Plaintiff if he proceeded to litigation).  *See* SOMF ¶¶38-40.  Oyewole's personal statements or opinions about the Rothblatts and what Plaintiff should do cannot be converted to a "wrongful act" or "improper threat" through sheer force of will.

Indeed, Plaintiff's interposing any alleged threat to his safety is pure surmise, particularly where *Plaintiff never sought clarification as to what these alleged statements meant*.  SOMF ¶41.

22

No reasonable juror could find that Plaintiff feared for his safety and simply declined to request clarification or specifics.

Where, as here, the record evidence confirms that that the conduct at issue is neither wrongful nor an actual threat, Plaintiff's self-serving speculation cannot defeat summary judgment.

<u>Plaintiff's conduct confirms he was not, in fact, threatened.</u>  Plaintiff's conduct and reactions to these alleged statements similarly preclude a reasonable jury from finding that Plaintiff was in fact threatened to the point of being deprived of his free will by either communication.    First, Plaintiff did not take immediate action to execute the Agreement after either conversation.  Rather, after the January 10th conversation, Plaintiff (1) <u>voluntarily</u> met with Oyewole for drinks 11 days later, (2) continued to search for counsel and did not sign the agreement for another 15 days, and (3) failed to reach out to anyone at UT or the police about any alleged concerns or purported threats.[11] SOMF ¶¶44, 53, 63; *see also* SOMF ¶¶46, 50-51.

Plaintiff's reaction following the January 21st drinks at Urban Butcher was similar.  Plaintiff did not immediately execute the Agreement.  Instead, Plaintiff testified that he left Urban Butcher still resolved to get a lawyer and had not decided whether to sign the agreement.  SOMF ¶60.  Plaintiff then discussed his options with his brothers in the following days.  SOMF ¶¶64, 67.  Two days later, he reached out to Friedrich proposing yet another set of new terms for the Agreement, including a demand for additional severance and his STAP grant.  SOMF ¶¶66.  No reasonable juror could find that a person in fear for his life would reach out and ask for more money from the very entity that was the source of the purported threat or "danger."

---

[11] In fact, at this point, Plaintiff was still technically an employee of UT, yet declined to raise any concerns with Friedrich or Mahon, despite the fact that Plaintiff demonstrated he was comfortable reaching out, making requests, and disclosing personal distress about his finances to these individuals  *See* SOMF ¶¶3-4, 17-18.

Friedrich responded simply stating that the UT would not be offering any additional consideration.  SOMF ¶66.  Two days later, and one day before the deadline to execute the Agreement, Plaintiff signed and returned the Agreement.  SOMF ¶¶69.  Notably, during those four additional days Plaintiff spent considering the Agreement following drinks at Urban Butcher, Plaintiff and Oyewole exchanged nothing more than pleasantries in passing.  SOMF ¶¶68.  Plaintiff's undisputed course of action following his communications with Oyewole belies his claim of duress.

The statements are unrelated to the execution of the Agreement.  Plaintiff's testimony also confirms that Oyewole's statements were not made with respect to signing the Agreement, undermining any argument that Oyewole's comments left Plaintiff with no reasonable alternative to signing the agreement.  In fact, according to Plaintiff, the conversation on January 21st focused on his search for an attorney, not the execution of the Agreement.  SOMF ¶¶59-60.  More generally, Plaintiff testified that the "dead man walking" statements were in reference to Plaintiff's contemplated pursuit of a years-long lawsuit that Plaintiff would lose, not any immediate threat to his well-being if he did not execute the Agreement in January 2017.  SOMF ¶¶40-41, 56.  Additionally, the context of these statements made clear that Oyewole expressed concern about the costs of a lawsuit against the Rothblatts, who had greater financial resources than Plaintiff.  SOMF ¶¶40, 56.

Indeed, particularly given that Oyewole had a personal and family relationship with Plaintiff, Plaintiff cannot now twist Oyewole's statements to manufacture an otherwise non-existent air of immediate physical danger that left him with no choice but to sign the Agreement.

