**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

_____

| | |
|---|---|
| MARK EKE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED THERAPEUTICS, *et al.*, | ) Civil Action No. 8:18-cv-2941 |
| | ) |
| Defendants. | ) |

_____)

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................... 1

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE.................................. 3

LEGAL STANDARD............................................................................................ 19

ARGUMENT ........................................................................................................ 19

    I.     PLAINTIFF'S FRIENDSHIP WITH JENESIS IS NOT A HOSTILE
          WORK ENVIRONMENT (COUNT I) ................................................. 19

          a.     No Reasonable Jury Could Find the Alleged Conduct was
                 Unwelcome. .............................................................................. 20

          b.     There is no Evidence of Severe or Pervasive Harassment........................ 23

          c.     There Is No Basis to Impute Liability to UT. ........................... 25

    II.    PLAINTIFF WAS FIRED FOR INSUBORDINATION, NOT AN
          ALLEGED REJECTION OF JENESIS (COUNT II) ......................... 27

    III.    PLAINTIFF WAS FIRED FOR INSUBORDINATION, NOT BECAUSE
          HE IS A MAN (COUNT III) ................................................................ 30

    IV.    PLAINTIFF'S CHARGE DOES NOT MENTION AIDING AND
          ABETTING, AND THERE WAS NOTHING TO AID OR ABET
          (COUNTS IV-VI) ................................................................................ 32

          a.     Plaintiff Failed to Exhaust Administrative Remedies............................. 32

          b.     There is No Evidence Supporting Aiding and Abetting. ......................... 33

CONCLUSION..................................................................................................... 34

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albero v. City of Salisbury*,
  422 F. Supp. 2d 549 (D. Md. 2006) ....................................................................20

*Alexander v. Marriott Int'l, Inc.*,
  No. RWT 09CV2402, 2011 WL 1231029 (D. Md. Mar. 29, 2011) ........................................29

*Alexander v. UIP Prop. Mgmt., Inc.*,
  No. CV DKC 14-2469, 2016 WL 125605 (D. Md. Jan. 12, 2016)..........................................19

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...............................................................................19

*Angelini v. Baltimore Police Dep't*,
  464 F. Supp. 3d 756 (D. Md. 2020) ....................................................................20, 21, 22

*Atkins v. Burwell*,
  No. CV JFM-15-2198, 2016 WL 4399304 (D. Md. Aug. 17, 2016)................................28, 30

*Barnes v. ISG Sparrows Point, LLC*,
  No. BPG-10-2492, 2011 WL 4596058 (D. Md. Sept. 30, 2011)............................................32

*Bolin v. Oklahoma Conference of the United Methodist Church*,
  397 F.Supp.2d 1293 (N.D. Okla. 2005) ....................................................................29

*Bonds v. Leavitt*,
  629 F.3d 369 (4th Cir. 2011) ...............................................................................23

*Boyer-Liberto v. Fontainebleau Corp.*,
  786 F.3d 264 (4th Cir. 2015) ...............................................................................27

*Bryant v. Bell Atl. Md., Inc.*,
  288 F.3d 124 (4th Cir. 2002) ...............................................................................31

*Bush v. Potter*,
  No. CIV.A. AW-06-959, 2009 WL 5177286 (D. Md. Dec. 21, 2009)............................25, 28

*Byrd v. The Baltimore Sun Co.*
  279 F. Supp.2d 662 (D. Md. 2003) ....................................................................30

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)...............................................................................19

91812059v.1

*Chughtai v. Kaiser Permanente*,
No. CV PX-15-2963, 2018 WL 3049198 (D. Md. June 20, 2018) .......................... 24

*Coleman v. Maryland Ct. of Appeals*,
626 F.3d 187 (4th Cir. 2010) ............................................................. 30

*Cuffee v. Verizon Commc'ns, Inc.*,
755 F. Supp. 2d 672 (D. Md. 2010) ..................................................... 32

*Davis v. BBR Mgmt., LLC*,
No. CIV.A. DKC 10-0552, 2011 WL 337342 (D. Md. Jan. 31, 2011) .................... 33

*Dici v. Commonwealth of Pa.*,
91 F.3d 542 (3d Cir. 1996) ............................................................... 33

*Dortch v. Cellco P'ship*,
770 F. App'x 643 (4th Cir. 2019) ....................................................... 27

*E.E.O.C. v. Cent. Wholesalers, Inc.*,
573 F.3d 167 (4th Cir. 2009) ............................................................. 23

*Ecklund v. Fuisz Tech., Ltd.*,
905 F. Supp. 335 (E.D. Va. 1995) ....................................................... 28

*Foster v. Univ. of Maryland-E. Shore*,
787 F.3d 243 (4th Cir. 2015) ............................................................. 26

*Fox v. Gen. Motors Corp.*,
247 F.3d 169 (4th Cir. 2001) ............................................................. 23

*Harris v. Forklift Sys., Inc.*,
510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) .................................. 23

*Hartsell v. Duplex Prod., Inc.*,
123 F.3d 766 (4th Cir. 1997) ............................................................. 20

*Haulbrook v. Michelin N. Am., Inc.*,
252 F.3d 696 (4th Cir. 2001) ............................................................. 19

*Louis v. Sun Edison*,
LLC, 797 F. Supp. 2d 691 (D. Md. 2011) ............................................... 28

*Lyle v. ESPN Zone*,
292 F. Supp. 2d 758 (D. Md. 2003) ..................................................... 26

*Lyons v. Shoppers Food Warehouse Corp.*,
No. SAG-16-3322, 2017 WL 3129391 (D. Md. July 24, 2017) .......................... 19

91812059v.1

*Membreno v. Atlanta Rest. Partners,*
  LLC, 517 F. Supp. 3d 425 (D. Md. 2021) .............................................................23

*Meritor Sav. Bank, FSB v. Vinson,*
  477 U.S. 57, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986) ...........................................20

*Moser v. MCC Outdoor, L.L.C.,*
  256 Fed. App'x 634 (4th Cir .2007) ......................................................................27

*Ocheltree v. Scollon Productions, Inc.,*
  335 F.3d 325 (4th Cir. 2003) .................................................................................26

*Okoli v. City Of Baltimore,*
  648 F.3d 216 (4th Cir. 2011) .................................................................................28

*Peninsula Reg'l Med. Ctr. v. Atkins,*
  448 Md. 197 (2016) ...............................................................................................19

*Peters v. Jenney,*
  327 F.3d 307 (4th Cir. 2003) .................................................................................19

*Pryor v. United Air Lines, Inc.,*
  791 F.3d 488 (4th Cir. 2015) .................................................................................19

*Raiford v. Maryland Dep't of Juvenile Servs.,*
  No. CIV.A. DKC 12-3795, 2014 WL 4269076 (D. Md. Aug. 28, 2014) (ADA
  claim) ....................................................................................................................32

*Scott v. Harris,*
  550 U.S. 372 (2007)...............................................................................................24

*Tuttle v. Anuvia Prevention & Recovery,*
  No. 3:13-cv-134, 2013 WL 3899666 (W.D.N.C. July 29, 2013) ............................32

*Vaeth v. Mayor and City Council of Balt. City,*
  Civ. No. WDQ–11–0182, 2011 WL 4711904 (D. Md. Oct. 4, 2011) ......................32

*Vance v. Ball State Univ.,*
  133 S.Ct. 2434, 186 L.Ed.2d 565 (2013) ...............................................................26

*Walters v. Chimes D.C., Inc.,*
  No. 253, Sept. Term, 2021, 2022 WL 17974610 (Md. Ct. Spec. App. Dec. 28,
  2022) ................................................................................................................33, 34

*Wang v. Metro. Life Ins. Co.,*
  334 F. Supp. 2d 853 (D. Md. 2004)........................................................................29

iv

*Wedderburn v. Bd. of Educ. of Baltimore Cnty.*,
   No. 8:19-CV-00215-PX, 2022 WL 504511 (D. Md. Feb. 18, 2022)......................................23

*Williams v. Silver Spring Volunteer Fire Dep't*,
   86 F. Supp. 3d 398 (D. Md. 2015) .........................................................................................27

*Zerfas v. Burwell*,
   No. PWG-14-2806, 2015 WL 3949372 (D. Md. June 26, 2015) ...........................................26

v

United Therapeutics Corporation ("UT") and Martine Rothblatt, Jenesis Rothblatt, Shola Oyewole and Robert Daye (collectively "Individual Defendants"), move for summary judgment pursuant to Fed. R. Civ. Proc. 56.

## INTRODUCTION

Plaintiff was an IT professional at UT for almost four years and became close friends with his co-worker, Jenesis Rothblatt ("Jenesis"), the CEO's daughter.  They often saw each other outside of work, socializing and spending time in each other's homes.  The hundreds of text messages between them demonstrate the closeness of their relationship.  They call each other "hon" and "sweetie" and other terms of endearment, engage in flirty banter, and make plans for dinner, drinks and travel.  Plaintiff initiated many of these exchanges and was a willing participant in the relationship.

On January 4, 2017, after he had transferred to a position in the Office of the Chairperson ("OOC"), Plaintiff disobeyed instructions from his supervisor, Robert Daye ("Daye") to be present for and assist with a Town Hall meeting led by Chief Executive Officer and Chairperson Martine Rothblatt ("Martine").  Daye twice denied Plaintiff's request to take PTO on January 4, and reiterated the meeting was mandatory, given Plaintiff's role in the OOC.  Despite his supervisor's instructions, Plaintiff skipped the meeting.  He took a train to New York and claimed—despite twice previously asking for the day off —that an unidentified emergency compelled his trip. Plaintiff now says he cannot recall the emergency.

