## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARK EKE,                                                     *

     Plaintiff,

  v.                                         Civil Action No. 8:18-cv-2941-PX
                                                              *
UNITED THERAPEUTICS, *et al.*,

     Defendants.                               *

                                        ***

### <u>MEMORANDUM OPINION</u>

Plaintiff Mark Eke brings this workplace discrimination case against his former employer, United Therapeutics ("UT"), and several UT employees.  Eke alleges that he endured two years of unwanted sexual advances from Defendant Jenesis Rothblatt ("Jenesis"), the daughter of UT's Chief Executive Officer, Defendant Martine Rothblatt ("Martine").  Eke also alleges that he was terminated because he resisted Jenesis' advances, and that several other UT employees—including Martine and Eke's former supervisors, Defendants Robert Daye and Shola Oyewole—aided and abetted Jenesis' harassment and discrimination.

After several years of discovery across two bifurcated phases, dispositive motions are now ready for the Court's resolution.  Pending are Defendants' motions for sanctions (ECF No. 155) and for summary judgment (ECF No. 165).  The issues are fully briefed, and no hearing is necessary.  *See* D. Md. Loc. R. 105.6.  For the following reasons, the Court GRANTS the motion for summary judgment and DENIES the motion for sanctions.

I. **Background**[1]

A. **Facts**

UT hired Eke to work as the Lead Systems Administrator in its Information Technology ("IT") department in May 2013.  ECF No. 165-3 at 12–13.  Eke covered the IT help desk for all UT employees, including Martine Rothblatt.  *Id.* at 13–14, 170.  Eke reported to Chief Information Officer Shola Oyewole, who led the IT department.  ECF No. 165-5 at 2.

When Eke started at UT, he received UT's "Employee Handbook," which included a "Sexual Harassment and Other Discriminatory Harassment Policy."  ECF No. 165-6 at 2–3; 18–19.  This Policy made clear that UT strictly prohibited "unwelcome sexual flirtations, advances, propositions, insinuations, or physical conduct."  *Id.* at 18.  It also set out the procedure for reporting prohibited harassment.  *Id.* at 19.

Eke developed a relationship with Martine's daughter, Jenesis, who also worked at UT.  ECF Nos. 165-3 at 13; 165-4 at 56.  In late 2013, the two exchanged unremarkable texts about weekend plans and season's greetings.  ECF No. 165-4 at 56–58.  Jenesis began to call Eke "hun" and Eke invited Jenesis out for a New Year's drink.  *Id.* at 58–62.  A few days later, they exchanged texts about potential evening plans, but no evidence suggests that they saw each other.  *Id.* at 63.

On April 10, 2014, Eke texted Jenesis, "Haven't seen that pretty smile in a while."  *Id.* at 63–64.  Jenesis responded, "Hey hun—I was actually thinking the same about you today.  Where have you been hiding?"  *Id.* at 64.  They each exchanged a few more texts about how busy their

---

[1] Except where otherwise noted, the facts related below are undisputed and construed most favorably to Eke as the non-movant.  *See The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010); *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 364 n.3 (D. Md. 2011).

respective work weeks had been.  *Id.*  This appears to be the only text communication between the two for the rest of the 2014 year.

In February 2015, Eke and Jenesis attended the Lung Biotech Sales Meeting in Las Vegas.  ECF No. 163-3 at 118.  They spent part of an evening at the hotel casino along with Jenesis' friend, Texas.  *Id.* at 30–31.  As Eke was leaving the casino to return to his room, Texas asked Eke why he "wouldn't give Jenesis a chance," to which Eke laughed.  *Id.* at 30.  Eke interpreted this as sexual in nature because earlier that day, Eke had overheard Texas comment to Jenesis about the size of Eke's penis.  *Id.* at 32–33.  As the three walked upstairs, Jenesis followed Eke to his hotel room.  *Id.* at 35–36.  Once inside the room, the two talked, with Eke sitting on the couch and Jenesis on the bed.  *Id.* at 36–37.  Eventually, Eke, fully clothed, laid down next to Jenesis on the other side of the bed and went to sleep, and Jenesis eventually left. *Id.* at 37.

Two months later, in April 2015, Jenesis visited Eke at his apartment.  *Id.* at 47–48. Jenesis, who lived in Los Angeles at the time, had been staying with her parents while she was in Maryland.  *Id.*  That night, she had invited herself to Eke's apartment to wait for her parents to get home.  *Id.*  Shortly after arriving, Jenesis went to the bathroom and emerged wearing only her underwear.  *Id.* at 52–53.  Eke immediately said, "Jenesis, please," and emphasized that he didn't "want to be messing around where I work."  *Id.* at 54.  Jenesis responded, "Well, no one has to know.  If you're not telling, I'm not telling."  *Id.*  Eke then asked Jenesis to put her clothes back on.  *Id.*  Jenesis instead sat down next to Eke and asked if she was making him "nervous."  *Id.* at 55.  Eke repeated that he wanted Jenesis to get dressed, which she eventually did.  *Id.*  Jenesis asked why Eke did not find her attractive, to which he responded that because he worked for Martine, he did not want to have such a relationship with her daughter.  *Id.*

Jenesis eventually readied to leave, and Eke asked her if they were "still cool." *Id.* at

129.  Jenesis responded, "Yes, we are." *Id.*  According to Eke, Jenesis texted him later that night

saying that she "lied when she said we're still cool" and that she had "never been humiliated like

this in her life." *Id.* at 129.  But unlike their earlier text exchanges, these text messages are not

part of the record.