**Plaintiff's Conduct Confirms That He Had Reasonable Alternatives to Execution.**
Beyond these fatal infirmities, it is clear from Plaintiff's testimony and actions that Oyewole's statements did not compel Plaintiff to take immediate action or cause him to feel he had no

reasonable alternative.  Plaintiff testified that he continued his search for a lawyer for three weeks, leaving both the January 10 and the January 21 conversations with Oyewole still resolved to secure counsel before signing the Agreement.  SOMF ¶¶36, 44, 48, 60.  Indeed, he had a consultation with at least one firm about his potential wrongful termination suit, and the firm declined to accept him as a client.  SOMF ¶50; *see also Recchia v. Kellogg Co.*, No. CIV. 10-4899-JEI-KMW, 2012 WL 762445, at *5 (D.N.J. Mar.  6, 2012) (citing *Clermont v. Brown*, No. 08–4257, 2009 WL 5205422, at *4 (D.N.J.2009) (noting that the opportunity to consult counsel prior to signing an agreement vitiates a duress defense)).  After his last conversation with Oyewole, Plaintiff consulted with his brothers before making a decision, further evidencing that he left the conversations with Oyewole understanding that he still had options to consider.  SOMF ¶¶60, 64-67.  Moreover, Plaintiff made a demand for additional severance to Friedrich before signing the agreement four days later, and a day before the deadline.  SOMF ¶66.

There is simply no evidence to suggest that Plaintiff could not simply have rejected the Agreement and continued to search for an attorney to pursue litigation, and thus Plaintiff cannot meet his burden to demonstrate that he was "deprived of his free will" in executing the Agreement. *See Washington v. Chicago Bd. of Educ.,* 786 F. App'x 602, 607 (7th Cir. 2019) ("[O]ne cannot successfully claim duress ... when he had an alternative to signing the agreement.").

**Plaintiff's Personal Economic Hardships Do Not Form The Basis for Duress.**  Rather, the undisputed material facts confirm that Plaintiff was experiencing personal economic duress due to his recent loan, limited funds, and loss of job which, according to Plaintiff's own testimony, would compel him to have to move back to Nigeria, at the time he was contemplating signing the Agreement.  SOMF ¶¶2-4, 10, 13, 15, 18. .  His repeated pleas for additional funds necessary to live and pay his rent confirm the simple fact that Plaintiff was in a dire economic situation, complicated

by his job loss, and had "nowhere else to go for funds" at that time.  SOMF ¶18; *see also* SOMF ¶¶2-4, 10, 13, 15.  Indeed, Plaintiff acknowledges that by January 17, 2017 he had only $500 in his personal bank account.  SOMF ¶49.

This type of personal economic duress is categorically insufficient under Maryland law to void an otherwise valid separation agreement.  *Taylor v. Northrop Grumman Sys. Corp.*, No. CIV. JKB-13-1832, 2013 WL 4781094, at *3–4 (D. Md. Sept. 5, 2013).  In fact, if mere reference to financial concerns were a sufficient basis to claim duress, "nearly every settlement ending an employment dispute would be voidable at the election of the employee."  *See id.*  Plaintiff was not under duress when he signed the Agreement.  *See, e.g., Randolph.*, No. CIV. RWT-13-2069, 2014 WL 4661985, at *4 (finding no duress where plaintiff alleged that she was not allowed time to think about signing the release agreement, was pressured to sign on the spot, and threatened that if she did not sign she would not be "paid anything" because "Defendants were under no obligation to pay [the plaintiff] anything following her termination.  Nor were they under any obligation to give her an extensive period of time to consider the Release ….").

**The Undisputed Evidence Confirms the Absence of Duress.**  Simply put, Plaintiff elected to accept the Agreement and payment (which he did not return) only after evaluating his options for 21 days, communicating with attorneys who were unwilling to accept his case, and consulting with his closest family.  It is not relevant to the Court's analysis that Plaintiff may have faced a difficult decision in deciding whether to execute the Agreement.  *See Juneau v. Motiva Enterprises LLC*, No. CIV.A. 1:06-CV-252, 2007 WL 1577647, at *4 (E.D. Tex. May 31, 2007) (granting summary judgment where "[t]here is nothing to suggest that Juneau was faced with anything other than a difficult decision.").

26

The ultimate question before the Court is not whether Oyewole's statements had *any* impact on Plaintiff's decision, but only whether they constituted an "improper threat which leaves the victim with no reasonable alternative other than to execute the agreement." *Employers Ins. of Wasau*, No. HAR–90–1139, 1991 WL 8431, *2.; *see also Pallonetti v. Liberty Mut.*, 10 Civ. 4487, 2011 WL 519407, at *5 (S.D.N.Y Feb. 11, 2011) ("[C]ourts look for evidence of high pressure or deceptive tactics," to determine "whether a party lacked 'meaningful choice' "). The record evidence prohibits such a finding as a matter of law. Plaintiff simply cannot meet his burden to prove that he executed the Agreement under duress. *See Smelkinson Sysco*, 162 Md. App. at 450-451.