Plaintiff's insubordination combined with the *de minimis* value of his position led Martine and Daye to terminate Plaintiff's employment.  Jenesis – who Plaintiff concedes was not his supervisor – had no involvement in the decision.  After being advised of his termination, Plaintiff negotiated a generous severance package, accepted the payment and signed a Separation

Agreement containing a full waiver and release.  At no time during his employment or during the post-termination negotiations did Plaintiff ever mention any alleged harassment.

Months after receiving the severance,, Plaintiff broke his promises and sued.  He claims Jenesis sexually harassed him and he was fired because he refused her alleged advances.  He also sued Jenesis, Martine, Daye and Chief Information Officer Shola Oyewole, claiming they aided and abetted alleged harassment.  Following depositions and discovery, it is clear, however, that Plaintiff's claims largely consist of and hinge upon, a single incident in April 2015, when he and Jenesis were socializing at Plaintiff's home and during which Jenesis allegedly came out of the bathroom in her bra and underwear.  Plaintiff allegedly declined the supposed romantic interest, and then Jenesis got dressed and the two continued the evening, with Plaintiff telling her they "were cool" and still friends.  Plaintiff and Jenesis continued to text and socialize frequently for the next 18 months.  Plaintiff never reported this – or any other alleged harassment – and there were no other alleged instances of sexual harassment after this incident.

No reasonable juror could find the totality of the conduct at issue in this case was unwelcome, severe or pervasive.  Plaintiff's failure to report the incident or any alleged harassment similarly forecloses his claims.  Further, there is no evidence of any aiding and abetting purported discrimination or harassment.  Plaintiff was not harassed, did not provide the company with an opportunity to address alleged harassment, and was ultimately fired for insubordination and the lack of business need for the position.  Summary judgment should be granted on all claims as to all Defendants.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE[1]

### UT Hires Eke

1.      UT hired Eke as a Lead Senior Systems Administrator in its IT department in May 2013.  Eke reported up to Shola Oyewole, Chief Information Officer at the time.  Pl. Dep. 71:8-72:11;[2] Decl. of Shola Oyewole ¶ 3.

2.      Plaintiff was not supervised by Martine Rothblatt, Chief Executive Officer, Jenesis Rothblatt, Project Leader, Corporate Telepresence & Robotics, or Robert Daye, Senior Manager of the Office of the Chairperson ("OOC") and Executive Assistant to the Board of Directors.  Pl. Dep. 71:8-72:11.

### UT's Anti-Discrimination and Anti-Harassment Policies

3.      As part of his employment with UT, Plaintiff was expected to review and be familiar with UT's policies in its Employee Handbook.  Decl. of A. Friedrich ¶ 3 and Exh. 1.

4.      UT maintains a strong anti-discrimination and anti-harassment policy.  The policy provides a complaint procedure, making clear that employees "should provide a written or verbal report" of any instances of alleged discrimination or harassment to their manager, Human Resources or an officer of United Therapeutics.  Decl. of A. Friedrich, Exh. 1 at DEF1063-1066. UT investigates all reports of potential harassment or discrimination and takes appropriate corrective and/or preventative action when supported by the investigation.  *Id.*

---

[1] Defendants do not concede the accuracy of these facts but have resolved all disputes in Plaintiff's favor and thus present them as "undisputed" only in recognition of the applicable summary judgment standard.

[2]  Relevant excerpts from Plaintiff's depositions and exhibits from Plaintiff's depositions are designated "Pl. Dep. __ and Pl. Dep. Ex. __," and are located at Tab A.  Declarations for Shola Oyewole, Alyssa Friedrich, Jenesis Rothblatt, Martine Rothblatt, and Robert Daye (including supporting exhibits) are located at Tab B through Tab F respectively.

5.      UT also has an Ethics and Compliance Hotline (via toll-free phone number or the internet) through which employees can anonymously report concerns or suspected workplace policy violations, and an Open Door Policy, which encourages employees to bring workplace issues to the attention of management. Decl. of A. Friedrich ¶ 4-7 and Exh. 1 at DEF1069, DEF1079.

6.      Plaintiff acknowledged receipt of the Employee Handbook on May 15, 2013, and later received an updated Employee Handbook via email in July 2015.  Decl. of A. Friedrich ¶ 8 and Exh. 2.

7.      UT also regularly conducts training on its anti-harassment policies through an internal training program called "Preventing Workplace Harassment."  Decl. of A. Friedrich ¶ 10. Plaintiff completed his training on August 20, 2013 and March 25, 2016.  *Id.* and Exh. 3.

**Plaintiff Engages Jenesis in Friendly Text Messages**

8.      After Plaintiff began working at UT, Plaintiff and Jenesis developed a friendly relationship and, by at least November 2013, began exchanging electronic messages outside of work.  Pl. Dep. 73:22-74:11 (Plaintiff "related with a number of people at United Therapeutics, including Jenesis"), 78:14-17 (Jenesis was one of the colleagues who came to Plaintiff's apartment); *See* Pl. Dep. 78:21-79:6, Pl. Dep. Exh. 3 (WhatsApp Messages).

9.      The November and December 2013 electronic messages confirm that Plaintiff initiated many of these communications seeking connection outside of and unrelated to work.  *See* Pl. Dep. Exh. 3 (WhatsApp Messages).

10.     These communications continued into 2014.   On January 2, 2014, Plaintiff messaged Jenesis inquiring, "If your highness is not too busy then maybe we have a 2014 dinner/drink…" Pl. Dep. 82:17-83:17, Exh. 3(DEF 1353).  A few days later, Plaintiff asked Jenesis if she "has any plans for the evening."  *Id.* (DEF 1354). Jenesis declined the invitation.  *Id.*  And a

4

few months later, in April 2014, Plaintiff reached out to Jenesis, saying he "ha[d]n't seen that pretty smile in a while." *Id.* (DEF 1355); Pl. Dep. 93:21-94:11.

**February 2015 Lung Biotech Sales Meeting (Las Vegas, NV)[3]**

11.     In February 2015, Plaintiff and Jenesis attended a Lung Biotech Sales Meeting in Las Vegas. Pl. Dep. 435:2-17.  According to Plaintiff, Jenesis followed Plaintiff to his hotel room. Pl. Dep. 105:15-18, 107:14-108:4, 112:2-11, 123:10-124:4.

12.     Plaintiff admits he did not give Jenesis any indication he did not want her to accompany him.  In fact, Plaintiff believes that if he asked Jenesis not to come, she would not have -- "I believe if I did tell her I didn't want her to come, I don't believe she would have come."  Pl. Dep. 126:18-127:3; *see also* Pl. Dep. 123:14-124:20.

13.     When they entered the room, Plaintiff sat on the couch and Jenesis laid down on the bed. Pl. Dep. 126:18-128:15.  Jenesis never made any physical contact with Plaintiff.  Pl. Dep. 436:8-13 (never physically touched him, never hugged him, and never kissed him).  After a brief conversation, *Plaintiff moved* to the bed and laid down next to Jenesis.  Pl. Dep. 435:19-436:5.

14.     Plaintiff confirmed that Jenesis did not make any inappropriate or sexual comments during this encounter. Pl. Dep. 437:17-20.  Plaintiff never asked Jenesis to leave his room at any point.  She left on her own.  Pl. Dep. 441:1-4, 441:8-11, 441:17-20.

15.     Plaintiff did not report this alleged encounter to anyone at UT.  Pl. Dep. 132:4-15; 134:8-12.

16.     Plaintiff also confirmed Jenesis did not engage in any other behavior during the meeting which he believed was sexual harassment.  Pl. Dep. 129:7-130:12; 441:21-442:6.

---

[3] Plaintiff could not identify any alleged sexual overture(s) by Jenesis *before* the February 2015 Las Vegas meeting.  Pl. Dep. 126:2-7.

17.    Plaintiff continued to see Jenesis outside of work after February 2015.  Pl. Dep. 135:1-4.

**Plaintiff's Silver Spring, MD Apartment (April 2015)**

18.    In April 2015, Jenesis visited Silver Spring, MD and asked Plaintiff, who lived across the street from UT offices, if she could come to his apartment while she waited for her parents.[4]  Pl. Dep. 139:20-140:11, 442:7-19.

19.    Jenesis did not show up unannounced and Plaintiff did not tell Jenesis not to come. Plaintiff never asked Jenesis to leave once she arrived.  Pl. Dep. 442:17-443:2; Pl. Dep. 166:13-167:3 (*Q  Okay.  Let's do it this way.  Did you invite Jenesis Rothblatt to your apartment in April 2015?  A  No, I didn't.  Q  Did she show up unannounced?  A  I don't believe she showed up unannounced.  Q  So you knew she was coming?  A  Like I earlier said, Jenesis told me her parents were out of town and she wanted to come wait for them.  Q  And you didn't tell her not to come.  A Oh, no.  I didn't tell her not to come.*)

20.    According to Plaintiff, the two began watching television on his couch and at some point Jenesis went into the bathroom and came out in her bra and underwear.[5]  Pl. Dep. 171:11-17; 443:3-6; *see also* Pl. Dep. 169:8-173:21.  Plaintiff testified that Jenesis stood in the doorway for a moment and he said, "Jenesis, please" and then explained, "I just don't want to be messing around where I work."  Pl. Dep. 177:2-178:8.

21.    According to Plaintiff, Jenesis then sat on the couch and Plaintiff asked her to put her clothes on, which Jenesis did.  Pl. Dep. 457:12-21;171:11-17; 459:1-460:4.

---

[4] In early 2015, Jenesis lived in Los Angeles, California.  Pl. Dep. 138:12-22.