A few weeks later, Jenesis called Eke's work phone and told him that her laptop had been

stolen from her office. *Id.* at 68.  Eke next discovered that a laptop from the IT stock had been

placed on Jenesis' desk as a supposed replacement for the stolen laptop. *Id.*  The Montgomery

County Police Department interviewed Eke about the theft. *Id.* at 69.  Eke was never charged

with any offense and the UT chief security officer assured him that he was not under

investigation. *Id.* at 69, 136, 139.  Nonetheless, Eke interpreted this incident as a "power

dynamic" orchestrated by Jenesis. *Id.* at 139.

As of May 2015, Eke and Jenesis were texting frequently and socializing outside of work.

ECF No. 165-4 at 2.  On May 5, Jenesis texted Eke, "I know you thought I forgot cooking for

you," followed by a smiley face emoji. *Id.*  Eke responded, "Lol.  You don't have to sweetie.

Are you coming over though?" *Id.*  In hundreds of text messages exchanged over the next

several months, Eke continued to refer to Jenesis as "sweetie" and "hun," and the two made

frequent plans to socialize at each other's apartments. *See, e.g.*, *id.* at 4 (Eke texting "Happy

Birthday Sweetie!" on May 19); 9 (Eke texting, on September 17, "We own this evening. Just

the 2 of us Drinks at society? And I'll make dinner for my very good friend").  Jenesis initiated

many of these text conversations, and at times expressed frustration that Eke was not more

interested in spending time with her. *See, e.g.*, *id.* at 5 (Jenesis texting, on May 27, "I wanted to

see you but I guess the feeling wasn't mutual."); 7 (Jenesis texting, on June 26, "why bother

asking if I'm gonna be here all week if you don't want to see me?").  Eke, though, also started

his share of text exchanges, some of them notably flirtatious.  *See, e.g.*, *id.* at 12 (Eke texting, on

October 27, "Who's the sexiest of them all?!").

Eke also testified that sometime in 2015, during an in-person conversation, Jenesis told

him that she was going to Texas "to get dick from some guy she knows in Texas because I

wouldn't give her no dick."  ECF Nos. 171-3 at 12.  Eke also testified that Jenesis made a

comment at one point about his "moving into her home."  *Id.*

As 2016 rolled around, Eke and Jenesis' communications became overtly sexual at times.

On February 3, 2016, Jenesis texted Eke a meme with the text, "Fuck Humpday! I want to know

when 'Fuck me so hard I can't walk' day is," to which Eke responded, "Hahahahaha. That day is

'Everyday'!"  ECF No. 165-4 at 18; 171-5.  Although this text is the most sexually explicit,

Jenesis and Eke consistently refer to each other as "sweetie" and make social plans.  *See, e.g.*, *id.*

at 18 (Eke texting Jenesis, "no complaints sweetie" on February 18).  Eke and Jenesis also spent

time together at the hotel bar during an April 2016 work-related trip.  *Id.* at 20–21; ECF No. 165-

3 at 83–84.  But Jenesis did not ask Eke for sex or otherwise do anything "inappropriate" during

that trip.  ECF No. 165-3 at 84–85.

A few weeks later, on April 21, 2016, Eke texted Robert Daye, Martine's executive

assistant, that he would "love to be considered" for a position as an "IT engineer" in the Office

of the Chairperson ("OOC").  ECF No. 165-4 at 89.  Jenesis and Martine worked in the OOC.

ECF No. 171-6.  Daye responded that Eke would be at the "top of my list with high

recommendations" if a spot opened up.  ECF No. 165-4 at 89.

Although the OOC had no available IT positions, a newly created position of Digital

Archivist remained unfilled.  ECF No. 165-9 at 2–3.  The Digital Archivist would be responsible

for archiving UT's online and offline content, tracking and maintaining Martine's biographical data, and creating and maintaining Wikipedia pages for Martine and UT.  *Id.*  For several months, UT tried to find an outside candidate to fill the position.  *Id.*  When the search proved unsuccessful, Daye and Human Resources Senior Vice President, Alyssa Friedrich, asked Eke if he would be interested in applying.  *Id.*; ECF No. 165-6 at 4.  According to Friedrich, Martine viewed Eke's work positively, and Eke believed Martine wanted him to apply for the position.  *See* ECF Nos. 165-6 at 5; 171-2 at 32.

Eke consulted Oyewole, who discouraged the move.  Oyewole advised that the position would not advance Eke's IT career and implied that Eke would "end up being an assistant" like Daye.  ECF No. 171-2 at 36.  Eke also testified that Jenesis had asked him "multiple times" to apply, but Eke told her that he was disinclined because it would not advance his IT career.  ECF No. 171-3 at 8.  Jenesis urged that UT could include in the job description more technical responsibilities.  *Id.*  According to Eke, the job description was changed shortly after this conversation.  *Id.* at 8, 35.  Jenesis denies having any role in creating the Digital Archivist position or altering the job description.  ECF No. 165-7 at 2; *see also* ECF No. 165-6 at 4 (Friedrich denying any role for Jenesis in the hiring process).