### 2.   **Plaintiff's Release of His Claims Was Knowing and Voluntary.**

An employee may waive claims so long as the waiver is knowing and voluntary. *Cobb v. Potter*, No. 1:04-cv-128, 2006 WL 2457812, at *4 (W.D.N.C. Aug. 22, 2006) *aff'd*, 233 F. App'x 331 (4th Cir. 2007) (citing *Melanson v. Browning-Ferris Indus., Inc.*, 281 F.3d 272, 274 (1st Cir. 2002)); *Cassiday v. Greenhorne & O'Mara, Inc.*, 63 F. App'x 169 (4th Cir. 2003); *see also Williams v. Prof. Transp. Inc.*, 294 F.3d 607, 613 (4th Cir. 2002) ("A trial court possesses the inherent authority to enforce a settlement agreement and to enter judgment based on that agreement.").

In determining whether a waiver of claims is knowing and voluntary, courts look at "the totality of the circumstances surrounding its execution." *See, e.g. Cassiday*, 220 F. Supp. 2d at 494. The factors to be considered are (1) Plaintiff's education and business experience; (2) the respective roles of UT and Plaintiff in determining the terms and conditions of the release; (3) the clarity of the release; (4) the time Plaintiff had to study the release; (5) whether Plaintiff had the advice of counsel; (6) whether the employer encouraged the employee to seek the advice of counsel and whether the employee had sufficient time to do so; and (7) the waiver's consideration. *Id.; Randolph*, No. 13-cv-2069, 2014 WL 4661985, at *4. The foregoing list is not exclusive, however, and no single factor

27

is determinative.  *Id.*  Here, the totality of the circumstances compels the conclusion Plaintiff's waiver was knowing and voluntary.  A review of the pertinent factors confirms this conclusion.

(1) There is no evidence of any inadequacy in Plaintiff's business experience or education that impacted his decision to execute the Agreement.  *See* Compl., *passim.*  Instead, Plaintiff testified that in his approximately four years with UT, he held critical roles within the IT department, received accolades for his performance, and had recently enrolled in a Master's program for Cybersecurity. Pl. Dep. 57:8-12. , 90:1-5, 103:1-3.

(2) The undisputed evidence confirms that Plaintiff did negotiate the terms of the Agreement. He successfully negotiated extending the termination date from January 4, 2017 to January 12, 2017. SOMF¶¶1, 21.  In successfully negotiating this term, Plaintiff received an additional week of pay as well as an additional 8 days to consider the Agreement.  SOMF¶¶21, 25.  Before he executed the Agreement, Plaintiff also made several demands for additional severance, the return of contributions to his ESSP, tuition reimbursement and accelerated vesting of his STAP award, and confirmed his accrued Paid Time Off payout.  SOMF¶¶3-4, 6, 10-13, 18, 22, 66.  There can be no dispute that he was actively engaged in discussions with UT, and in particular Friedrich, regarding the terms of the Agreement prior to execution.  Moreover, the Agreement itself advised Plaintiff of his right to negotiate its terms.  SOMF¶20 (Exh. 1, ¶ 15 ("Employee and the Company acknowledge that each party had an equal opportunity to review and/or modify the provisions set forth in this Agreement.")); *See id.* at 493 (noting that while the plaintiff did not negotiate the terms of the waiver, there was no evidence that she was precluded from doing so).   Thus, while UT provided Plaintiff an initial copy of the Agreement on January 4, 2017, both parties had the opportunity, and did, provide input into its terms before it was executed on January 25, 2017.

28

(3) The entire Agreement is written in clear, plain language and is less than five pages long. SOMF¶25.  Moreover, it contains the following language, in bold font, and all capital letters, making clear to Plaintiff that he is executing a waiver of potential claims.

> **EMPLOYEE UNDERSTANDS AND AGREES THAT, OTHER THAN THE EXEMPTED CLAIMS AND CLAIMS THAT CANNOT BE WAIVED BY LAW, HE IS WAIVING AND RELEASING ANY AND ALL CLAIMS AGAINST THE RELEASED PARTIES TO THE DATE OF THIS AGREEMENT IN EXCHANGE FOR CONSIDERATION TO WHICH HE IS NOT OTHERWISE ENTITLED.**

SOMF¶28; *See id.* at 493 (noting that the agreement itself was written in non-complex, straightforward language and was only three pages long); *Randolph*, No. 13-cv-2069, 2014 WL 4661985, at *4 (finding waiver where, among other factors, the release was less than three pages long and "in clear language indicates [the plaintiff] is releasing all claims she might have").