[5] Plaintiff testified he did not review his original complaint "in detail" and never reviewed the amended complaint and, as a result, assertions in these documents are not accurate.  Pl. Dep. 194:3-197:14.  Plaintiff s deposition testimony is inconsistent with allegations in the amended complaint. (*e.g.*, Plaintiff's Amended Complaint asserts Jenesis was naked, and Plaintiff repeatedly testified Jenesis was wearing underwear. *Id.*).

22.     Jenesis did not force herself on Plaintiff and at no point did Jenesis touch Plaintiff. Pl. Dep. 200:15-201:10 (Plaintiff testifying "I wouldn't have let [Jenesis] touch me" and has no recollection of her touching him), 461:18-462:4.

23.     Before Jenesis left Plaintiff's apartment, he asked her, "are we still cool?"  Jenesis responded that they were.  Pl. Dep. 463:8-15; *see also* Pl. Dep. 179:4-11 (describing the interaction as asking Jenesis "[a]re we good?" and she replied "[w]e're good.").  According to Plaintiff's statement to the EEOC, he confirmed he told Jenesis via text, "we are still friends and I've moved past it." Pl. Dep. 192:18-193:14, Exh. 5 (DEF 1455).

24.     Plaintiff did not report this incident to any manager, supervisor or member of the Human Resources department at UT.  Pl. Dep. 183:22-185:5.

**Plaintiff Continues to Engage in Playful Banter with Jenesis**

25.     After telling Jenesis that they were "cool" following the April 2015 evening, Plaintiff continued to call Jenesis "dear", "babe" and "sweetie" in their frequent text exchanges and socialized with her outside of work, including numerous dinners together and late night invitations to Plaintiff's apartment.[6]  Pl. Dep. 9:20-11:22, 53:12-54:3; 89:14-90:2; *see also, generally,* Pl. Dep. Exh. 1 (Text Messages between May 19, 2015 and January 2017).

26.     These friendly texts continued despite what Plaintiff calls "the laptop incident."  A few weeks after the April 2015 encounter in Plaintiff's apartment, Jenesis told Plaintiff her laptop was missing from her office and had been replaced by a different one.  Pl. Dep. 202:20-205:12, 485:17-487:2.  Plaintiff was responsible for all of the IT hardware stock at UT and identified the "replacement" laptop as being from his locked cabinet.  Pl. Dep. 490:2-10.  The Montgomery

---

[6] Plaintiff denied using the term "sweetie" in the RFAS, which was categorically false.  Pl. Dep. 54:17-55:8.

County Police were called and UT's Chief of Security indicated he was looking into it. Pl. Dep. 202:20-205:12.

27.     Plaintiff was not accused, arrested, charged, or detained by the police. They simply asked for a copy of his license. Pl. Dep. 485:17-486:13. Rather, Plaintiff was expressly told, "Don't worry about it. You're not under investigation." Pl. Dep. 494:18-19; 497:7-16. Plaintiff also never received any disciplinary action and this "incident" was never referenced in a performance evaluation. Pl. Dep. 497:7-498:1.

28.     Plaintiff and Jenesis exchanged hundreds of text messages in 2015 and 2016, including the following examples reflecting Plaintiff's use of terms of endearment, engaging in friendly banter and making social plans outside of work with Jenesis:[7]

- On May 5, 2015, Plaintiff texted Jenesis: "Lol. You don't have to sweetie. Are you coming over though? 9:30?" Pl. Dep. Ex. 1 (DEF 1384)

- On May 9, 2015, Plaintiff texted Jenesis, "Have fun sweetie!" Pl. Dep. Ex. 1 (DEF 1385)

- On May 19, 2015, Plaintiff texted Jenesis, "Happy Birthday sweetie!" Pl. Dep. Ex. 1 (DEF 1385)

- On May 20, 2015, commenting on a picture of Jenesis, Plaintiff commented, "(: pretty face! That view though!" Pl. Dep. Ex. 1 (DEF 1385)

- On June 12, 2015, Plaintiff texted Jenesis, "Happy Friday dear!" Pl. Dep. Ex. 1 (DEF 1387)[8]

- On June 26, 2015, Plaintiff told Jenesis, "I never said I didn't want to see you." Pl. Dep. Ex. 1 (DEF 1388)

- On Saturday, June 27, 2015, Plaintiff reached out to Jenesis and asked "Got any plans?" and then offered that he would "be home working for the most part so let me know if you wanna hang." Pl. Dep. Ex. 1 (DEF 1388)

---

[7] *See also,* J. Rothblatt Decl. at Ex. 1 (DEF 1382-1429).

[8] In his deposition, Plaintiff admitted that "[d]ear is a term of endearment." Pl. Dep. 86:22-87:5.

91812059v.1

- On September 17, 2015, Plaintiff invited Jenesis out to drinks followed by dinner at his place, stating, "We own this evening.  Just the 2 of us!  Drinks at Society? And I'll make dinner for my very good friend…?"  Pl. Dep. Ex. 1 (DEF 1390)

- On October 21, 2015, Plaintiff began a conversation with Jenesis, saying "Good morning sweetie.  In response Jenesis asked Plaintiff if she "should stop by for a min" and Plaintiff responded, "Sure thing…"  Pl. Dep. Ex. 1 (DEF 1391)

- On October 27, 2015, Plaintiff initiated communications with Jenesis, asking "Who's the sexiest of them all?!" and when Jenesis replied "Me!!!.." Plaintiff agreed "Haha! Yes!"  Pl. Dep. Ex. 1 (DEF 1393)

- On February 3, 2016, Jenesis texted Plaintiff a cartoon that said "Fuck Humpday!  I want to know when  Fuck-me-so-hard-I-can't-walk-day is."   (Pl. Dep. Exh. 9; DEF 1399) Plaintiff responded less than an hour later, "Still here at my desk. I'll probably head out to your place in 30 minutes unless you wanna come over?... Hahahahaha. That day Is 'Everyday'!"  *Id.*[9]

- On June 18, 2016, Jenesis said she could come get Plaintiff if he "wan[ts to] chill…" and Plaintiff responded, "okay come get me." Pl. Dep. Ex. 1 (DEF 1405)

- On August 28, 2016, when Jenesis returned home from a trip, Plaintiff offered, "Welcome home! Shrimp and grits from Georgia Brown's here if you need dinner."  Pl. Dep. Ex. 1 (DEF 1410)

- On September 28, 2016, when Jenesis asked how Plaintiff was, he responded, "I'm good, wanted to stop by. Or you wanna come here?" Pl. Dep. Ex. 1 (DEF 1414); and

- On October 27, 2016, Plaintiff and Jenesis exchanged several messages regarding taking a vacation together, where Plaintiff suggested "we should really do one of these all inclusive beach vacations – blue waters and coconut rum." Pl. Dep. Ex. 1 (DEF1419)

**Plaintiff Plans to Spend Time with Jenesis on North Carolina Trip (April 2016)**

29.     In early April 2016, Plaintiff exchanged text messages with Jenesis about his upcoming trip for UT to Research Triangle Park ("RTP").  Pl. Dep. 247:12-249:123; Pl. Dep. Exh. 1 (DEF 1401) (Plaintiff texts Jenesis, "Still going to RTP this week?"), (DEF 1401-1402) (discussing dinner plans).  Plaintiff inquired if Jenesis would also be in RTP on the same dates

---

[9] The Amended Complaint includes this text message as an alleged instance of harassment (without identifying Plaintiff's response – laughing and agreeing with the cartoon).  Pl. Dep. 4 - Am Compl. 32.  However, during his deposition, Plaintiff was unable to confirm whether he believed this text was alleged harassment.  Pl. Dep. 231:20-235:17; *see also* 232:14-16 (*Q: Do you contend that this text message exchange is in any way harassment? A: I don't know.*)

and, while in North Carolina, Plaintiff and Jenesis made plans to meet at the bar of Plaintiff's hotel for dinner.  *Id.*

30.     Jenesis did not go to Plaintiff's hotel room, never touched him in any way and Plaintiff cannot identify any sexual advances or comments made by Jenesis during the North Carolina trip.  Pl. Dep. 250:5-12; 251:6-252:7; 478:18-479:5.

**Creation of Digital Archivist Role in 2016**

31.     In or around February 2016, UT created a new Digital Archivist position.  The purpose of the role was to provide a dedicated resource to identify, edit, organize and archive online and offline digital text, photo and video content related to UT, along with tracking and maintaining Martine's biographical data, for which UT often received requests from media and other third parties. The Digital Archivist was also expected to create and maintain accurate Wikipedia pages for Martine and UT.  Decl. of M. Rothblatt ¶ 4; Decl. of R. Daye ¶ 4-6.  Decl. of A. Friedrich ¶ 11-14.

32.     Martine tasked Daye and Friedrich with creating the job posting, recruitment and hiring for the position.  Decl. of M. Rothblatt ¶ 5; Decl. of R. Daye ¶ 6.  Decl. of A. Friedrich ¶ 11-14.  Jenesis did not have any role in the creation of or hiring for the position.  Decl. of M. Rothblatt ¶ 5; Decl. of R. Daye ¶ 6.  Decl. of A. Friedrich ¶13; Decl. of J. Rothblatt ¶ 3-5.

33.     The Digital Archivist position was part of the OOC and reported to Daye.  Decl. of M. Rothblatt ¶ 10-11; Decl. of R. Daye ¶ 6; Decl. of A. Friedrich ¶ 15.

34.     On April 19, 2016, shortly after returning from the RTP trip, Plaintiff texted Daye and expressed his desire to join the OOC.  Decl. of R. Daye ¶ 7 and Ex. 1; Pl. Dep. Exh. 11 (EKE 234).  Daye responded that Plaintiff would be "at the top of [his] list with high recommendations" from Daye if the opportunity arose.  Pl. Dep. Exh. 11.

35.     Two months later, after external recruiting efforts for the Digital Archivist role were unsuccessful, Daye asked Plaintiff if he was interested. Decl. of R. Daye ¶ 8-9; Exh. 2 (EKE 235).