On June 17, 2016, Eke texted Oyewole and told him that he had spoken to Daye and Jenesis, who had both encouraged him to apply.  ECF No. 171-7.  Oyewole responded, "Since everyone's talking about it, I can't weigh in anymore.  Do what you feel is best for your career!!" *Id.*  On June 18, Eke texted Jenesis that he needed to "draft a cover letter and put in my application."  ECF No. 165-4 at 23.  Daye emailed Eke on June 20 and asked if he had given the position "more thought," to which Eke responded that he had applied for the position and was "exciting [sic] to interview and discuss further."  ECF No. 165-9 at 12.

6

Daye next interviewed Eke for the position.  ECF No. 165-3 at 86 ("The only person that interviewed me was Robert Daye.").  On June 26, Jenesis texted Eke, "How did it go," to which Eke responded, "Just left.  It went well.  Fingers crossed. Will wait to hear from Alyssa now." ECF No. 165-4 at 25.  On July 7, Jenesis asked Eke whether he had finished "Martine's wiki project," telling him not to "delay."  *Id.*  Three days later, she followed up to say, "I haven't seen the changes on wiki," and emphasized, "I don't want to regret putting in a good word for you so please don't ignore."  *Id.* at 26.  Eke responded that he had updated the article, expressing confusion that she had not seen the changes.  *Id.*

On July 25, 2016, Eke was offered, and accepted, the Digital Archivist position.  ECF No. 165-6 at 63.  The offer letter specified that Eke would report directly to Robert Daye.  From this, Eke understood that Daye was his boss.  *Id.*; *see also* ECF Nos. 165-3 at 90 ("Jenesis wasn't my supervisor.  My supervisor was Robert Daye."); 165-7 at 2–3.

After Eke became the Digital Archivist, he and Jenesis still continued to exchange frequent text messages and socialize regularly.  On August 28, Eke texted Jenesis that he had "shrimp and grits from Georgia Brown's here if you need dinner."  ECF No. 165-4 at 29.  Eke also suggested, in a series of texts on October 27, that they should go on "one of these all inclusive beach vacations" together.  *Id.* at 38.

In September, Eke drove Jenesis to several medical appointments.  On September 16, Jenesis told Eke that she was in "serious pain" and that there was "something wrong with [her] back," to which Eke immediately responded, "Send me the address and I come pick you up."  *Id.* at 31.  Four days later, after Jenesis texted Eke that she "can't move," Eke responded that he would take her to the clinic.  *Id.* at 32.  Three days after that, Jenesis again asked for help getting to the hospital.  *Id.*  Eke noted that he would need to "try to get in touch with Robert [Daye]" to

get permission to leave work, to which Jenesis responded that Daye "told me already he didn't mind if I needed you," but that she would text him to confirm that Eke could leave work.  *Id.*  Eke responded, "Yes please.  Can't just leave without his notice.  He won't be happy at all.  I'll head out to you soon."  *Id.*  According to Eke, Daye called to inform Eke that he could take Jenesis to the hospital, and that Eke should consider any requests from Jenesis to have Daye's approval.  ECF No. 171-3 at 31.

Later that fall, Eke received invitations to attend two different galas with Martine, Jenesis, and other members of the OOC.  Jenesis invited Eke and two other UT colleagues to attend the FIRST Robotics Gala in New York on November 3, 2016.  ECF No. 165-3 at 90–91.  Eke and Jenesis made plans to take the train to New York together, and Eke sent Jenesis the details for his New York hotel.  ECF No. 165-4 at 35–36.  The two also took photos together in the lobby of the hotel.  ECF Nos. 165-3 at 91; 165-4 at 94.  Jenesis did not make any sexual advances toward Eke while at the FIRST Robotics Gala.  ECF No. 165-3 at 95.

On November 16, Eke attended the Billie Jean King Leadership Initiative Gala in New York, along with Jenesis, Martine, and Daye.  ECF Nos. 165-3 at 95; 171-2 at 51–53.  Three days before the gala, Jenesis texted Eke that she was going to book the Ravel hotel, to which Eke initially replied, "Okay, I'll book Ravel."  ECF No. 165-4 at 42.  Later that day, Eke texted Jenesis that Daye had given him permission to book the Conrad Hotel because it was closer to the venue.  *Id.*  Jenesis responded that Ravel was only $140 per night and that she was not going to change her hotel, but Eke should do what he preferred.  *Id.*  According to Eke, Daye next directed him to book the same hotel as Jenesis, and he followed Daye's directive.  ECF No. 171-2 at 51.