(4) UT presented Plaintiff with the Agreement on January 4, 2017.  SOMF¶1.  Plaintiff signed the Agreement on January 25, 2017.  SOMF¶69.  Plaintiff had the short, simple Agreement for 21 days before signing it.  Likewise, Plaintiff acknowledged that "he has been given a reasonable period of time in which to consider, sign and return the Agreement to the Company."  SOMF¶27 (Pl. Dep. Exh. 1 at ¶5(e)).  Based on these undisputed facts, there can be no argument that Plaintiff did not have ample time to review and consider the Agreement before deciding to execute it.  This further demonstrates a knowing and voluntary execution of the Agreement.  *See Randolph*, 2014 WL 4661985, at *4 (finding waiver despite the fact that the plaintiff alleged that she "was not allowed time to think" and "was pressured to sign on the spot.")

(5) and (6)  Although Plaintiff testified that he was unable to secure counsel despite repeated attempts to do so, the Agreement itself – which he undisputedly signed – explicitly states that he was "being advised in writing to consult with an attorney concerning this Agreement."  *See* SOMF¶ 29 (Pl. Dep. Exh. 1 as ¶5(e)); *see Randolph*, 2014 WL 4661985, at *4 (finding waiver was knowing

and voluntary even though it was "undisputed that [the plaintiff] did not have the advice of counsel"

where "the express terms of the Release encouraged her to seek counsel."). Indeed, Plaintiff's

repeated attempts to secure counsel, including meeting with Katz, Marshall & Banks, make it clear

that he understood this directive. *See* SOMF ¶¶ 30, 50. Plaintiff had 22 days in which to secure

counsel to have the Agreement reviewed. *See* SOMF ¶ 52. And despite his repeated requests for

additional money and specific terms in the Agreement, Plaintiff never requested additional time for

further consideration or to secure counsel. The fact that Plaintiff could not find counsel interested

in taking his case does not undermine that his waiver and release was knowing and voluntary. *See,*

*e.g., Krupczak*, No. CV WMN-16-23, 2016 WL 4013640, at *6 ("Furthermore, Plaintiff was given

21 days to sign the agreement and an additional 7 days to revoke her acceptance; ample time to

weigh her options and consult with counsel, if she wished to do so.").

(7) As consideration for signing the Agreement, Plaintiff received $31,949.76, less

applicable taxes and withholdings, which was equivalent to eight weeks of his prior salary plus a

payment in lieu of Plaintiff's 2016 target bonus payment to which he would not otherwise be entitled

due to his termination date. *See* SOMF ¶ 26; *Cassiday*, 220 F. Supp. 2d at 493-94 (finding that ten

weeks' severance pay was sufficient consideration for a waiver of Title VII claims); *Randolph*, 2014

WL 4661985, at *4 (finding two weeks of severance pay to be adequate consideration even though

it "is not a huge sum of money" because the plaintiff "was an at-will employee" and the employer

"could have terminated [her] employment at any time for any reason without giving her anything").

In addition to the foregoing factors, the acknowledgment language contained within the

Agreement itself further argues in favor of a finding that the waiver was knowing and voluntary:

> Employee covenants that he is legally and mentally competent to enter into this
> Agreement, and acknowledges that **he is entering into this Agreement knowingly,**
> **voluntarily and with full knowledge of its significance and the rights he is**
> **waiving**, that no other promises or representations whatsoever have been made to

30

induce him to sign this Agreement **and that he has not been coerced, threatened, or intimidated into signing the Agreement**.

SOMF¶ 27, Pl. Dep. Exh. 1, ¶18 (emphasis added); *Cassiday*, 220 F. Supp. 2d at 493-94 (noting that the plaintiff expressly affirmed that she was signing the agreement knowingly and voluntarily). Indeed, there is no evidence that Plaintiff would have declined to sign the Agreement given a change in any of these circumstances, as he was actively considering the Agreement, searching for counsel, lobbying for additional money, and consulting with others throughout the review period. *See Cobb,* 2006 WL 2457812, *5 ("[T]he Court cannot find that Plaintiff's waiver was ineffective as being not knowingly and voluntarily executed on the basis of a lack of time or [review by] counsel where the waiving party does not even argue that given the benefit of such items she would not have signed the waiver.")