36.     In his IT role, Plaintiff served as the primary IT support for Martine, the OOC and the Board of Directors.  Decl. of M. Rothblatt ¶ 3; Decl. of R. Daye ¶ 10.  Both Plaintiff and Martine believed they had a positive working relationship. *See id.*; Pl. Dep. 683:11-684:6 (Plaintiff testified "I love Martine…I was solely responsible for all Martine's technology – for all Martine's technology, boardrooms and otherwise…")

37.     Friedrich also reached out to Plaintiff regarding the Digital Archivist role.  Friedrich understood Plaintiff wanted to work in the OOC and had a positive working relationship with Martine.  Decl. of A. Friedrich ¶ 17-19.

**Plaintiff Applies for and Receives the Digital Archivist Position**

38.     Following his discussion with Friedrich, on Saturday June 18, 2016, Plaintiff texted Jenesis that he "just needed to draft a cover letter and put in [his] application" for the Digital Archivist position.  Pl. Dep. Exh. 1 (DEF 1404)

39.     On June 20, 2016, Plaintiff emailed Daye: "I have applied for the position.  I'm exciting (sic) to interview and discuss further."  Decl. of R. Daye ¶ 9; Exh. 2 .

40.     Daye interviewed Plaintiff, and Daye and Martine agreed to offer Plaintiff the position.  Decl. of R. Daye ¶ 10.  Jenesis did not interview Plaintiff or have any role in the hiring decision.  Decl. of M. Rothblatt ¶ 5, 9; Decl. of R. Daye ¶ 10, Decl. of A. Friedrich ¶ 13; Decl. of J. Rothblatt ¶ 4; Pl. Dep. 266:17-267:6; 279:3-10.

41.     Plaintiff accepted the position on July 25, 2016, and began reporting to Daye on August 1, 2016.  Pl. Dep. 275:5-13, Exh. 14 (job description), 275:14-276:4, Exh. 15 (offer letter), 278:9-16, Exh. 16 (Org Chart).

42.     Daye served as Plaintiff's direct supervisor, and both Daye and Martine provided Plaintiff with assignments.  Decl. of M. Rothblatt ¶ 10; Decl. of R. Daye ¶ 11.  Jenesis was not Plaintiff's supervisor and did not manage or supervise Plaintiff's work at any time.  Decl. of R. Daye ¶ 11; Decl. of M. Rothblatt ¶ 11; Decl. of J. Rothblatt ¶ 5; Pl. Dep. 279:6-10.

43.     UT did not provide Plaintiff with any "trial period" to see if he liked the position or promise to restore him to an IT role if the Digital Archivist position did not work out.  Decl. of A. Friedrich ¶ 20; *see also* Pl. Dep. 275:14-276:4, Exh. 15 (offer letter with no reference to trial period).

44.     Rather, Oyewole confirmed to Friedrich before Plaintiff accepted the position that (1) the risks were well known that Martine may not think he was the right match and that his old job may not be waiting for him if he ended up wanting to return to IT and (2) Oyewole would be reluctant to have Plaintiff back on the IT team given how Plaintiff had acted toward co-workers regarding his access to the OOC.  Decl. of Shola Oyewole ¶ 6-7; Exh. 1-2; Decl. of A. Friedrich ¶ 21,, Exh. 5. (DEF 1326-1327).

**Plaintiff Attends Multiple New York Galas in Fall 2016**

45.     In October 2016, Jenesis invited Plaintiff and two other UT colleagues to attend the FIRST Robotics Gala in New York.  Pl. Dep. 282:13-285:6.  Jenesis' invitation said it was in gratitude for the work these individuals performed for the FIRST initiative – for example, Plaintiff testified he assisted with IT, office set ups and office visits for FIRST.  Pl. Dep. 283:6-284:5. Plaintiff asked for and was granted permission to attend by his supervisor, Daye.  *Id.*

46.     Plaintiff attended the Gala on November 3, 2016.  Pl. Dep. 279:14-280:21.  Plaintiff met up with Jenesis before the Gala at their hotel to take pictures of the two of them together.  Pl. Dep. 280:12-282:12, Exh. 19; Decl. of J. Rothblatt ¶ 14-15 and Exh. 4-5.

47.     Plaintiff confirmed that Jenesis did make any sexual advances towards him and did not say or do anything "inappropriate" at the FIRST Robotics Gala.  Pl. Dep. 285:7--287:11; 470:17-471:14.  Plaintiff also did not complain to anyone at UT about any behavior by Jenesis at the FIRST Robotics Gala.  Pl. Dep. 309:11-14.

48.     Later that week, on November 9, 2016, Jenesis invited Plaintiff to join other UT colleagues at the Billie Jean King Leadership Initiative Gala ("BJK Gala"), again in New York. Pl. Dep. 285:16-286:6.  On November 13, 2016, Plaintiff and Jenesis exchanged several text messages regarding hotel and travel reservations, with Plaintiff volunteering to make reservations for both of them.  Pl. Dep. 287:4- 289:22, Exh. 1 (DEF 1423).  Plaintiff does not contend Jenesis engaged in any harassing behavior at the BJK Gala on November 16, 2016.  *See* Pl. Dep. 308:17-309:18; 471:2-10.  In fact, Plaintiff took pictures with Jenesis at the BJK Gala, smiling broadly. Pl. Dep. 297:8-298:19, Exh. 21.

49.     After Plaintiff and Jenesis left the BJK Gala, they took pictures close together and smiling broadly.  Pl. Dep. 285:20-286:6, Exh. 20; Decl. of J. Rothblatt ¶ 14-15 and Exh. 4-5. Jenesis, Jenesis' personal friend, Plaintiff and Plaintiff's personal friend, returned to their hotel, had drinks together at a rooftop bar at the hotel, and then briefly went to Jenesis' room to hang out.  PPl. Dep. 300:9-301:4.  Plaintiff and his friend left Jenesis' room to go to a bar.  Pl. Dep. 303:6-20, 306:15-307:12.  Jenesis did not accompany them.  Pl. Dep. 304:1-5.

50.     Jenesis did not make any sexual advances towards Plaintiff at or after the BJK Gala. Pl. Dep. 304:4-9, 305:12-21, 471:8-10.  Plaintiff also cannot identify any sexual comments made by Jenesis before, during or after this event.  Pl. Dep. 473:11-14.

51.     Plaintiff did not complain to anyone at UT about Jenesis' behavior at or after the BJK Gala.  Pl. Dep. 309:15-18.

13

52.     Plaintiff cannot identify any instances between the BJK Gala on November 16, 2016, and his termination on January 4, 2017, where Jenesis made any alleged sexual advances towards him.  Pl. Dep. 501:18-502:12.

**Plaintiff Fails to Meet Expectations and Follow Express Instruction Regarding PTO**

53.     On December 2, 2016, Plaintiff advised Daye at 2:58 p.m. that he "w[ould] like to leave at 4:00 p.m." that day.  Daye reminded Plaintiff that Martine was in the Silver Spring HQ and there was a planned office event that evening, but Plaintiff claimed it was an "unexpected emergency."  Decl. of R. Daye at ¶ 13-14 and Exh. 4 (DEF 1199-1200).   While it was expected that employees who supported the OOC would be available when Martine was working in Silver Spring, Daye permitted Plaintiff to leave early that day but advised him that he needed to give advance notice of future PTO.  *Id.*

54.     Daye's December 2nd email to Plaintiff also made clear it was important for his staff to be in the office when Martine was in the Silver Spring HQ and to be available for any possible meetings with Martine or other business needs that may arise with her being on site.  Decl. of R. Daye at ¶ 14 and Exh. 4.

55.     A "Town Hall" meeting with Martine and the Chief Operating Officer was planned for January 4, 2017, in UT's Silver Spring HQ.  Decl. of R. Daye at ¶ 16.  Consistent with Daye's expectations outlined in the December 2nd email, the Town Hall meeting was mandatory for employees supporting the OOC.  Decl. of R. Daye at ¶ 17.

56.     Plaintiff was out of the office on approved vacation from December 21-29, 2016. Decl. of R. Daye at ¶ 15; Pl. Dep. 505:22-507:9.  On December 26, Plaintiff texted Daye, stating "I will have to be in NY on [January] 4th for a family issue. I'm back in the office on Friday this week but will need to travel to NY on the 4th…"  Pl. Dep. Exh. 25.  Daye responded, "[p]lease

work around the emergency as your presence is needed *in the office* during that time." *Id.* (emphasis added); Decl. of R. Daye at ¶ 16.

57.     Despite express direction that Plaintiff needed to be in the office on January 4th, Plaintiff requested leave for January 4, 2017, through the Workday system.  Pl. Dep. 319:7-320:5, Pl. Exh. 25; 323:7-14.  The request was denied.  Pl. Dep. 323:7-21, 516:5-517:2; Decl. of R. Daye at ¶ 18 and Exh. 7 (DEF 1269).

58.     Daye also sent an email to his direct reports on December 26, 2016, regarding PTO requests and reminding them that it was important for staff to be in the office on the days when meetings were planned and/or Martine was in the office.  Decl. of R. Daye at ¶ 18 and Exh. 6 (DEF 1178).

59.     However, on January 4, 2017, Plaintiff left the office before the Town Hall meeting began and never returned.  Pl. Dep. 540:4-541:2.  Plaintiff did not seek or obtain approval to leave early for the day.  *Id.*; *see also* Pl. Dep. 517:16-19 ("…no one kn[e]w I left for the rest of the day.")

60.     It was only after Daye noticed that Plaintiff was missing, and then emailed, texted and called him, that Plaintiff finally responded and claimed he was on the train to New York for an unidentified "emergency."  Decl. of R. Daye at ¶ 20; Pl. Dep. Exh. 25.