8

At the gala, before dinner was served, Jenesis told Eke that she was leaving.  *Id.* at 52.
Eke responded that he would stay for dinner.  *Id.*  According to Eke, Daye directed that he had to
"leave when Jenesis leaves."  *Id.* at 53.  Eke and Jenesis then went back to their hotel, where they
met up with Jenesis' friend.  *Id.*  Jenesis told Eke that Martine and her wife would be joining
them after the gala.  *Id.*  Eke called a friend to join them at the hotel so that he would "feel more
comfortable."  *Id.*  The group "hung out" both on the rooftop of the hotel and in Jenesis' room,
before Eke and his friend eventually left.  *Id.* at 53, 57.  Eke testified that Jenesis did not make
any sexual advances that night.  ECF No. 165-3 at 105.

 Through the end of that year, Eke and Jenesis only exchanged a few text messages which
were cordial and brief.  ECF No. 165-4 at 43–44.  Although Eke asserts that Jenesis called and
texted him several times to come to his home, no records support this contention.  ECF No. 165-
3 at 145.

In December 2016, Eke requested from Daye on several occasions to take personal time
off ("PTO").  ECF No. 165-9 at 4–5, 17.  Daye generally granted PTO requests for Eke and
others, but he also made clear that Eke was expected to be in the office when Martine was there.
*Id.* at 4–5, 20.  Predictably, Daye denied Eke's specific request to take off January 4 through
January 6, 2017, because Martine was holding a Town Hall meeting on January 4 that Eke was
expected to attend.  *Id.*  Daye also reminded the staff, including Eke, that their presence in the
office was required when Martine was there.  *Id.* at 22.

Despite this, Eke left the office early on January 4 to go to New York, and he attended
the Town Hall meeting remotely.  *Id.* at 6, 20.  When Daye texted Eke to ask why he was not at
the meeting, Eke informed him that he "had to leave the office for an emergency."  *Id.*  Eke
testified that the emergency was unexpected.  ECF No. 165-3 at 156–57.  He also testified that he

thought that he could join the Town Hall meeting remotely, as many UT employees did.  ECF No. 171-3 at 23–24.  Daye informed Eke that this was an issue to be addressed with Human Resources.  ECF No. 165-9 at 6.

After the Town Hall meeting, Martine decided to eliminate the Digital Archivist position, citing a lack of business need for the position.  *Id.*  Daye agreed with Martine and noted that Eke had recently ignored Daye's directive to be on site for the Town Hall meeting.  *Id.* at 6–7.  Daye also reported to Martine that Eke's recent work product was lackluster.  *Id.* at 6, 14–15.  This confirmed for Martine her decision to eliminate the position and fire Eke.  ECF No. 165-8 at 4.  Jenesis played no part in those discussions or in Martine's decision.  *Id.*; ECF No. 165-9 at 7.

Later that day, Friedrich and Daye told Eke that UT was eliminating his position.  ECF Nos. 165-6 at 6; 165-9 at 7.  Friedrich, in turn, asked Oyewole about any potential position in IT for Eke.  Oyewole responded that no such position was available.  ECF No. 165-6 at 66.

Eke immediately emailed Martine, pleading with her to reconsider.  ECF No. 165-4 at 102–104.  He acknowledged in the email his recent lack of productivity at UT, explaining that his focus was on preparing for graduate school exams.  *Id.* at 102 ("I tried to be very dedicated to my job, and lately all I have had time for is my GRE STUDIES for UNC admission.").  He also apologized for being "disrespectful" and explained that he had missed the Town Hall meeting to assist his brother with an immigration issue.  *Id.* at 103.  Last, he told Martine, "I understand the archivist position is no longer beneficial to UT so I have no negative thoughts or feelings about the decision."  *Id.* at 102.  Eke also texted Jenesis asking for her help to keep his job.  *See, e.g.*, ECF No. 165-4 at 45–46 ("please I can DO ANYTHING to keep my job at UT.  Please Jenesis, my only hope is in you now.").

On January 5, Eke again sent an email to Martine, agreeing his "skill set is not required at UT any longer." ECF No. 165-4 at 105.  He also asked her for money to help him "offset some debt."  *Id.*  Eke sent a similar email to Friedrich about receiving certain benefits such as payment for unpaid PTO and school tuition.  ECF No. 165-10 at 64.  Friedrich responded that UT would pay Eke for some of these benefits, and that UT was willing to move his official termination date to January 12 to accommodate Eke's January 11 citizenship interview.  *Id.* at 64–65.

Friedrich also sent Eke a Separation Agreement for him to sign.  ECF No. 165-10 at 26.  Under the Separation Agreement, Eke would receive over $30,000 in severance payments, and Eke would agree to waive "claims and causes of action of any kind" against UT.  *Id.* at 32–33.  At no point did Eke raise or report any allegations of harassment to anyone in management.  ECF No. 165-3 at 130–31.  Nor is there any evidence that Martine knew about his relationship with Jenesis.[2]  Eke's last official day at UT was January 12, 2017.  ECF No. 165-10 at 65.

### B.  Procedural History

On August 10, 2017, Eke complained to the Equal Employment Opportunity Commission ("EEOC") that Jenesis had sexually harassed him.  ECF No. 165-4 at 80–87.  After 180 days, Eke requested a right to sue letter.  *Id.* at 80.  Eke was told he needed to submit a Form 5 Charge of Discrimination to receive his right to sue letter.  ECF No. 29-1 at 3.  He did so, and next received his letter on July 18, 2018.  *Id.*; ECF No. 165-4 at 88.