It is not necessary that all of the factors weigh in favor of finding that the waiver was knowing and voluntary and courts in this Circuit have found waivers to be knowing and voluntary in situations where only a few of the factors weighed in favor of such a finding. *See, e.g., Randolph*, 2014 WL 4661985, at *4 (finding the waiver was knowing and voluntary despite the fact that "[c]ertainly some of the factors cut in [plaintiff's] favor. But knowing and voluntary is not a counting game"); *Cobb,* 2006 WL 2457812, *5 ("Having considered each of the six factors …, three support Defendant's position while three support Plaintiff's position. However, the question here is not one of simple mathematics, but rather of the actual facts and circumstances surrounding Plaintiff's execution of the waiver.").

Here, after considering all of the relevant factors, as well as the express statement in the Agreement, the totality of the circumstances confirm that Plaintiff's release of claims was knowing and voluntarily. Consequently, Plaintiff's release of all claims against UT and its "officers, directors, agents, [and] employees…arising out of or related to his employment…and/or termination from

31

employment" bars all claims asserted in the Amended Complaint. Putting to one side other fatal flaws in Plaintiff's claims, Defendants are entitled to summary judgment on these grounds alone.

## CONCLUSION

As detailed herein, Defendants are entitled to summary judgment as to all remaining claims based on Plaintiff's knowing and voluntary waiver and release of claims in his separation agreement. Pursuant to that Agreement, Plaintiff waived any right to assert the claims set forth in his Amended Complaint against all Defendants in exchange for a considerable sum of money. Plaintiff cannot now escape the consequences of his decision to accept immediate and certain payment in lieu of the uncertainty and delay of litigation. Summary judgment should be grated in favor of Defendants. *See Alexander*, No. CV DKC 14-2469, 2016 WL 125605, at *6 (granting summary judgment to employer on employee's ADA and FMLA claims because "[b]y signing the [Agreement], failing to revoke it, and accepting payment under it, [plaintiff] chose to forego the uncertainty and expense of a lawsuit in favor of the certainty of a severance payment…The [c]ourt will not allow [Plaintiff], having knowingly and voluntarily waived her rights in exchange for a payment she has long since accepted,...to assert those rights now."); *Jarallah v. Thompson,* 123 F. Supp. 3d 719, 727 (D. Md. 2015), *aff'd*, 627 F. App'x 185 (4th Cir. 2015) ("Having obtained the benefit of his bargain, [Plaintiff] cannot now seek a remedy from the courts after knowingly and voluntarily relinquishing the underlying claims."). To determine otherwise under these circumstances would send a dangerous message to employers that individuals armed with nothing more than self-serving and unsupported claims of "duress" can void their contractual obligations, retain tens of thousands of dollars in severance, and use the prospect of lengthy and expensive litigation as leverage to negotiate a more lucrative deal.

Date:   June 26, 2020                     Respectfully Submitted,

                                          */s/ Eric J. Janson*
                                          Eric J. Janson, Esq.
                                          ejanson@seyfarth.com
                                          Christine M. Costantino
                                          ccostantino@seyfarth.com
                                          SEYFARTH SHAW LLP
                                          975 F Street, NW
                                          Washington, D.C. 20004
                                          (202) 463-2400 (telephone)
                                          (202) 641-9232 (facsimile)

                                          *Counsel for Defendants*

64586809v.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of June, 2020, a copy of Defendants' Motion for Summary Judgment and Memorandum of Points and Authorities in Support was filed electronically using CM/ECF, upon to the following:

Andrew Nyombi
KNA PEARL
8701 Georgia Avenue
Suite 606
Silver Spring, MD 20910

Onyebuchim Aduire Chinwah
The Chinwah Firm LLC
8403 Colesville Road
Suite 1100
Silver Spring, MD 20910

Ikechukwu K Emejuru
Emejuru Law LLC
8403 Colesville Road
Suite 1100
Silver Spring, MD 20910

<u>/s/  Eric J. Janson                    </u>

34

**EXHIBIT LIST**

| EXHIBIT | DESCRIPTION |
|:---:|:---|
| 1 | Select Portions of the December 17, 2019 Deposition Testimony of Mark Eke, including Exhibits |
| 2 | Select Portions of the January 9, 2020 Deposition Testimony of Ifegwu Eke |
| 3 | Select Portions of the May 22, 2020 Deposition Testimony of Ike Eke |
| 4 | Select Portions of the December 18, 2019 Deposition Testimony of Shola Oyewole |
| 5 | Selected Portions of Defendants' Document Production |

64586809v.1