61.     Plaintiff maintained at his deposition that he went to New York on January 4th for an alleged emergency about which he purportedly could not recall any specifics.  Pl. Dep. 541:4-19; 546:2-13; 549:10-550:4.

62.     However, both in Plaintiff's prior requests for that day off to travel to New York and his pre-purchased train ticket to New York, it was evident that Plaintiff disregarded his supervisor's direct instruction and expectations.  *See* Pl. Dep. 511:4-8, Exh. 36; 512:13-513:6, Exh. 25; *see also* Pl. Dep. 514:13-515:5 ("in my mind I decided I will definitely be joining the

15

town hall meeting, *because I didn't see why I couldn't join the town hall meeting over the phone…*").

63.    Moreover, Plaintiff never explained to Daye what the alleged "emergency" was that caused him to disobey Daye's directive that he attend the January 4 Town Hall meeting.  Pl. Dep. 513:14-514:3, Exh. 25; Decl. of R. Daye at ¶ 22.

**Plaintiff's Position is Eliminated and His Employment is Terminated**

64.    Daye viewed Plaintiff's refusal to follow express directions to be in the office on January 4, 2017 as disrespectful and insubordinate.  Decl. of R. Daye at ¶ 24; Pl. Dep. 576:17-577:17.  Daye advised Plaintiff they would have to address his insubordination with Human Resources when Plaintiff returned.  Decl. of R. Daye at ¶ 23.

65.    However, Martine also wanted to eliminate the Digital Archivist position as it became clear that Plaintiff's role provided little value and did not serve business needs.  When Martine learned that Plaintiff was disrespectful to Daye, her valued colleague, it further confirmed that Plaintiff's minimal contribution as the Digital Archivist was not worth the strife Plaintiff caused Daye through his disrespectful conduct. Decl. of M. Rothblatt ¶ 12-14; Decl. of R. Daye ¶ 25.

66.    Martine and Daye agreed to eliminate the Digital Archivist position and terminate Plaintiff's employment.  Daye reached out to Friedrich to inform her of the decision and they together communicated the decision to Plaintiff on January 4, 2017. Decl. of M. Rothblatt ¶ 14; Decl. of R. Daye ¶ 25-26, Decl. of A. Friedrich ¶ 24;  Decl. of S. Oyewole ¶ 9.

67.    Martine and Daye were not aware of any alleged romantic or sexual overtures between Plaintiff and Jenesis, and it had nothing to do with their decision to eliminate the position. Decl. of M. Rothblatt ¶ 16-21; Decl. of R. Daye ¶ 27, 30-32.

16

68.     In an email to Martine the day after his termination, Plaintiff acknowledged the Digital Archivist position was no longer beneficial to UT.  Pl. Dep. 588:20-589:2, Exh. 27 ("Today I received the separation letter from Alyssa.  I understand the archivist position is no longer beneficial to UT so I have no negative thoughts or feelings about the decision.").  Plaintiff also impliedly recognized his insubordination.  *Id.* ("HR speaking to me for insubordination would be a guarantee that I would never leave the office again without [Daye's] approval."); Pl. Dep. 571:1-572:2.

69.     And despite Daye's concerns about Plaintiff's insubordination, Friedrich reached out to Oyewole to ascertain whether there was any interest in having Plaintiff return to a role in IT.  Oyewole confirmed with two of his team members that the IT department did not have a role for Plaintiff.  Decl. of A. Friedrich ¶ 27; Decl. of S. Oyewole ¶ 10.

70.     Jenesis did not have any role in the decision to eliminate the Digital Archivist position or terminate Plaintiff's employment.  Decl. of M. Rothblatt ¶ 16; Decl. of R. Daye ¶ 27, Decl. of A. Friedrich ¶ 26; Decl. of J. Rothblatt ¶ 7; Decl. of S. Oyewole ¶ 9.

**Plaintiff Never Reports Sexual Harassment/No Impact on Employment**

71.     Plaintiff concedes he never reported any alleged sexual harassment by Jenesis to any management employees at UT.  Pl. Dep. 469:15-470:3.  In fact, Plaintiff testified he affirmatively represented to both Daye and Oyewole that there was "nothing going on with Jenesis."  Pl. Dep. 469:15-20.

72.     Plaintiff concedes he never received a negative performance review or disciplinary action between April 2015 and January 2017.  Pl. Dep. 498:15-2, 499:18-22.

73.     He also confirmed that other than his perception of the "laptop incident" in 2015, he never experienced any other negative consequence for allegedly rejecting Jenesis' alleged sexual advance in April 2015.  Pl. Dep. 500:13-501:16.

17

**Plaintiff Never Mentions Alleged Harassment During Post-Termination Negotiations**

74.     Consistent with company practice when eliminating a job position, on January 4, 2017, Friedrich presented Plaintiff with a separation agreement via email.  Pl. Dep. I at 82:14-83:1;[10] Pl. Dep. I, Exh. 1.  Plaintiff immediately sought additional severance, accelerated vesting of his grant under UT's Share Tracking Awards Program ("STAP") and/or another position at UT. Pl. Dep. I 85:8-14, 87:4-88:4.

75.     Plaintiff contacted Friedrich, Daye, Martine, Oyewole, Jenesis and UT's General Counsel, Paul Mahon, on January 4 and 5, 2017, imploring each to give him another position within the IT department or accelerated vesting of his STAP grant.  Pl. Dep. I 84:14-85:15; Pl. Dep. I Exh. 2 (DEF 37-39); Pl. Dep. I 93:14-95:16, 119:17-120:8; Pl. Dep. I Exh. 3 (DEF 210-213); Pl. Dep. I 121:4-16; Pl. Dep. I Exh. 4 (DEF 209); Pl. Dep. I 127:3-129:1.; Pl. Dep. I Exh. 5 (DEF 348); Pl. Dep. I 239:1-10, 241:13-18, Tab H - DEF 0319; Pl. Dep. I 132:19-134:3; Pl. Dep. I, Exh. 6 (DEF 166-172).

76.     Plaintiff shared many personal details regarding his life in his pleas; however, none of these email communications reference any alleged harassment or inappropriate behavior by Jenesis. *Id.*

77.     At no time, including during his post-termination efforts to secure additional severance benefits, did Plaintiff ever inform Martine, Daye, Friedrich or Mahon of any alleged comments or actions by Jenesis that he perceived as being inappropriate, unprofessional, or harassing.  *Id.*; Decl. of M. Rothblatt ¶ 19; Decl. of R. Daye ¶ 32, Decl. of A. Friedrich ¶ 28.

78.     Months after signing the severance agreement and accepting the severance payment, Plaintiff filed a charge of discrimination, dated June 13, 2018.  Pl. Dep. 216:17-20, Exh.

---

[10] Relevant excerpts from Plaintiff's Phase 1 deposition conducted on December 17, 2019 and accompanying exhibits are designated "Pl. Dep. I ___ and "Pl. Dep. I Ex. __" and are located at Tab G.

6.  The charge names UT as the only respondent.  *Id.*  Plaintiff did not file any other charges of discrimination against any of the individual defendants.  *Id.*

## LEGAL STANDARD

"Summary judgment is not a 'disfavored procedural shortcut,' but is an important mechanism for weeding out claims and defenses [that] have no factual basis." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  A movant is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 700 (4th Cir. 2001).  "Summary judgment is particularly appropriate where, as here, the record evidence would not support a verdict by a reasonable jury in favor of the plaintiff."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A mere scintilla of proof...will not suffice to prevent summary judgment."  *Alexander v. UIP Prop. Mgmt., Inc.*, No. CV DKC 14-2469, 2016 WL 125605, at *3 (D. Md. Jan. 12, 2016) (*citing Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003)).

## ARGUMENT[11]

### I.   PLAINTIFF'S FRIENDSHIP WITH JENESIS IS NOT A HOSTILE WORK ENVIRONMENT (COUNT I)

To prove a hostile work environment, Plaintiff must show that the complained of conduct was (1) unwelcome; (2) based on a protected characteristic; (3) sufficiently severe or pervasive to alter the conditions of employment and to create an abusive work environment; and (4) imputable to his employer.  *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 495–96 (4th Cir. 2015).  Plaintiff's inability to establish the requisite elements warrants summary judgment.  *Lyons v. Shoppers Food*

---

[11] Plaintiff asserts claims under Title VII and Maryland's Fair Employment Practices Act ("FEPA").  FEPA is modeled after Title VII, and Maryland courts therefore look to Title VII jurisprudence to interpret FEPA.  *Peninsula Reg'l Med. Ctr. v. Atkins*, 448 Md. 197, 218-19 (2016).

91812059v.1

*Warehouse Corp.*, No. SAG-16-3322, 2017 WL 3129391, at *4 (D. Md. July 24, 2017) (summary judgment appropriate where plaintiff has not demonstrated a genuine dispute of material fact).