On September 21, 2018, Eke filed his original complaint in this Court.  ECF No. 1.  Defendants moved to dismiss the claims, which the Court granted in part and denied in part at a motions hearing held on July 10, 2019.  ECF Nos. 10 & 34.  Eke subsequently amended the

---

[2] Although Eke testified that Martine once told someone else in the office that "[w]e need to find Jenesis a Nigerian husband," Eke admits he did not hear Martine make the comment directly, and so it amounts to inadmissible hearsay.  *See* ECF Nos. 171-3 at 34; 155-7 at 60.  Nor does this comment, if truly made, alone support the inference that Martine knew of her daughter's relationship with Eke.

Complaint, which UT answered.  ECF Nos. 35 & 36.  In the Amended Complaint, Eke brings

claims against UT under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

("Title VII") and the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't §

20-601, *et seq.* ("MFEPA"), for hostile work environment, quid pro quo sexual harassment, and

sexual discrimination.  ECF No. 35.  Eke also sues Jenesis, Oyewole, Martine, and Daye for

aiding and abetting discrimination in violation of the MFEPA.

At Defendants' request, the Court bifurcated discovery.  The first phase involved

discovery and briefing on the affirmative defense that the Separation Agreement barred this

lawsuit.  ECF No. 43.  The Court ultimately concluded that Eke had generated sufficient

evidence of having entered the agreement under duress, precluding summary judgment in

Defendants' favor.  ECF Nos. 59 & 75.

The second phase involved discovery on Eke's harassment and discrimination claims.

The Court referred the case to Magistrate Judge Gina Simms for discovery and scheduling.

Discovery disputes escalated after Eke's counsel withdrew in October 2021.  Judge Simms held

*five* case management conferences, for four of which Eke represented himself.  *See* ECF Nos. 93,

103, 114, 129, 132.  Many disputes centered around Eke's failure to provide complete answers to

interrogatories and requests for production, particularly regarding his requests for damages.  *See,*

*e.g.*, ECF Nos. 109 & 123.  Judge Simms ultimately ordered Eke to sit for a second deposition

because the answers in his first were woefully lacking, and warned Eke that his continued failure

to comply with his discovery obligations could result in sanctions.  ECF Nos. 126; 130 at 5.

Eke's second deposition did not go much better.  Eke refused to answer questions about

his claimed damages, prompting counsel for Defendants to request an emergency conference

with Judge Simms.  ECF No. 155-6.  Although it appears as if Eke did not fully understand what

12

was meant by damages, he was resolute at the time that he was not "claiming any damages." *See id.* at 13.  He also seemed to take great umbrage at his prior counsel's damages discussions during failed settlement negotiations.  *See id.* at 9, 12.  Because Eke essentially withdrew any claims of actual damages, Judge Simms declined to sanction him, but invited Defendants to pursue whatever relief they deemed appropriate.  *Id.* at 14, 19.

Defendants responded by moving to strike the damages clause in the Amended Complaint and deny the claims as moot.  ECF No. 142.  Eke, in turn, reversed course, and now asserted that he did not intend to disclaim damages.  ECF No. 145.  At a hearing on November 21, 2022, at which Eke was represented by new counsel, this Court denied Defendants' motion, concluding that Eke's claims were not moot because he could still seek nominal damages.  ECF Nos. 150 & 151.  However, the Court also acknowledged Defendants' difficulty in obtaining certain discovery, and invited Defendants to file a motion for sanctions alongside its summary judgment motion.  *Id.*  Thereafter, Eke attempted to supplement his answers and responses so as to resurrect the damages question.  ECF No. 155-10.  But in the end, Eke never provided any additional record evidence.

On December 21, 2022, Defendants moved for sanctions under Federal Rules of Civil Procedure 37 and 41(b).  ECF No. 155.  Defendants primarily ask that the Court dismiss the Amended Complaint with prejudice.  *Id.* at 8.  In the alternative, Defendants ask that Eke be judicially estopped from seeking any damages, and they seek attorneys' fees related to their sanctions motion and previous discovery disputes.  *Id.* at 36.  Defendants also moved for summary judgment on all claims.  ECF No. 165.[3]  For the following reasons, the Court grants summary judgment in Defendants' favor on all claims and denies the motion for sanctions.

---

[3] Eke also requested two extensions of time to respond to the summary judgment motion, which are unopposed and thus the Court will grant *nunc pro tunc*.  ECF Nos. 168 & 169

## II.   Motion for Summary Judgment

### A.  Standard of Review

Summary judgment is appropriate when the Court, construing all evidence and drawing all reasonable inferences in the light most favorable to the non-moving party, finds that no genuine dispute exists as to any material fact, thereby entitling the movant to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011).  Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)) (alteration in original).  Genuine disputes of material fact are not created "through mere speculation or the building of one inference upon another."  *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

### B.  Analysis

#### 1.  Hostile Work Environment

The Court first considers Eke's hostile work environment claim brought pursuant to Title VII and MFEPA.[4]  ECF No. 35 ¶ 74.  To survive summary judgment, Eke must adduce some evidence that he was subjected to (1) unwelcome conduct; (2) based on his sex; (3) that was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (4)

---

[4] The Court analyzes the Title VII and MFEPA claims together, as MFEPA claims are judged "under the same standards as Title VII."  *Crockett v. SRA Int'l*, 943 F. Supp. 2d 565, 574 n. 5 (D. Md. 2013).

that such misconduct is imputable to the employer.  *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 174–75 (4th Cir. 2009).