### a.      No Reasonable Jury Could Find the Alleged Conduct was Unwelcome.

Plaintiff's own actions confirm the alleged harassing conduct was not "unwelcome." "Conduct is 'unwelcome' when it continues after the employee sufficiently communicates that it is unwelcome." *Albero v. City of Salisbury*, 422 F. Supp. 2d 549, 557–58 (D. Md. 2006) (citation omitted).  The Court must inquire "whether respondent by h[is] conduct indicated that the alleged [sexual harassment was] unwelcome ..." *Id*. (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 68, 106 S. Ct. 2399, 2406, 91 L. Ed. 2d 49 (1986)).  Courts have found that a plaintiff fails to present sufficient evidence of "unwelcome" conduct where the plaintiff does not voice an objection or is a willing participant in the conduct.  *Id.* at 558 (holding that the plaintiff failed to present evidence from which a reasonable jury could find that the allegedly harassing behavior was "unwelcome" where "the record shows that [plaintiff] was a willing participant in many of the episodes…that she contends were harassing…[and] there is no evidence that [plaintiff] complained about any of the alleged incidents until she filed her first EEOC charge.."); *Hartsell v. Duplex Prod., Inc*., 123 F.3d 766, 774 n.7 (4th Cir. 1997) ("[B]ecause Hartsell never complained to her husband or to the alleged harassers until after her confrontation with [the alleged harasser] Myers, she cannot prove that the harassment was unwelcome…[T]he record clearly suggests that Hartsell fully participated in, and even enjoyed, the office banter until her run-in with Myers. She cannot now cry 'foul' for conduct that was, at the time, not 'unwelcome.'"); *see also Angelini v. Baltimore Police Dep't*, 464 F. Supp. 3d 756, 789 (D. Md. 2020) ("The Fourth Circuit has explained that "an employee can demonstrate that certain conduct is unwelcome simply by voicing [his] objection ....")

Here, it is undisputed that Plaintiff never complained to any supervisor, manager or member of Human Resources at UT about Jenesis' alleged conduct.  SOMF 71, 76-77.  The undisputed evidence further shows that Plaintiff and Jenesis exchanged hundreds of personal text messages throughout Plaintiff's employment reflecting an on-going friendly – and often times flirtatious relationship outside of work.  SOMF 8-10, 25-30.  These undisputed facts belie any assertion of "unwelcome" conduct.

Plaintiff's conduct during the work events underlying his claims similarly confirm the conduct was not unwelcome.  For example, in February 2015, while at a meeting in Las Vegas, Jenesis accompanied Plaintiff to his hotel room.  SOMF 11.  Plaintiff did not tell her not to come to his hotel room and even admits that, if he had told her not to come, he believes she would have listened.  SOMF 12.  Jenesis laid on the bed when they entered the room, and *Plaintiff moved from the couch to the bed* while Jenesis was still lying in the bed.  SOMF 13.  Plaintiff also never asked Jenesis to leave.  SOMF 14.  There was no physical contact or sexual overtures by either Plaintiff or Jenesis, and Plaintiff admitted he never voiced his objection to her presence or let her know that it was unwelcome.  SOMF 13-15.

The next time Plaintiff recalls seeing Jenesis was in April 2015.  SOMF 18.  Plaintiff allowed Jenesis to come to his apartment.  SOMF 19.  According to Plaintiff, he and Jenesis were sitting on the couch, watching a movie, when Jenesis went to the bathroom and emerged in her underwear.  SOMF 20.  Jenesis sat on the couch with Plaintiff, and he then asked her to put her clothes back on.  SOMF 21.  After a short period, Jenesis did so.  SOMF 21.  She never touched Plaintiff nor made any effort to force herself on Plaintiff.  SOMF 22.  Before Jenesis left, *Plaintiff asked Jenesis* if they "were cool."  SOMF 23.  She responded that they were.  *Id.*  In a text message exchanged later evening, Plaintiff again told Jenesis, "we are still friends and I've moved past it."

*Id.* Plaintiff did not report this incident to a supervisor, management or member of Human Resources at UT.  SOMF 24.

After this incident, Plaintiff engaged in and encouraged text messages and social interactions with Plaintiff (*see, e.g.,* SOMF 28 (response to "hump day" text)), solicited dinner and drinks with Jenesis during the RTP trip to North Carolina (SOMF 29), and actively planned travel with Jenesis to the two New York galas in November 2016 where he took multiple smiling photos with her, some on his own phone.  SOMF 45-50.  Days before his termination, Plaintiff was even still calling Jenesis "babe."  SOMF 25 and 28.

No reasonable jury could find Jenesis' alleged conduct was "unwelcome" even based on Plaintiff's own account.  The only "objection" Plaintiff ever voiced was his request that Plaintiff put her clothes back on in April 2015.  She obliged and nothing remotely close to this ever happened again. SOMF 21.  In fact, after that occurrence, Plaintiff continued to text Jenesis frequently using terms of endearment, initiating and engaging in social events in both his and her home outside of work, and playfully bantered with Jenesis about who was sexiest and where they might take a vacation together.  SOMF 25 and 28.  Their relationship continued as it had before, for the next 18 months.

Thus, despite Plaintiff's allegations that Jenesis' attempts to socialize with him – without making any sexual comments or advances – on later work trips constitute harassment, the undisputed evidence confirms that he presented himself as a willing participant in these interactions, often initiating the communications and never complaining or asking Jenesis to change her conduct.  Indeed, even a brief look at the pictures from the New York trip, confirms Plaintiff did not find Jenesis' conduct unwelcome.  Plaintiff's inability to establish "unwelcome conduct" is fatal to his claim.  Summary judgment should be entered in UT's favor.

**b.      There is no Evidence of Severe or Pervasive Harassment.**

Harassment is considered sufficiently severe or pervasive so as to alter the terms or conditions of the employment if a workplace is "permeated with discriminatory intimidation, ridicule, and insult." *Harris v. Forklift Sys.*, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks omitted).  A plaintiff asserting a hostile work environment claim "must clear a high bar in order to satisfy the severe or pervasive test." *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 176 (4th Cir. 2009) (internal quotation marks omitted).  "Such proof depends upon the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Bonds v. Leavitt*, 629 F.3d 369, 385 (4th Cir. 2011) (internal quotation marks omitted).

"[T]he test of workplace hostility is an objective one—a plaintiff must demonstrate that a reasonable employee in [his] shoes would perceive the employer's actions to be "objectively hostile." *Wedderburn v. Bd. of Educ. of Baltimore Cnty.*, No. 8:19-CV-00215-PX, 2022 WL 504511, at *13 (D. Md. Feb. 18, 2022) (citing *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 178 (4th Cir. 2001)); *see also Membreno v. Atlanta Rest. Partners*, LLC, 517 F. Supp. 3d 425, 437 (D. Md. 2021) ("[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'")

Plaintiff essentially seeks to convert a single incident – Jenesis in her bra and underwear in his apartment in April 2015 – to severe or pervasive harassment, by recasting their mutual and consensual friendship as Jenesis' unilateral effort to engage in a romantic relationship.

Plaintiff admits that Jenesis never touched him inappropriately and never attempted to force herself on him during any of alleged events.  SOMF 22.  Although Plaintiff suggests Jenesis expressed interest in a sexual relationship, Plaintiff cannot identify the substance, date or

23

circumstance of any such communication. Jenesis also was not Plaintiff's supervisor at any point in time and never threatened any aspect of Plaintiff's employment. There is no evidence that Plaintiff's interactions with Jenesis impacted his work or working conditions. Indeed, there is not a single allegation that relates to any allegedly inappropriate or unwanted interactions in the workplace.[12]

Moreover, the hundreds of text messages exchanged between Plaintiff and Jenesis evidencing Plaintiff's willing engagement in and frequent initiation of social interactions with Jenesis over several years, cannot be disputed by Plaintiff's belated efforts to self-servingly disavow their friendship. *Chughtai v. Kaiser Permanente*, No. CV PX-15-2963, 2018 WL 3049198, at *3 (D. Md. June 20, 2018) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("Where a party's statement of a fact is blatantly contradicted by the record, so that no reasonable jury could believe it, the Court will credit the record over the averred fact."). Despite Plaintiff's inexplicable refusal to expressly admit to this friendship in his deposition, his Charge of Discrimination plainly states that fact – "I became friends with the Owner's daughter, Jenesis…"  Pl. Dep. Exh. 6.

These text communications also confirm that the friendship included affectionate or flirtatious banter, even shortly after the alleged April 2015 incident in Plaintiff's apartment. SOMF 28. These amiable exchanges continued for the next 18 months and just three days before his termination, Plaintiff was still calling Jenesis "babe." *Id.* (DEF 1425). Plaintiff even took smiling pictures with Jenesis at these events about which he now complains, and *texted those pictures to Jenesis after the event.* SOMF 46; Pl. Dep. Exh. 1 (DEF 1424); Pl. Dep. Exh. 20. Plaintiff cannot

---

[12] Notwithstanding the, at best, attenuated relationship between these events and the alleged harassment, Plaintiff's unsupported speculation that Jenesis orchestrated Plaintiff's selection for the Digital Archivist role *to which he applied* (SOMF 38-40) or that Jenesis' missing laptop in 2015 (for which Plaintiff did not suffer any negative consequences) was somehow a scheme to target Plaintiff (SOMF 26-27) must be disregarded given the complete absence of evidentiary support for these conspiracy theories.

now assert Jenesis' efforts to socialize were part of a pattern of harassment when he solicited those social interactions.  SOMF 9; *see, e.g.,* Pl. Dep. Exh 1 (DEF 1390) (On September 17, 2015, Plaintiff invited Jenesis out to drinks followed by dinner at his place, stating, "We own this evening.  Just the 2 of us!  Drinks at Society? And I'll make dinner for my very good friend…?")

At best, Plaintiff's evidence demonstrates that Jenesis attempted to escalate their friendship in April 2015, Plaintiff declined but affirmed they "were cool" and "still friends" and, consistent with Plaintiff's representations, Jenesis attempted to spend time with Plaintiff on occasion, including at a handful of work events.