UT contends that no reasonable jury could find Jenesis' conduct constituted severe and pervasive harassment, nor that her conduct is imputable to UT.  ECF No. 165-2 at 25–26.  The Court agrees.  The record undoubtedly reflects that for some time, Jenesis and Eke had a consensual intimate relationship.  But Eke recounts only one occasion when he rebuffed Jenesis' advances—in April of 2015 when she emerged from his bathroom in her underwear.  ECF No. 165-3 at 52–55.  Otherwise, the two maintained a close friendship which, at least sometimes, included sexualized banter.  ECF No. 165-4 at 12, 18; 171-5.  This course of conduct, construed most favorably to Eke, does not amount to the kind of severe and pervasive *unwelcome* sexual advances necessary to sustain the claim.  *See E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) ("[P]laintiffs must clear a high bar in order to satisfy the severe or pervasive test."); *cf. Bruce v. Fair Collections & Outsourcing, Inc.*, No. CCB-13-3200, 2014 WL 3052477, at *3 (D. Md. June 30, 2014) (four incidents of unwelcome touching in four months "was not so extreme" as to pass the severe and pervasive test).

Moreover, no evidence suggests that Eke's relationship with Jenesis had actually interfered with the terms and conditions of his employment.  Before Eke became the Digital Archivist, he consistently received stellar performance reviews and awards for his work.  ECF No. 165-3 at 141; *see also Butts v. Encore Mktg. Int'l*, No. PJM-10-3244, 2012 WL 3257595, at *4 (D. Md. Aug. 7, 2012) (dismissing hostile work environment claim where plaintiff failed to show that the harassment "interfered with his work performance").  After he became the Digital Archivist, no evidence suggests that his relationship with Jenesis impacted his working conditions at all.  And as to his termination, nothing reflects that Jenesis played any part in

Martine's decision to fire Eke.  ECF Nos. 165-8 at 4; 165-9 at 7.  There is simply no evidence that links Eke's relationship with Jenesis to any adverse change in his working conditions.

Eke nonetheless surmises that the incident involving Jenesis' stolen laptop was essentially retaliatory because he had rejected her sexual advances.  ECF No. 165-3 at 139.  But no evidence supports his rank speculation.  Likewise, Eke suggests that Jenesis had some hand in his receiving the Digital Archivist job so he could work more closely with her.  ECF No. 171-3 at 35.  On this point, the Court is hard pressed to see how—even if true—Eke's receipt of a new position that he *wanted* could sustain a sexual harassment claim.  Sure, Jenesis encouraged Eke to apply, as did Daye and Friedrich; and others, like Oyewole, urged Eke to consider carefully whether the position aligned with his larger career path.  But in the end, Eke *chose to apply* and was happy to receive the opportunity to work in the OOC.  *See* ECF Nos. 165-4 at 89; 165-9 at 12.  Nothing suggests that this garden variety career dilemma had anything to do with unwelcome sexual overtures on Jenesis' part.  And no evidence suggests that a reasonable employee in Eke's position would have experienced the situation as Eke did.  *See Cent. Wholesalers*, 573 F.3d at 175 (Plaintiff must show that "a reasonable person would perceive…the environment to be abusive or hostile.").

In the alternative, Eke's hostile work environment claim must fail because no evidence allows a factfinder to impute any purported harassment to UT.  Because Jenesis was Eke's coworker, not his supervisor, UT does not automatically assume liability for Jenesis' misconduct.  *Cf. Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013) (An employee is a supervisor, for whose conduct the employer may be held vicariously liable, "only when the employer has empowered that employee to take tangible employment actions against the victim.").  Although Eke admits as much, *see* ECF Nos. 165-3 at 90 ("Jenesis wasn't my

supervisor.  My supervisor was Robert Daye."), he claims that UT remains responsible because Jenesis was his "de facto" supervisor, ECF No. 171-1 at 18.

This semantic sleight of hand is not supportable.  No evidence reflects that Jenesis had any role in Eke's work as a Digital Archivist in OOC.  *Cf.* ECF Nos. 165-6 at 4; 165-7 at 2.  Nor does her familial relationship with Martine alone support, as Eke suggests, that Jenesis wielded some indirect supervisory power over him.  To be sure, Daye urged Eke to stay by Jenesis' side, and authorized that Eke assist her when needed.  ECF No. 171-1 at 18.  But Jenesis' "favored status" does not transform her into Eke's supervisor for purposes of imputing liability to UT.  *See Zerfas v. Burwell*, No. PWG-14-2806, 2015 WL 3949372, at *11 (D. Md. June 26, 2015) (rejecting contention that a co-worker was a supervisor merely because they had "favored status" with the boss, as otherwise "any employee whose input is respected" would be a supervisor).