The lack of physical contact, the absence of threats, Jenesis' role as a co-worker and friend, the isolated nature of the April 2015 incident, Plaintiff's ongoing initiation of social interaction, and Plaintiff's failure to object to any of Jenesis' actions after April 2015, present a totality of circumstances that no reasonable jury could find meet the high bar of severe or pervasive harassment.  Summary judgment is appropriate.  *See, e.g., Bush v. Potter,* No. CIV.A. AW-06-959, 2009 WL 5177286, at *5 (D. Md. Dec. 21, 2009) ("[T]he Court finds that a single request for sex and two touches to the back of the leg over a three month period, although inappropriate, could not led a reasonable jury to conclude that Bush's allegations were sufficiently severe and pervasive.").

c.    **There Is No Basis to Impute Liability to UT.**

It is undisputed that Jenesis was not Plaintiff's supervisor.  Pl. Dep. 279:6-10 (*Q:  Do you contend in this case that Jenesis Rothblatt was your supervisor when you were the digital archivist?  A:  Oh, Jenesis wasn't my supervisor.  My supervisor was Robert Daye.*)[13]  When the

---

[13] Plaintiff's Amended Complaint alleges Jenesis was his supervisor and directed his work.  Am. Compl. ¶31, 55.  However, Plaintiff denied any such supervisory relationship.  Pl. Dep. 279:6-10.  To the extent Plaintiff seeks to recant his testimony and assert a supervisor relationship in his opposition, Defendants reserve the right to argue the applicability of the *Faragher-Ellerth* defense in reply.

alleged harasser "is the victim's co-worker, [rather than a supervisor,] the employer is liable only if it was negligent in controlling working conditions." *Zerfas v. Burwell*, No. PWG-14-2806, 2015 WL 3949372, at \*9 (D. Md. June 26, 2015) (citing *Vance v. Ball State Univ.*, 133 S.Ct. 2434, 2439, 186 L.Ed.2d 565 (2013)).   In those circumstances, "[s]exual harassment is imputable to an employer when the employer knew or should have known about the harassment and failed to take effective action to stop it." *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 255 (4th Cir. 2015).   A plaintiff may demonstrate knowledge by proving that either: 1) "specific complaints [were] directed" to the plaintiff's superiors; or 2) "that a reasonable [person] intent on complying with Title VII would have known about the harassment." *Lyle v. ESPN Zone*, 292 F. Supp. 2d 758, 764 (D. Md. 2003) (citation omitted).

UT has a strong policy against sexual harassment.   SOMF 4.   UT's policy makes clear that the company prohibits harassment, and provides a detailed complaint procedure stating employees "should…report" any conduct that may violate the policy.   *Id*.   UT also provides alternative reporting mechanisms through its Open Door policy and Ethics reporting hotline.   SOMF 5.   UT ensures that new employees, including Plaintiff, receive the Handbook, regularly distributes updated versions of the Handbook, and instructs that employees are responsible to review and be familiar with these policies.   SOMF 6.   UT investigates all incidents of potential harassment or discrimination that are reported and takes appropriate remedial action, as necessary.   SOMF 4.   UT also provides employees with sexual harassment training.   SOMF 7.[14]

Despite ample opportunity to bring any concerns related to Jenesis' conduct to UT's attention, Plaintiff chose never to do so.   Plaintiff admits that, in addition to failing to ask Jenesis

---

[14] The adoption, dissemination and reinforcement of these policies and reporting mechanisms belies any finding of "constructive knowledge" of the alleged harassment.   *See Ocheltree v. Scollon Productions, Inc.,* 335 F.3d 325, 334 (4th Cir. 2003).

to stop any alleged harassing behavior, he never reported any of these incidents to anyone at UT.[15] SOMF 15, 24, 51, 71, 77.  There are also no allegations that anyone else at UT personally observed any alleged harassing behavior.  The undisputed record evidence confirms UT did not have knowledge of the alleged harassment and, consequently, the alleged harassment cannot be imputed to UT.  *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015) ("a plaintiff seeking to impute liability to her employer for harassment by a co-worker may not be able to establish the employer's negligence if she did not report the harassment."); *Dortch v. Cellco P'ship*, 770 F. App'x 643, 646 (4th Cir. 2019) ("[A]s to Dortch's subordinate who possessed a book on Nazi Germany at his desk, Dortch concedes that she did not alert Verizon to her discovery of the book. Thus, Verizon was not on notice that it needed to correct any behavior. Accordingly, the district court correctly granted summary judgment on Dortch's hostile work environment claim."). Plaintiff's admitted failure to report the conduct confirms that UT is entitled to summary judgment on these grounds as well.

## II.    PLAINTIFF WAS FIRED FOR INSUBORDINATION, NOT AN ALLEGED REJECTION OF JENESIS (COUNT II)

"[T]o establish *quid pro quo* liability, a plaintiff must prove that a 'tangible employment action resulted from a refusal to submit to a supervisor's sexual demands.'" *Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 3d 398, 416 (D. Md. 2015) (quoting *Moser v. MCC Outdoor, L.L.C.*, 256 Fed. App'x 634, 642 (4th Cir .2007)).  "To prove a *prima facie* case of *quid pro quo* discrimination, a plaintiff must show five elements: membership in a protected group; unwelcome sexual harassment; sexual harassment based on sex; that her reaction to the harassment

---

[15] Indeed, even after Plaintiff was terminated and negotiating a sizable severance, he never raised any concerns regarding Jenesis' conduct, including in his communications with the UT CEO and General Counsel.  SOMF 76-77.  Rather, he reached out to Jenesis seeking assistance in getting his job back.  SOMF 25 (DEF1429).  This period of "negotiation" with the company – when there could be no fear of retaliation – would have been yet another opportunity for Plaintiff to raise concerns.  He chose not to.

affected 'tangible aspects of the employee's compensation, terms, conditions, or privileges of employment;' and that the employer knew or should have known of the harassment but took no remedial action." *Atkins v. Burwell,* No. CV JFM-15-2198, 2016 WL 4399304, at *6 (D. Md. Aug. 17, 2016) (citing *Okoli v. City Of Baltimore*, 648 F.3d 216, 222 (4th Cir. 2011) (internal citations omitted)).

With respect to the fourth element, the "acceptance or rejection of the harassment must be an express or implied condition to the receipt of a job benefit or cause of a tangible job detriment to create liability," and the plaintiff must have been otherwise qualified to receive the job benefit. *Id.* In other words, plaintiff must "provide evidence of 'a nexus or casual connection between the acceptance or rejection of the unwelcome sexual advances and the employment decision complained of.'" *Louis v. Sun Edison*, LLC, 797 F. Supp. 2d 691, 707 (D. Md. 2011) (citations omitted). "The circumstances surrounding the employment decision, including the close temporal proximity between the sexual advance and employment action or whether the harasser made or influenced the decision, should guide the court in its analysis of the fourth element." *Bush v. Potter,* No. CIV. AW-06-959, 2009 WL 5177286, at *7 (D. Md. Dec. 21, 2009) (citation omitted) (granting summary judgment on *quid pro quo* claim where termination occurred after plaintiff failed to appear for work on a regular basis); *Ecklund v. Fuisz Tech., Ltd.*, 905 F. Supp. 335, 339 (E.D. Va. 1995) ("[The alleged harasser] had no power to hire, fire, promote, or evaluate the plaintiff. Because [the alleged harasser] was not in a position to grant or withhold job benefits to the plaintiff, a *quid pro quo* harassment claim cannot be sustained.").

Plaintiff's *quid pro quo* claim is devoid of evidentiary support. It suffers the same infirmities as Plaintiff's hostile work environment claim, compelling the entry of summary judgment in favor of UT on Count II on those grounds alone. *See* Section I, *supra.* However,

Plaintiff's inability to establish the fourth element of his *quid pro quo* claim further confirms the propriety of summary judgment on this Count.

The only alleged "sexual advance" Plaintiff rebuffed occurred in April 2015. SOMF 18-24. Plaintiff was not terminated until January 2017, more than 18 months later. This time gap forecloses the requisite causal connection between these two events. *See Alexander v. Marriott Int'l, Inc.*, No. RWT 09CV2402, 2011 WL 1231029, at *9 (D. Md. Mar. 29, 2011) (citing *Bolin v. Oklahoma Conference of the United Methodist Church*, 397 F.Supp.2d 1293 (N.D. Okla. 2005) (no inference that termination causally connected to refusal to submit to supervisor's alleged sexual advances, where it occurred more than four months later)).

Moreover, Jenesis was not Plaintiff's supervisor and did not have any supervisory authority over him. SOMF 42. There is no evidence that Jenesis ever threatened Plaintiff with any employment action. SOMF 72-73. Indeed, the alleged incident took place in Plaintiff's apartment outside of working hours and, in April 2015, Jenesis and Plaintiff did not even work in the same department or location at UT. SOMF 18. Plaintiff cannot establish that there was any express or implied condition of employment associated with Jenesis' alleged overtures in April 2015 that resulted in Plaintiff's termination 18 months later. *See Wang v. Metro. Life Ins. Co*., 334 F. Supp. 2d 853, 866 (D. Md. 2004) (granting summary judgment and finding "[the plaintiff] has failed to establish any connection between her rejection of [the alleged harasser]'s sexual overtures and her termination. Plaintiff does not contend that [the alleged harasser] ever actually threatened to take "tangible employment actions" against her for rebuffing his sexual overtures….The fact that Plaintiff was terminated, standing alone, does not demonstrate a tangible *quid pro quo* action. The termination occurred nine months after Plaintiff's last encounter with [the alleged harasser].").

There is also no record evidence that Jenesis had any ability to or did influence the 2017 termination decision. Rather, it is undisputed that Jenesis did not have any role in Plaintiff's

29

selection for the Digital Archivist position or in the later decision to eliminate the position and terminate Plaintiff's employment.  SOMF 32, 42, 70.  Martine and Daye made the challenged employment decisions.  SOMF 64-66.  And they were unaware of the relationship between Plaintiff and Jenesis, and certainly unaware of any alleged request for and rejection of a romantic relationship.  SOMF 67.  Daye and Friedrich communicated the termination decision to Plaintiff. SOMF 66.  None of the individuals involved in the termination even communicated with Jenesis regarding these decisions, undermining Plaintiff's speculation regarding Jenesis' influence.  *See* SOMF 64-70.