Alternatively, to the extent Eke pursues liability against UT for failing to stop one coworker's sexual harassment of another, no evidence supports that UT "knew or should have known about the harassment and failed to take effective action to stop it."  *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 498 (4th Cir. 2015) (quoting *Sunbelt Rentals*, 521 F.3d at 319).  UT clearly maintained an established sexual harassment policy that allowed employees to report such abuse.  ECF No. 165-6 at 18–19.  Eke knew about the policy, but at no point availed himself of it; never did he report that he had been the victim of sexual harassment.  *Id.* at 2–3, 18–19, 53; ECF No. 165-3 at 130–31.  Nor can Eke's claimed fear of reprisal excuse his "duty…to alert the employer to the allegedly hostile environment."  *Nana-Akua Takyiwaa Shalom v. Payless Shoesource Worldwide, Inc.*, 921 F. Supp. 2d 470, 483 (D. Md. 2013) (quoting *Thomas v. BET Soundstage Rest.,* 104 F. Supp. 2d 558, 568 (D. Md. 2000)).

Accordingly, even if Jenesis' conduct amounted to severe and pervasive harassment (which it does not), no reasonable juror could impute such conduct to UT.

In sum, Eke has generated no evidence from which a rational factfinder could conclude that he had been subjected to severe and pervasive harassment, or that Jenesis' supposed harassing conduct was imputable to UT.  Thus, the Court must grant summary judgment to UT on the hostile work environment claim.

### 2. Quid Pro Quo Sexual Harassment

Eke next advances a slightly different liability theory—that he had been the victim of quid pro quo sexual harassment, having been fired only because he rejected Jenesis' sexual advances.  ECF No. 35 ¶ 77.  A quid pro quo sexual harassment claim is subject to the well-established burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Lewis v. Forest Pharms., Inc.*, 217 F. Supp. 2d 638, 646–47 (D. Md. 2002).  To withstand challenge, a plaintiff must first make a prima facie showing that (1) he was subject to unwelcome sexual harassment; (2) his reaction to the harassment affected tangible aspects of the terms and conditions of employment; and (3) the employer knew or should have known of the harassment and failed to take remedial action.  *See id.*; *Pitter v. Cmty. Imaging Partners, Inc.*, 735 F. Supp. 2d 379, 390 (D. Md. 2010).  If plaintiff makes this showing, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment action.  *Lewis*, 217 F. Supp. 2d at 647.  The burden then shifts back to the plaintiff to show that the proffered explanation is mere pretext for discrimination.  *Id.*

Because no rational factfinder could conclude UT knew or should have known of Jenesis' allegedly harassing conduct, the claim fails on this ground alone.  Alternatively, no evidence supports that Jenesis or anyone else at UT conditioned his continued employment on the "acceptance of the harassment or sexual favors."  *Williams v. Silver Spring Volunteer Fire Dep't*,

18

86 F. Supp. 3d 398, 417 (D. Md. 2015) (quoting *Temple v. Benjamin,* No. 01-720, 2001 WL 826576, at *5 (D. Md. July 19, 2001)).  At best, the record reflects that Eke and Jenesis' relationship was like many workplace romances: on again, off again, sometimes a matter of convenience, and sometimes coincident with work functions.  But nothing supports the inference that Eke was expected to provide sexual favors if he wanted to stay in good standing at work. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753–54 (1998).

Nor does any evidence suggest that Eke was terminated because he resisted Jenesis' advances.  *See Wang v. Metro. Life Ins. Co.*, 334 F. Supp. 2d 853, 866 (D. Md. 2004).  The mere fact that Eke was terminated, "standing alone, does not demonstrate a tangible *quid pro quo* action."  *Id.*  And the singular time that Eke rebuffed Jenesis—when she emerged from his bathroom wearing only her underwear—took place nearly two years before he had been fired. ECF No. 165-3 at 52–55.  Because no evidence supports any connection between Eke's rejection of Jenesis and his termination, the claim on this theory fails.

Last, even if Eke could somehow make the prima facie case, he has generated no evidence to rebut Defendants' stated grounds for terminating him.  Where, as here, Defendants put forward legitimate bases for terminating the plaintiff, the plaintiff must in turn point to something that shows the stated reasons were pretextual; that is, the reasons were either "inconsistent over time, false, or based on mistakes of fact," *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019), or "unworthy of credence," *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

Viewing the record most favorably to Eke, no rational factfinder could conclude that UT's stated reasons amount to pretext.  Indeed, Eke agreed with Martine that his productivity lagged before he was fired, and that he disobeyed Daye's direct order to stay on site for the

Town Hall meeting.  *See* ECF Nos. 165-4 at 102; 165-8 at 4; 165-9 at 6–7.  Eke also agreed that "the archivist position is no longer beneficial to UT."  ECF No. 165-4 at 102.  By contrast, nothing supports that UT wavered in these reasons for firing Eke.  Eke's after-the-fact arguments cannot erase his contemporaneous acknowledgement that such grounds were sound and well supported.