There is simply no evidence connecting Plaintiff's termination to the rejection of an alleged sexual advance 18 months earlier.  Summary judgment should be entered in favor of UT on Count II.  *See Atkins v. Burwell*, No. CV JFM-15-2198, 2016 WL 4399304, at *6 (D. Md. Aug. 17, 2016) (granting summary judgment for failure to establish fourth element of *quid pro quo* harassment where plaintiff "proffers no credible evidence that her 2013 non-selection was in any way related to her decision to turn down [the alleged harasser]'s alleged sexual advances.").

## III.   PLAINTIFF WAS FIRED FOR INSUBORDINATION, NOT BECAUSE HE IS A MAN (COUNT III)

"[T]he elements of a prima facie case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Maryland Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).  Where a plaintiff, at the close of discovery, is unable to find a comparable situation in which a person outside the protected class was treated differently, "it [is] impossible to raise an inference of impermissible discriminatory conduct on the part of the [employer] under McDonnell Douglas." *Byrd v. The Baltimore Sun Co.* 279 F. Supp.2d 662, 669 (D. Md. 2003).  Plaintiff's testimony on this claim permits summary disposition:

91812059v.1

Q       So going on to Count 3, "Sex Discrimination."  Paragraph 83 says, "Defendant, by and through its agents and supervisors, unlawfully terminated Plaintiff because of his sex." And your sex is male, correct?

A       Correct.

Q       Do you believe you were terminated because of you are a male?

A       I believe I was terminated because of my sex in violation of Title VII with respect to sexual harassment and discharge.  That's what I believe.

Q       Okay.  Were you aware of any female employees at UT who engaged in insubordination who were not terminated?

A       I'm not aware of any.

Q       Were -- did you experience any negative or derogatory comments about your sex from Martine or anyone else involved in your termination?

A       Did I what?

Q       Experience any negative or derogatory comments or jokes about men or about -- or about males in general?

A       No, I didn't.

Pl. Dep. 677:16-678:18.

Plaintiff admits he cannot identify any similarly situated individuals outside of his protected class who received more favorable treatment and that he cannot identify any negative or derogatory comments about his sex by anyone involved in the termination decision.  There is also no evidence that anyone outside of his protected class "replaced" Plaintiff following the position elimination. Decl. of R. Daye at ¶ 29; Decl. of M. Rothblatt ¶ 14; Decl. of A. Friedrich ¶ 25. Plaintiff's recitation of conclusory allegations of discrimination cannot salvage his claim in the admitted absence of supporting evidence.  Summary judgment should be entered in favor of UT on Count III.  *See Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 135 (4th Cir. 2002) (affirming summary judgment where plaintiff was "unable to demonstrate that [defendant] treated similarly situated employees outside his class more favorably").

31

IV.    **PLAINTIFF'S CHARGE DOES NOT MENTION AIDING AND ABETTING, AND THERE WAS NOTHING TO AID OR ABET (COUNTS IV-VI)**

a.    **Plaintiff Failed to Exhaust Administrative Remedies.**

Under § 20-801 of the Maryland Code (State Gov. Article), a person may not, "(1) aid, abet, incite, compel, or coerce any person to commit a discriminatory act; or (2) attempt, directly or indirectly, alone or in concert with others, to commit a discriminatory act…" However, in order to bring a private action for "aiding and abetting" under § 20-801, the employee must have, "(1)… initially filed a timely administrative charge or a complaint under federal, State, or local law alleging an unlawful employment practice by the respondent; (2) at least 180 days have elapsed since the filing of the administrative charge or complaint; and (3) the civil action is filed within 2 years after the alleged unlawful employment practice occurred." *Id*. at § 20-1013.  *See also Cuffee v. Verizon Commc'ns, Inc.*, 755 F. Supp. 2d 672, 678 (D. Md. 2010) (holding that FEPA requires administrative exhaustion prior to filing civil suit); *Barnes v. ISG Sparrows Point, LLC*, No. BPG-10-2492, 2011 WL 4596058, at *4 n. 10 (D. Md. Sept. 30, 2011) ("The administrative exhaustion requirements in Title 20 mirror those under Title VII.").

Satisfaction of exhaustion prerequisites as to a corporate defendant is not sufficient to exhaust claims as to any individual employee.  *See Raiford v. Maryland Dep't of Juvenile Servs*., No. CIV.A. DKC 12-3795, 2014 WL 4269076, at *8 n. 9 (D. Md. Aug. 28, 2014) (ADA claim) (citing *Vaeth v. Mayor and City Council of Balt. City*, Civ. No. WDQ–11–0182, 2011 WL 4711904, at *3 (D. Md. Oct. 4, 2011) ("individual defendants are not subject to personal liability when an EEOC charge names only the City of Baltimore as the respondent"); *Tuttle v. Anuvia Prevention & Recovery,* No. 3:13-cv-134, 2013 WL 3899666, at *3 (W.D.N.C. July 29, 2013) ("[T]he fact that some of the Defendants may have had knowledge of Plaintiff's EEOC charge against the company does not put them on notice that they could be personally liable for the alleged

violations. Therefore, Plaintiff's [ ] ADA claim[ ][is] also dismissed for lack of subject matter jurisdiction due to her failure to exhaust her administrative remedies with respect to the individual Defendants.").

Here, Plaintiff failed to name any individual respondent in his charge of discrimination, and thus impermissibly seeks to assert statutory FEPA claims against Martine, Jenesis, Daye and Oyewole as individual defendants.  SOMF 78.  Counts IV-VII must be dismissed as a matter of law on these grounds alone.  *See Davis v. BBR Mgmt., LLC,* No. CIV.A. DKC 10-0552, 2011 WL 337342, at *5 (D. Md. Jan. 31, 2011) (plaintiff failed to exhaust administrative remedies as to individual defendants where not name in charge).

### b.      There is No Evidence Supporting Aiding and Abetting.

"FEPA imposes liability on 'a person' for that person's participation in the discriminatory acts of another person." *Walters v. Chimes D.C., Inc*., No. 253, Sept. Term, 2021, 2022 WL 17974610, at *16 (Md. Ct. Spec. App. Dec. 28, 2022) (citing *Dici v. Commonwealth of Pa.*, 91 F.3d 542, 552-53 (3d Cir. 1996) (interpreting a provision of Pennsylvania law similar to State Government § 20-801).  Consequently, Plaintiff's inability to survive summary judgment on his harassment claims requires summary judgment in favor of the Individual Defendants on Counts IV-VII as well.  *See id.* ("Because we agree with the circuit court that Ms. Walters failed to prove that Chimes violated FEPA, however, the individual appellees cannot have aided or abetted Chimes.")

Beyond that, Plaintiff must provide evidence against each Individual Defendant that "relate[s] to the individual supporting discriminatory acts of another, such as the individual's employer, as opposed to direct incidents of discrimination by the individual." *Id.* (citing *Dici,* 91 F.3d 542, 552-53 (3d Cir. 1996) (interpreting provision of Pennsylvania law similar to State Government § 20-801).  Plaintiff's individual claim against Jenesis must fail as he alleges only

direct harassment by Jenesis as the basis for his claims against UT.  This cannot sustain a separate aiding and abetting claim against Jenesis.

Plaintiff similarly fails to assert any evidence of conduct by Martine, Daye or Oyewole that was intended to assist Jenesis in her alleged harassment of Plaintiff.  As a threshold matter, there is no evidence that Martine, Daye or Oyewole had knowledge of the conduct that Plaintiff alleges was harassing, foreclosing the possibility that any action by these individuals was motivated by an intent to aid that alleged harassment.  SOMF 77.  Beyond that, Plaintiff does not identify any examples of this alleged "aiding and abetting" alleged harassment.  To the extent Plaintiff seeks to rely on alleged "coercion" to take the Digital Archivist position in July 2016, his claim fails not only for want of evidence of "coercion" to take a position for which he was "excited" to apply (SOMF 34, 39), but also because Plaintiff fails to identify any alleged harassment assisted or aided by his position as the Digital Archivist.  Indeed, the vast majority of Plaintiff's allegations in this case occurred before he accepted the Digital Archivist role effective August 1, 2016.  SOMF 41.

Plaintiff's failure to provide evidence to support claims against Martine, Daye and Oywole, requires the entry of summary judgment in their favor.  *See Walters*, 2022 WL 17974610 at *16 (summary judgment granted where plaintiff provided no evidence that individuals assisted or intended to assist in discrimination).

## CONCLUSION

Plaintiff cannot convert his friendship with Jenesis into a viable sexual harassment claim.

He willingly and for a long period of time engaged in and, by all accounts, enjoyed their friendship.  The single alleged proposition, which supposedly occurred at his home where Jenesis was a guest, was declined without issue and cannot be considered severe or pervasive harassment.  Likewise, there is no evidence to support the assertion Plaintiff was fired for declining that advance 18 months earlier, particularly in light of the compelling fact there is no evidence any decision

91812059v.1

maker knew anything about that interaction and the fact that Plaintiff disobeyed a specific instruction from his supervisor.  Summary judgment should be granted on all claims as to all Defendants.

Date:   February 3, 2023                    Respectfully Submitted,


                                            /s/ Eric J. Janson
                                            Raymond C. Baldwin
                                            rbaldwin@seyfarth.com
                                            Eric J. Janson
                                            ejanson@seyfarth.com
                                            Christine M. Costantino
                                            ccostantino@seyfarth.com
                                            SEYFARTH SHAW LLP
                                            975 F Street, NW
                                            Washington, D.C. 20004
                                            (202) 463-2400 (telephone)

35