Eke responds that his historically good evaluations from the IT department could lead a fact finder to deem UTs stated grounds "unworthy of credence."  ECF No. 171-1 at 21.  Sure, Eke performed well when he worked for Oyewole.  ECF No. 165-3 at 141.  But he received no such rave reviews as the Digital Archivist.  Rather, his performance suffered, and the needs of the company changed.  ECF Nos. 165-9 at 4, 14–15; 165-4 at 102.  Positive evaluations from a different time in a different position do not shake these uncontroverted facts.  Thus, summary judgment is granted in Defendants' favor on the quid pro quo sexual harassment claim.

### 3. Discrimination

The Court turns to Eke's last substantive claim—that his termination amounts to unlawful sexual discrimination in violation of Title VII.  ECF No. 35 ¶ 83.  The claim is subject to the same *McDonnell Douglas* burden-shifting framework previously articulated.  *See Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011).  Eke, however, makes no argument in response to Defendants' summary judgment motion.  Thus, the Court concludes that he has abandoned the claim.  *See Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010); *Mentsch v. E. Sav. Bank*, 949 F. Supp. 1236, 1247 (D. Md. 1997).  Perhaps this is because Eke recognizes that no evidence whatsoever supports the inference that he was terminated because of his sex.

As best the Court can discern, Eke pleaded the discrimination claim as he did for harassment: that he was fired because he rejected Jenesis' sexual advances.  But as already

20

discussed, that liability theory plainly fails.  No other evidence supports that Eke was terminated

because he is a man.  Nor has Eke adduced any facts to undermine UT's stated reasons for firing

him.  Thus, the Court grants summary judgment in Defendants' favor on this claim.[5]

### III.    Motion for Sanctions

Defendants separately urge the Court to find that Eke's persistent refusal to comply with

his discovery obligations warrants dismissing the Amended Complaint.  ECF No. 155.  In the

alternative, Defendants request that Eke be judicially estopped from seeking any damages in this

case, and they seek attorneys' fees related to this motion and all previous discovery disputes.  *Id.*

at 36.  Because the Court grants summary judgment in Defendants' favor, the requests for

dismissal and judicial estoppel are moot.  On the propriety of making Eke pay their attorneys'

fees, Defendants offer no argument.  *Id.*

A Court may order appropriate sanctions, including attorneys' fees, if "a party, after

being properly served with interrogatories under Rule 33 or a request for inspection under Rule

34, fails to serve its answers, objections, or written response."  Fed. R. Civ. P. 37(d).  *Id.*  In

determining the propriety of sanctions under Rule 37, the court considers four nonexclusive

factors: "(1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that

noncompliance caused the adversary, (3) the need for deterrence of the particular sort of

noncompliance, and (4) whether less drastic sanctions would have been effective."  *Belk v.

Charlotte–Mecklenburg Bd. of Educ.*, 269 F.3d 305, 348 (4th Cir. 2001).  Whether to grant

sanctions under Rule 37 remains a matter within the "wide discretion" of the trial court.  *Mut.

Fed. Sav. and Loan Ass'n v. Richards & Assocs., Inc.*, 872 F.2d 88, 92 (4th Cir. 1989).

---

[5] Because the substantive discrimination claim fails, so too does Eke's derivative "aiding and abetting" theory as to
the individual Defendants.  ECF No. 35 ¶¶ 85–96; *cf. Walters v. Chimes D.C., Inc.*, No. 253, 2022 WL 17974610, at
*16 (App. Ct. Md. Dec. 28, 2022).

Although Eke failed to fulfill his written obligations and dodged deposition questions, ECF Nos. 123 & 130, the Court cannot conclude he did so in bad faith.  Eke proceeded pro se during the worst of the discovery battles, and it is not clear that he fully understood his discovery obligations or the implications of failing to meet them.  ECF No. 155-6 at 9–13.  Although pro se litigants do not escape a bad faith finding purely because they represent themselves, *see Ballard v. Carlson*, 882 F.2d 93, 96 (4th Cir. 1989), Eke's demonstrated confusion is plain.

Second, this same lack of understanding undercuts any deterrent effect that fee shifting customarily provides.  Third, the prejudice arising from Eke's unsatisfactory compliance with discovery has been blunted by the Court's grant of summary judgment in Defendants' favor.  This, combined with Defendants' lack of any rationale for their attorneys' fee request, counsels against shifting fees.

Accordingly, while the Court appreciates the difficulties that Eke brought about in this litigation, Defendants secured final judgment in their favor, and Eke has borne his own expense of litigating his case to conclusion.  *Cf. Ericksen v. Kaplan Higher Educ.*, No. RDB-14-3106, 2016 WL 7374455, at *3 (D. Md. Dec. 20, 2016) (noting that the Court should be "cognizant of the financial burden imposed upon the pro se plaintiff to pay even a reduced amount of defendants' attorney's fees").  Thus, the Court denies the motion for sanctions.

IV.     **Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment is granted and their motion for sanctions is denied.  A separate Order follows.


8/16/2023                                                        /S/
Date                                                    Paula Xinis
                                                        United States District Judge


22